UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSHUA ADAM SCHULTE,

                Plaintiff,

-v-

UNITED STATES OF AMERICA,

                Defendant.

21-CV-4042 (JMF)

**Amended Complaint**

    Plaintiff Joshua Adam Schulte, through counsel, submits this Amended Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure and the Court's order of February 22, 2023. Mr. Schulte alleges as follows:

### NATURE OF THE ACTION

    1.    Defendant, the United States of America, and its constituent part, the Federal Bureau of Prisons ("BOP"), owes a duty of care to the inmates housed in its facilities. That duty requires the government to meet detained peoples' basic needs, including heat, the conditions required for sleep, non-toxic air, sanitation, adequate food, and medical care. The BOP repeatedly failed to meet its basic obligations to Mr. Joshua Adam Schulte, Plaintiff, during his confinement at the Metropolitan Correctional Center ("MCC") in New York City.

    2.    Mr. Schulte suffered physical and emotional injuries resulting from Defendant's negligence. He grew ill after he was left to spend the night in a cell flooded with putrid sewage from the cell toilet. He lived through two winters without adequate heat, wearing every item of clothing he possessed to protect against the extremely low temperatures. He suffered sleep deprivation due to constant bright lighting above his head and noise from BOP Officials outside

his door. He was denied physical exercise for weeks at a time. He struggled to breathe as a result of the air in his cell being variously filled with pepper spray, laundry particles, and mold, which covered the cells in which he was housed.

3. These are not the conditions of confinement required in a civilized society.

4. As a result of the BOP's negligent failure to adequately mitigate these inhumane conditions, Mr. Schulte's physical health has deteriorated. Manifestations and symptoms of this deterioration have included muscle atrophy, breathing problems, sleep deprivation, increasingly frequent and severe migraines, illness with COVID-19, and intestinal issues. Mr. Schulte has also suffered emotional distress as a result of the BOP's negligent failure to maintain adequate living conditions.

5. The BOP's negligent acts and omissions were not discretionary decisions about prison policy, and instead represent an unlawful disregard for the health and well-being of Mr. Schulte which resulted in both physical and emotional injury.

6. The BOP should be held accountable for its negligent acts and omissions causing injury to Mr. Schulte.

## JURISDICTION AND VENUE

7. This is a civil action seeking monetary relief for the negligence of the United States and its constituent part and instrumentality, the BOP, toward Mr. Schulte, brought pursuant to 28 U.S.C. § 2674. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1346(b)(1).

8. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2), 1402(b), as the events giving rise to this action occurred at the MCC in New York County, New York, located within the Southern District of New York.

## PARTIES

9. Plaintiff, Joshua Adam Schulte, was detained in the 10 South unit of the now-shuttered MCC from October 2018 until October 2021. He is currently detained at the Metropolitan Detention Center ("MDC").

10. Defendant, the United States of America, and its constituent part and instrumentality, the BOP, operated the MCC during the relevant time period. The BOP was responsible for overseeing and implementing all operations and procedures at the MCC.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Mr. Schulte has exhausted all administrative remedies prior to filing this civil complaint. Mr. Schulte originally filed grievances to the MCC in December of 2018, but the MCC did not timely respond to the grievances. Mr. Schulte then appealed those grievances to the Northeast Regional Office, which were denied for failure to file at the institutional level. Mr. Schulte subsequently appealed to the Central Office and was similarly denied. Mr. Schulte filed administrative remedies in 2019, 2020, and 2021, many of which were ignored and none of which were successful. After properly exhausting his administrative remedies, Mr. Schulte now seeks redress through the courts.

## STATEMENT OF THE FACTS

12. On or around October 2018, the BOP removed Mr. Schulte from the general population at the MCC and placed him in the MCC's 10 South unit, the facility's most restrictive unit. This action followed the Department of Justice's issuance of Special Administrative Measures ("SAMs") applicable to Mr. Schulte.

13. Mr. Schulte was detained in 10 South from October 2018 until October 2021.

14. The MCC is in downtown Manhattan, adjacent to the federal courthouses. It was closed in the late fall of 2021 due to frequent and severe plumbing, electrical, heating, cooling, and ventilation issues, among other dysfunctions.

15. During his detention in 10 South, Mr. Schulte was isolated in one of the unit's six cells for 23 hours a day. He was restricted to no-contact visitation with his criminal counsel and no-contact, monitored visitation with his parents. 10 South inmates were rotated from one cell to another every three weeks.

16. All visitors had to agree not to pass on any information from Mr. Schulte to third parties, and he had no communication of any sort with any other people except for ordinary mail service, which was limited, monitored, and unreliable.

## I. EXPOSURE TO PUTRID SEWAGE

17. The cells in 10 South faced chronic plumbing problems.

18. Between October 2018 and June 2021, Mr. Schulte experienced regular water and sewage leaks, lack of water pressure in the sink and shower, lack of hot water, inability to control the temperature of the water, and other plumbing failures.

19. There was little regulation of water temperature. Mr. Schulte burned his skin when the water was too hot and had no choice but to wash with freezing water at other times.

20. Between his arrival at 10 South in October 2018 and October 30, 2020, Mr. Schulte experienced incidents of putrid sewage flooding his cell on three separate occasions in 10 South. Two of those incidents occurred in Cell #4. On each of those prior occasions, Mr. Schulte was moved to a different cell a couple hours after the flooding began.

21. On or around October 30, 2020, Mr. Schulte returned to his cell (Cell #4) from the recreation room at approximately 5:00 PM and took a shower.

22. When he finished his shower, Mr. Schulte noticed putrid sewage leaking from the cell toilet, which was spreading across the cell floor. Mr. Schulte informed the Lieutenant on duty—a Lieutenant Mr. Schulte had not seen before—that his cell was flooding with sewage from the toilet. He asked to be moved to a different cell and explained to the Lieutenant that sewage flooding was a common problem in 10 South.

23. The Lieutenant told Mr. Schulte he would address the issue. The Lieutenant never returned or followed up with Mr. Schulte. Several inches of sewage had accumulated to cover the cell floor. The sewage began to leak under the cell door and into the hallway. A Corrections Officer began continuously mopping outside Cell #4 to stem the flow of the sewage into the hallway.

24. At approximately 8:30 PM, a second Lieutenant approached Mr. Schulte's cell, covering his nose and asking the Corrections Officer, "what's that smell?" Mr. Schulte explained the situation to the second Lieutenant. The Lieutenant told Mr. Schulte they would move him to a different cell. On information and belief, there was an empty cell (Cell #1) in 10 South on the night of October 30, 2020.

25. The second Lieutenant did not return to Mr. Schulte's cell again until approximately 12:00 AM. Between approximately 8:30 PM and 12:00 AM, Mr. Schulte repeatedly communicated with the Corrections Officer mopping outside his cell door. Mr. Schulte repeatedly told the Corrections Officer that the flooding was intensifying and that he had begun to feel physically sick.

26. The Corrections Officer told Mr. Schulte repeatedly that he had called the Lieutenant and told him Mr. Schulte needed to be moved. At approximately 12:00 AM, the second Lieutenant returned to Mr. Schulte's cell and informed him that it was "too late" to move him to a

different cell.  The Lieutenant said they would move him in the morning.  At approximately 2:00 AM, Mr. Schulte began to vomit and experience diarrhea.  Unable to use the malfunctioning toilet inside his cell, Mr. Schulte was forced to use the shower drain to vomit and relieve himself.

27. At approximately 3:00 AM, a Corrections Officer passed Mr. Schulte's cell, and Mr. Schulte informed the Officer that he had started vomiting.  He requested medical attention.  The second Lieutenant never returned to Mr. Schulte's cell.  At approximately 7:30 AM on the morning of October 31, 2020, a third Lieutenant passed Mr. Schulte's cell during the breakfast distribution.  Mr. Schulte recounted the night's events to the third Lieutenant.  Mr. Schulte told him he could not and would not eat until he was moved to a different cell.

28. On information and belief, the third Lieutenant had Mr. Schulte moved to Cell #1 around 9:30 AM.  Mr. Schulte experienced intestinal illness for days following this incident.

## II. EXPOSURE TO EXTREME TEMPERATURES

29. During two of the three winters Mr. Schulte spent in 10 South, the heating system did not work for long periods of time.  Cold air blew out of the vents.  Mr. Schulte could not hold a book in his hands to read without losing feeling in his fingers.  On one occasion a cup of water froze inside his cell.  When he told the BOP official on duty that water had frozen inside his cell, the official insisted to Mr. Schulte that the temperature in the cell was 75 degrees Fahrenheit.

30. Mr. Schulte frequently wore three layers of clothing to try to keep warm.  He could not remove these layers of clothing without trembling.  His appendages routinely went numb within minutes of exposure to the air inside the cell.  The 10 South BOP officials wore thick jackets and gloves during their shifts to keep themselves warm.  They did not supply Mr. Schulte with winter clothing so that he could do the same.

31. During the summer months, Mr. Schulte was exposed to high temperatures without access to air conditioning.  Between the weeks of July 4th and the Summer Solstice, no air

conditioning cooled the cells. Poor air quality in the cells contributed to the oppressive effects of the heat. Mr. Schulte would remove all his clothes and press against the cement walls of the cells to attempt to cool down. During the summer months, the 10 South cell temperatures were often sufficiently high to prevent Mr. Schulte from sleeping.

32. During summer and winter months, Mr. Schulte developed debilitating migraine headaches approximately once each week. The headaches caused severe pain and limited or prevented him from engaging in any activities. He was forced to remain prone with his eyes shut.

### III. SLEEP DEPRIVATION

33. At all relevant times, the fluorescent light fixtures directly above the beds in the 10 South cells were illuminated twenty-four hours a day. The lights were approximately 30 inches long. The positioning and brightness of the light inside the cells prevented Mr. Schulte's ability to sleep.

34. During his detention in 10 South, Mr. Schulte was rotated every three weeks to a different cell in the unit. Rotation through the six cells in the unit encompassed a period of 18 weeks. BOP officials working the night shift would engage in continuously loud activities and conversations at the staff station immediately adjacent to Cell #1. As Mr. Schulte was moved into cells closer to this staff station, it would become increasingly difficult to sleep.

35. For example, Mr. Schulte was unable to sleep for more than an hour for each night of the three-week rotations he spent in Cell #1, due to a combination of the noise made by the guards on duty throughout the night, the twenty-four-hour florescent light coming from a roughly two-foot-long fixture directly above his bed and, depending upon the time of year, the extreme temperatures inside the cell.

36. During repeated, multi-week periods of sleep deprivation in cells close to the staff station, Mr. Schulte experienced migraines, each lasting ten to twelve hours, which increased in frequency to approximately twice a week during his Cell # 1 rotations.

## IV. EXPOSURE TO TOXIC AIR

37. On information and belief, beginning in October 2018, BOP officials in 10 South indefinitely blocked the windows in Mr. Schulte's cell, preventing outside air—as well as natural light—from entering his cell.

38. On information and belief, at all relevant times, clearly visible brown, yellow, and black mold covered the ceilings and walls of all six cells in 10 South. The mold grew most vigorously on the materials used to block the cell windows. The mold was especially prevalent in the several cells with continuous water leaks. Mr. Schulte regularly spent three weeks at a time in these cells, which measured approximately six-by-twelve feet.

39. Mr. Schulte observed and inhaled the mold in the 10 South cells from October 2018 until June 2021. On information and belief, at all relevant times, the MCC ventilation system circulated air into 10 South from the SHU unit on the 9th floor. Any use of pepper spray in the 9th floor SHU unit resulted in pepper spray particles circulating into the 10 South cells. On these occasions, Mr. Schulte struggled to breathe.

40. On information and belief, at all relevant times, air from the laundry unit was also circulated into 10 South. Mr. Schulte regularly observed orange lint particles coating surfaces inside the 10 South cells. He could not avoid inhaling the particles and would struggle to breathe.

41. Mr. Schulte looked forward to leaving his cell for the recreation room, where a cracked window permitted detainees to inhale fresh outside air if they put their faces close to the opening. In or around March 2020, BOP officials moved the MCC general population detainees

infected with COVID-19 to the SHU. Within days of this move, all detainees in 10 South, including Mr. Schulte, contracted COVID-19.

42. Mr. Schulte's exposure to the air in 10 South caused him to develop respiratory issues, which have precluded him from engaging in the kinds and degree of physical exercise to which he was previously accustomed.

## V. PROHIBITION OF OUTDOOR RECREATION AND LIMITATION ON INDOOR RECREATION

43. While housed in general population at the MCC, Mr. Schulte would play basketball or engage in other cardiovascular exercise daily or almost daily. From October 2018 to June 2021, Mr. Schulte was not permitted outdoor recreation and had only limited access to indoor recreation. At times, Mr. Schulte would be denied even indoor recreation for three to six weeks at a time.

44. The indoor recreation room in 10 South was too small to run or walk around in, and inmates used it to watch television, further limiting space for physical exercise. The two pieces of exercise equipment in the room were made entirely of metal and were painful to use.

45. Mr. Schulte developed hemorrhoids during this period of involuntary inactivity. The hemorrhoids lasted for 18 months and made it painful for Mr. Schulte to sit or sleep. Mr. Schulte was eventually provided medication to treat the condition, but was given no medication to account for his pain. After informing medical staff of the hemorrhoids, the doctor and medical staff told Mr. Schulte that hemorrhoids were common among inmates in 10 South who had little access to physical activity.

46. Mr. Schulte has pre-existing heart issues which can be mitigated by consistent exercise. When he was unable to exercise in 10 South, Mr. Schulte experienced increasingly frequent and acute heart palpitations and migraines. Mr. Schulte developed acute ankle pain that

prevented him from even attempting to run. Mr. Schulte also continues to experience muscle atrophy and persistent throbbing in his legs and arms.

## CAUSES OF ACTION

47. Mr. Schulte hereby realleges and incorporates by reference paragraphs 1–46.

48. Mr. Schulte is entitled to damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), consistent with the Act's provision that a person has a remedy under the FTCA when a federal actor breaches the duty of care established by a private tort law analogue in the jurisdiction where the wrong occurred. In this case, New York State law provides a remedy for a person in private analogue for the tort claims alleged under the FTCA.

## FIRST CAUSE OF ACTION

(Damages for Negligence for Confinement in Cell Flooded with Sewage)

49. Mr. Schulte repeats and incorporates by reference paragraphs 1–46.

50. Mr. Schulte was left in a cell flooded with putrid sewage several inches deep for over fourteen hours, even as Cell #1 remained empty nearby.

51. The BOP was aware of the repulsive and unsafe conditions inside Mr. Schulte's cell. This type of plumbing dysfunction had occurred before and a process for moving a 10 South inmate in the event of such dysfunction existed. No BOP official acted to mitigate the situation, even after multiple BOP officials became aware of the worsening sewage leak, and even after Mr. Schulte repeatedly called for help and medical attention.

52. At all relevant times pursuant to this Amended Complaint, the BOP had a duty to exercise ordinary care to Mr. Schulte.

53. The BOP failed to uphold this duty to Mr. Schulte when it failed to move him from the sewage-flooded cell for over fourteen hours, which resulted in Mr. Schulte's developing acute intestinal distress. Multiple BOP officials' failure to remove Mr. Schulte from a sewage-flooded

cell, even after he began to vomit and experience diarrhea, demonstrated a disregard for his safety and health and was a result of the BOP's negligent acts and omissions.

54. The actions of the BOP represent an impermissible deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as operators of the MCC.

55. At all relevant times pursuant to this Amended Complaint, BOP employees were acting within the scope of their employment by the BOP, a constituent part of the United States.

56. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

57. The BOP's negligence resulted in Mr. Schulte's physical illness including vomiting, diarrhea, intestinal illness, headache, and emotional distress.

## SECOND CAUSE OF ACTION

(Damages For Negligent Exposure to Extreme Temperatures)

58. Mr. Schulte repeats and incorporates by reference paragraphs 1–46.

59. Mr. Schulte was forced to endure entire winter seasons in the MCC's 10 South without working heat. During the winter, temperatures inside the cells were extremely cold, often freezing or near-freezing. BOP staff would complete their shifts dressed in their winter coats. Standing water inside Mr. Schulte's cell froze. During the summer, a complete lack of air-conditioning and ventilation resulted in cell temperatures so high that Mr. Schulte could not sleep and experienced an increase in migraines. These conditions were compounded by related deteriorations in other conditions of confinement, including intermittent lack of access to recreation and the plumbing, air quality, and electrical issues.

60. The BOP was aware of these conditions, which also affected BOP officials working inside the 10 South unit during the relevant time period.

11

61. At all relevant times pursuant to this Amended Complaint, the BOP had a duty to exercise ordinary care to Mr. Schulte.

62. At all relevant times pursuant to this Amended Complaint, the BOP repeatedly and enduringly failed to uphold this duty to Mr. Schulte, resulting in inhumane and dangerous living conditions that caused Mr. Schulte to live for months in extreme temperatures without relief. The failure to mitigate this excessive risk to health and safety was the result of the BOP's negligent acts and omissions and demonstrated a complete disregard for Mr. Schulte's basic human needs.

63. The actions of the BOP represent an impermissible deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as operators of the MCC.

64. At all relevant times pursuant to this Amended Complaint, BOP employees were acting within the scope of their employment by the BOP, a constituent part of the United States.

65. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

66. Because of the BOP's unlawful conduct, Mr. Schulte has suffered compounding and multifaceted physical injury in the form of increasingly frequent and acute migraines, loss of sleep, dehydration, muscle atrophy, and hemorrhoids.

### THIRD CAUSE OF ACTION

(Damages For Negligent Deprivation of Sleep)

67. Mr. Schulte repeats and incorporates by reference paragraphs 1–46.

68. The BOP negligently caused Mr. Schulte to endure weeks at a time of less than one hour of sleep each night, due to the twenty-four-seven bright fluorescent light directly above the cell beds and constant noise created immediately next to the first cell on the unit by BOP staff during night shifts.

69. The BOP was aware of these conditions, which Mr. Schulte repeatedly reported and communicated to BOP officials, and which were open and obvious throughout the 10 South unit.

70. At all relevant times pursuant to this Amended Complaint, the BOP had a duty to exercise ordinary care to Mr. Schulte.

71. At all relevant times pursuant to this Amended Complaint, the BOP failed to uphold this duty to Mr. Schulte, resulting in inhumane and dangerous living conditions. The failure to mitigate these physically and psychologically dangerous conditions resulting in multi-week periods of near-total sleep deprivation demonstrated a complete disregard for the humanity and suffering of Mr. Schulte and was a result of the BOP's negligent acts and omissions.

72. The actions of the BOP represent an impermissible deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as operators of the MCC and given the fact that Mr. Schulte's chronic insomnia and migraine conditions were known to the BOP prior to his arrival at 10 South.

73. At all relevant times pursuant to this Amended Complaint, BOP employees were acting within the scope of their employment by the BOP, a constituent part of the United States.

74. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

75. Because of the BOP's negligent conduct, Mr. Schulte has suffered physical injury in the form of sleep deprivation, increasingly frequent and severe migraines, and emotional and psychological distress.

**FOURTH CAUSE OF ACTION**

(Damages For Negligent Prohibition of Exercise)

76. Mr. Schulte repeats and incorporates by reference paragraphs 1–46.

77. From approximately October 2018 to June 2021, Mr. Schulte was prohibited from engaging in any outdoor recreation and severely limited in his indoor recreation. As a result, Mr. Schulte was deprived of access to adequate exercise and involuntarily forced into inactivity.

78. At all relevant times pursuant to this Amended Complaint, the BOP was aware that Mr. Schulte was being denied recreation and suffering physical deterioration as a result. The BOP was aware of Mr. Schulte's pre-existing health issues that could be, and ultimately were, exacerbated by lack of exercise.

79. At all relevant times pursuant to this Amended Complaint, the BOP had a duty to exercise ordinary care to Mr. Schulte.

80. At all relevant times pursuant to this Amended Complaint, the BOP failed to exercise its duty of ordinary care to Mr. Schulte when it negligently denied him access to adequate recreation, resulting in Mr. Schulte's physical deterioration.

81. The actions of the BOP represent an impermissible deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as operators of the MCC.

82. At all relevant times pursuant to this Amended Complaint, BOP employees were acting within the scope of their employment by the BOP, a constituent part of the United States.

83. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

84. Because of the BOP's negligence, Mr. Schulte has suffered physical injury including muscle atrophy, hemorrhoids, increasingly frequent and severe migraines, and emotional and psychological distress.

## FIFTH CAUSE OF ACTION

(Damages For Negligent Exposure to Dangerous Air Quality)

85.     Mr. Schulte repeats and incorporates by reference paragraphs 1–46.

86.     Mr. Schulte was continuously caused to breathe airborne mold spores, emanating from the copious black, brown, and yellow mold growing on the ceiling, walls, and window coverings of all of 10 South's cells.  These conditions were compounded by pepper spray particles, the COVID-19 virus, and orange lint particles from the laundry, which were recirculated into 10 South from other floors of the MCC.  All of these conditions, alone and in combination, posed an unreasonable risk of serious damage to Mr. Schulte's respiratory health and basic physical well-being.

87.     The BOP was aware of these conditions, which were open and obvious throughout the 10 South unit.

88.     At all relevant times pursuant to this Amended Complaint, the BOP had a duty to exercise ordinary care to Mr. Schulte.

89.     At all relevant times pursuant to this Amended Complaint, the BOP failed to uphold this duty to Mr. Schulte, resulting in inhumane and dangerous living conditions.  The failure to mitigate this excessive risk to health and safety demonstrated a complete disregard for Mr. Schulte's basic human needs and well-being and was a result of the BOP's negligent acts and omissions.

90.     The actions of the BOP represent an impermissible deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as operators of the MCC.

91.     At all relevant times pursuant to this Amended Complaint, BOP employees were acting within the scope of their employment by the BOP, a constituent part of the United States.

92. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

93. As a result of the BOP's negligent conduct, Mr. Schulte suffered physical injury including ongoing breathing issues for months upon his confinement in 10 South and continues to suffer persistent migraines and respiratory issues. Mr. Schulte has additionally experienced muscle atrophy, limited capacity to exercise as a result of breathing problems, and emotional and psychological distress.

## SIXTH CAUSE OF ACTION

(Damages For Negligent Pattern and Practice of Failing to Provide Adequate Sanitation, Breathable Air, and Other Rudiments)

94. Mr. Schulte repeats and incorporates by reference paragraphs 1–46.

95. Mr. Schulte was forced to live under various continuing combinations of inhumane air and water temperatures, dysfunctional plumbing, blooms of fungal spores, and other dangerous airborne particles while he was confined in 10 South between October 2018 and June 2021. Mr. Schulte was deprived of regular indoor exercise, any outdoor exercise, fresh air, and even minimal exposure to natural light. Mr. Schulte was repeatedly deprived of sleep for weeks at a time. All of these conditions, alone and in combination, posed an unreasonable risk of serious damage to Mr. Schulte's physical and mental soundness.

96. The BOP was aware of these conditions, which were open and obvious throughout the 10 South unit and which Mr. Schulte repeatedly brought to the attention of the BOP.

97. At all relevant times pursuant to this Amended Complaint, the BOP had a duty to exercise ordinary care to Mr. Schulte.

98. The BOP failed to uphold this duty to Mr. Schulte, resulting in a pattern and practice of negligent acts and omissions through which the BOP failed to provide Mr. Schulte with

adequate, safe living conditions which, in turn, resulted in excessive risk to Mr. Schulte's health and safety and in physical and psychological harm to Mr. Schulte.

99. The BOP's failure to mitigate these conditions represents an impermissible deviation from the actions a reasonable person would have taken in their positions to uphold the duty the BOP owed to Mr. Schulte.

100. At all relevant times pursuant to this Amended Complaint, BOP employees were acting within the scope of their employment by the BOP, a constituent part of the United States.

101. A private employer would otherwise be liable for the negligence of Defendant. The United States is therefore liable for tort claims under the FTCA.

102. Because of the BOP's unlawful conduct, Mr. Schulte has suffered physical injury, including intestinal illness, sleep deprivation, increasingly frequent and severe migraines, heart palpitations, muscle atrophy, respiratory issues, and emotional and psychological distress.

## PRAYER FOR RELIEF

103. Award Mr. Schulte damages for the pain and suffering caused by the BOP when it negligently caused Mr. Schulte enduring and severe injuries while he was detained in the now-shuttered MCC 10 South isolation unit.

104. Award Mr. Schulte costs, fees, expenses, and other disbursements associated with the prosecution of this Amended Complaint, and reasonable attorney fees, pursuant to 28 U.S.C. § 2412.

105. Award such other relief that this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: New York, New York
March 23, 2023

Respectfully submitted,

MICHAEL W. MARTIN
IAN WEINSTEIN
*Attorneys for Plaintiff*

On the Amended Complaint:
Jessica Lagnado
Elizabeth Rivera
Thomas Rukaj
Kaleb Underwood
*Legal Interns*

By:  */s/ Michael W. Martin*
MICHAEL W. MARTIN
Lincoln Square Legal Services, Inc.
150 W 62nd St, 9th Floor
New York, New York 10023
Tel.: (212) 636-6934
E-mail: mwmartin@lsls.fordham.edu