**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JOSHUA ADAM SCHULTE,

                Plaintiff,

- against -

UNITED STATES OF AMERICA,

                Defendants.

No. 21 Civ. 4042 (JMF)

---

### DECLARATION OF KENNETH ALVARADO

I, Kenneth Alvarado, declare as follows pursuant to 28 U.S.C. § 1746:

1.    I was employed by the United States Department of Justice, Federal Bureau of Prisons (the "BOP") at the Metropolitan Correctional Center in New York, New York (the "MCC") from March 2009 until January 2013.[1] I returned to the MCC in May 2016 where I worked until around December 2021, when the MCC closed. While I worked at the MCC, I was a plumbing foreman.

2.    When the MCC closed, I began working as a plumbing foreman at the MDC Brooklyn until around February 2023. In February 2023, I became a plumbing vocational instructor at Federal Correctional Institution ("FCI") Danbury. As a plumbing vocational instructor, I taught inmates on how to do plumbing – i.e., install and remove toilets, sinks and faucets, and I taught them plumbing code. In around March 2024, I returned to working as a plumbing foreman at FCI Fort Dix, where I have been employed since.

3.    I have reviewed a copy of the complaint in this case, and was deposed in connection with this action. I understand that Plaintiff Joshua Schulte alleges that the cells in 10

---

[1]    In 2009, I went on family leave to care for an ill family member, eventually resigning in June 2013.

South at the MCC faced chronic plumbing problems; that he experienced regular water and sewage leaks, lack of water pressure in the sink and shower, a lack of hot water, and other plumbing issues.

4.  At the MCC, we regularly had two plumbing foremen on duty. We also had a work cadre of inmates who performed plumbing repairs.[2] There were typically between four and ten work cadre inmates at any one time who were assigned to the plumbing detail. Typically, I supervised half of the cadre inmates and the other plumbing foremen supervised the other half. While supervising cadre inmates, I trained them in how to make plumbing repairs, although there were many inmates who were already skilled at such repairs.

5.  If a plumbing repair, whether to a sink, shower, toilet, faucet, ejector pump, or other implement was needed, I would typically receive a work order at my desk indicating the issue and its location. Work orders were typically created by the general foremen, the facilities manager, or other MCC staff, like lieutenants in the CMSS electronic system.

6.  Once I received a work order, I or the other plumbing foreman would take care of the issue by picking up one or more of the inmates on the plumbing detail, taking them to the repair site, and supervising them while they worked. The other plumbing foremen and I would also make plumbing repairs ourselves when someone approached one of us in person with a plumbing issue or had an emergency, without waiting for a work order to be submitted.

7.  There was a priority system for work orders: work orders with a "1" needed to be completed immediately; work orders with a "2" were less urgent than "1s".

---

[2] Work cadre inmates are generally sentenced (not pre-trial) inmates.

8. Due to the restrictions on the inmates in the 10 South unit at the MCC, most plumbing work in that unit was done either by myself or the other plumbing foreman, rather than any of the cadre inmates.

9. The other plumbing foreman and I tried to make plumbing repairs as quickly as possible. The MCC plumbing shop was fully stocked and had approximately 95% of the parts that were needed for any given plumbing repair job. In the event that we needed a part that we did not already have in stock, I could usually order it and get it the same or next day. On very rare occasions, it could take a few more days to get a part that had to be shipped from out of state.

10. There are approximately 400 toilets in the MCC, mostly in individual cells, including in 10 South. When a toilet was broken in any unit, we would attempt to fix it as quickly as possible. Most of the plumbing issues, especially issues concerning toilets at the MCC, were caused by inmates either intentionally flushing non-flushable items down the toilet or otherwise causing physical damage to the plumbing fixtures.

11. The plumbing fixtures in 10 South were more modern than the rest of the facility because at some point prior to my time at the MCC, there was a renovation done to build 10 South. All of the showers, toilets, sinks, and other plumbing fixtures were newer than the rest of the building.

12. Each cell in 10 South had its own toilet and sink combination unit. Each combination unit in 10 South discharged into its own stack line (a vertical four-inch pipe) that took the wastewater from the toilet all the way down to the MCC's basement, where it fed into the city sewer.

13. Because the stack lines are independent from one another, breakage or blockage in one line would only affect that individual line, not any of the others.

14. The MCC did not experience any prolonged periods without hot water. If we had to shut down the water system, we would notify MCC staff in advance.

15. We regularly tested the plumbing system at the MCC in accordance with the Facilities Operation Manual. For example, we regularly tested the backflow preventers, which are safety devices to stop contaminated or polluted water from reversing direction and flowing backward into the clean water supply. We also regularly tested wastewater outflows to ensure that there was no debris blocking the flow of wastewater out to the city sewer.

16. During the time period from February 2019 through the closing of the MCC, I reported to Christopher Nobile, the MCC's Facilities Manager.

17. Mr. Nobile was a very effective Facilities Manager. He ran a tight ship and was very hands on. He was able to get funding for us to get parts and materials. He was also very responsive and was onsite a lot of the time.

18. Mr. Nobile held daily meetings with the facilities department staff. We talked about changes that happened in the facility, any projects that were ongoing, and provided each other with updates on our work.

19. I understand that Mr. Schulte alleges that on October 30, 2020, while he was in Cell #4 in 10 South, the toilet began leaking putrid sewage, which eventually spread all over the cell floor to the point where his entire cell floor was covered in several inches of sewage.

20. The cells in 10 South were fairly large. For a cell in 10 South to be filled with several inches of sewage, the toilet would have had to of been hemorrhaging sewage very quickly.

21. There is a work order from CMSS, numbered 13607, which relates to Cell #4 in 10 South and was activated in the BOP's electronic work order system on November 3, 2020. A true and correct copy of that work order is attached hereto as Exhibit 1 (BOP000706). The work order states that "[w]hen toilet is flushed it leaks a lot of water out from the under side." *Id.* The work order was entered as a priority "2" indicating that the issue was not an emergency.

22. I personally completed the work in response to this work order.

23. The work order reflects that I replaced the wax seal underneath the toilet. The wax seal on a toilet is a malleable, ring-shaped gasket made of petroleum or beeswax that creates a watertight and airtight seal between the bottom of a toilet bowl and the drainpipe in the floor.

24. The toilet/sink combination unit in this cell was a rear mount discharge toilet, meaning that it was held against the concrete wall behind it with brackets. To fix the leak here, I loosened the toilet/sink combination unit from the brackets that fastened it to the wall, I replaced the wax seal and then reset the toilet.

25. A breached wax seal allows water from the toilet bowl to seep out from the base of the bowl. Once a wax seal is breached, the more one flushes the toilet, the more water would seep out from the bottom of the bowl.

26. The toilet in Cell #4 was not leaking because of a stoppage in the toilet. If there had been a stoppage, the work order would reflect that the toilet was clogged, and something needed to be snaked out.

27. Further, the toilet in Cell #4 was not leaking as a result of a backup in the stack line (piping) connected to this toilet. If there had been a backup in the stack line, that would have been reflected in the work order. Accordingly, it is not the case that sewage from the stack line was backing up and leaking from this toilet.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: __February 17th__, 2026

_____
KENNETH ALVARADO