**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSHUA ADAM SCHULTE,

                 Plaintiff,

         -v-

UNITED STATES OF AMERICA,

                 Defendant.

No. 21 Civ. 4042 (JMF)

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES OF AMERICA'S**
**MOTION FOR SUMMARY JUDGMENT**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2633
E-mail: tara.schwartz@usdoj.gov

TARA SCHWARTZ
Assistant United States Attorney
– Of Counsel –

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND .................................................................................................................2

  I.   Schulte's Criminal Case and Detention ..........................................................................2

  II.  The 10 South Unit at the MCC ....................................................................................4

  III. Schulte's FTCA Claims ..............................................................................................4

      A.  Exposure to Sewage ............................................................................................4

      B.  Exposure to Extreme Temperatures ......................................................................5

      C.  Sleep Deprivation................................................................................................6

      D.  Exposure to Toxic Air .........................................................................................6

      E.  Prohibition of Outdoor Recreation and Limitation on Indoor Recreation ..................7

  IV. Procedural History .....................................................................................................7

LEGAL STANDARD..........................................................................................................8

  I.   Summary Judgment Standard .......................................................................................8

  II.  Law Applicable to FTCA Claims .................................................................................9

ARGUMENT .................................................................................................................10

  I.   Schulte's FTCA Claims Are Barred by the Discretionary Function Exception ...............10

  II.  Schulte Cannot Show that the Breached Any Duty to Him.............................................14

      A.  Schulte Cannot Show that the BOP Acted Negligently with Respect to the
           Temperature at the MCC ...................................................................................14

      B.  Schulte Cannot Show that the BOP Acted Negligently with Respect to the Plumbing
           at the MCC. ....................................................................................................17

      C.  Schulte Cannot Show that the BOP Was Negligent with Respect to the Air Quality or
           other Conditions at the MCC ..............................................................................21

      D.  Schulte Cannot Show that the BOP Was Negligent in Depriving Him of Sleep.........23

      E.  Schulte Cannot Show that the BOP Negligently Prohibited Exercise ........................25

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................................. 8, 9

*Berkovitz v. United States*,
    486 U.S. at 531 (1988)............................................................................................. 11

*Bivens v. Six Unknown Named Agents*,
    403 U.S. 388 (1971)................................................................................................... 7

*Brown v. Eli Lilly & Co.*,
    654 F.3d 347 (2d Cir. 2011)...................................................................................... 9

*Brown v. United States*,
    No. 00 Civ. 529 (RR), 2001 WL 477250 (E.D.N.Y. Mar. 19, 2001) ............................. 12

*Burton v. Evans*, No.
    No. 01 Civ. 3328, 2002 WL 832590 (N.D. Ill. May 2, 2002) ......................................... 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).................................................................................................... 8

*Chen v. United States*,
    No. 09 Civ. 2306, 2011 WL 2039433 (E.D.N.Y. May 24, 2011)................................... 10

*Cook v. U.S.*,
    No. 2:11 Civ. 4, 2011 WL 7139158 (N.D. W.Va. Dec. 22, 2011) ................................. 15

*Coulthurst v. United States*,
    214 F.3d 106 (2d Cir. 2000)...................................................................................... 13

*Cowart v. United States*,
    617 F.2d 112 (5th Cir. 1980) ..................................................................................... 10

*Del Raine v. Williford*,
    32 F.3d 1024 (7th Cir. 1994) ..................................................................................... 15

*Dugan v. Washington*,
    No. 99 Civ. 4382, 2001 WL 741626 (N.D. Ill. June 11, 2001) ..................................... 15

*Enigwe v. Zenk*,
    No. 03 Civ. 854 (CBA), 2007 WL 2713849 (E.D.N.Y. Sept. 14, 2007).................... 12, 13

*Evans v. Fogg*,
    466 F. Supp. 949 (S.D.N.Y. 1979)............................................................................. 21

*Fazi v. United States*,
    935 F.2d 535 (2d Cir. 1991)...................................................................................... 11

*Fernandini v. United States*,
    No. 15 Civ. 3843 (GHW), 2019 WL 1033797 (S.D.N.Y. Mar. 5, 2019) ........................ 13

*Flake v. Peck*,
    No. 9:12 Civ. 517 (MAD), 2014 WL 1289582 (N.D.N.Y. Mar. 31, 2014) ..................... 16

*Florio v. Canty*,
    954 F. Supp. 2d 227 (S.D.N.Y. 2013) ............................................................................. 20

*Gongora Hinestroza v. United States*,
    No. 25 Civ. 61, 2025 WL 1588349 (S.D. Tex. June 4, 2025) ......................................... 13

*Herrington v. United States*,
    No. 83 Civ. 8007, 1984 WL 1279 (S.D.N.Y. Nov. 28, 1984) ......................................... 10

*Horror Inc. v. Miller*,
    15 F.4th 232 (2d Cir. 2021) ............................................................................................... 9

*Hudson v. McMillian*,
    503 U.S. 1 (1992) ............................................................................................................. 15

*Hylton v. Federal Bureau of Prisons*,
    No. 00 Civ. 5747 (RR), 2002 WL 720605 (E.D.N.Y. Mar. 11, 2002) ............................ 15

*Jones v. United States*,
    534 F.2d 53 (5th Cir. 1976) ............................................................................................. 10

*Jones v. United States*,
    No. 11 Civ. 2242 (DOC) (SP), 2014 WL 7240533 (C.D. Cal. Dec. 16, 2014) ......... 17, 23

*Kane v. United States*
    189 F. Supp. 2d 40 (S.D.N.Y. 2002) .................................................................................. 9

*Kee v. City of New York*,
    12 F.4th 150 (2d Cir. 2021) ............................................................................................... 9

*Lopez v. United States*,
    No. 5:18 Civ. 263, 2020 WL 1492804 (M.D. Fla. Mar. 27, 2020) ................................... 14

*Mejia v. United States*,
    No. 13 Civ. 5676 (AJN), 2015 WL 5138708 (S.D.N.Y. Sept. 1, 2015) ........................... 12

*Myers v. City of N.Y.*,
    No. 11 Civ. 8525 (PAE), 2012 WL 3776707 (S.D.N.Y. Aug. 29, 2012) ........................ 20

*Nelson v. Plumley*,
    No. 9:12 Civ. 422, 2014 WL 4659327 (N.D.N.Y. Sept. 17, 2014) ................................. 16

*Odom v. Keane*,
    95 Civ. 9941 (SS), 1997 WL 576088 (S.D.N.Y. Sept. 17, 1997) .................................... 21

*Ojo v. United States*,
    No. 16 Civ. 4112 (MKB) (LB), 2019 WL 3852391 (E.D.N.Y. Aug. 15, 2019) ............. 12

*Ortiz v. Dep't of Corr.*,
    No. 08 Civ. 2195 (RJS) (HBP), 2011 WL 2638137, at *8 (S.D.N.Y. Apr. 29, 2011) .... 20

*Ortiz v. United States*,
    No. 01 Civ. 4665 (AKH), 2002 WL 1492115 (S.D.N.Y. July 11, 2002) ............. 12, 13, 21

*Paulino-Duarte v. United States*,
No. 02 Civ. 9499 (RCC), 2003 WL 22533401 (S.D.N.Y. Nov. 7, 2003)........................ 13

*Prellwitz v. Anderson*,
No. 07 Civ. 2120, 2007 WL 2033804 (D. Minn. July 12, 2007).................................... 21

*Rinaldi v. United States*,
904 F.3d 257 (3d Cir. 2018)........................................................................................ 10

*Ross v. United States*,
No. 13 Civ. 573-A, 2013 WL 5290498 (N.D. Tex. Sept. 18, 2013)............................... 14

*Saeli v. Chautauqua County*,
36 F.4th 445 (2d Cir. 2022) ......................................................................................... 9

*Scrima v. Hasty*,
No. 97 Civ. 8433 (JGK), 1998 WL 661478 (S.D.N.Y. Sept. 24, 1998).......................... 13

*Smith v. Copeland*,
87 F.3d 265 (8th Cir. 1997) ......................................................................................... 21

*Smith v. Menifee*,
No. 00 Civ. 2521 (DC), 2002 WL 461514 (S.D.N.Y. Mar. 26, 2002) .......................... 15

*Smith v. Snyder*,
No. 05 Civ. 325 (JBC), 2006 WL 379516 (E.D. Ky. Feb. 15, 2006) ............................ 14

*Smith v. United States*,
19 F.3d 22, 1994 WL 55559 (7th Cir. Feb. 24, 1994) .................................................. 14

*Steele v. Schomig*,
No. 96 Civ. 99, 1996 WL 599640 (N.D. Ill. Oct.11, 1996)............................................ 15

*Strickler v. Waters*,
989 F.2d 1375 (4th Cir.1993) ...................................................................................... 15

*Strothers v. Ohio Dep't of Rehab. and Corr.*,
No. 2000-08354, 2002 WL 31948020 (Ct. of Claims of Ohio Oct. 17, 2002)................ 17

*Trammell v. Keane*,
338 F.3d 155 (2d Cir. 2003)......................................................................................... 15

*United States v. Gaubert*,
499 U.S. 315 (1991).............................................................................................. 11, 12

*United States v. Muniz*,
374 U.S. 150 (1963)..................................................................................................... 10

*United States v. S.A. Empresa de Vicao Aerea Rio Grandense*,
467 U.S. 797 (1984)..................................................................................................... 11

*Wang v. Vahldieck*, No.,
09 Civ. 3783, 2012 WL 119591 (E.D.N.Y. Jan. 9, 2012) ............................................. 21

*Waring v. Meachum*,
175 F. Supp. 2d 230 (D. Conn. 2001)........................................................................... 15

*Weathersby v. Dalsheim*,
No. 89 Civ. 1203 (LLS), 1991 WL 102507 (S.D.N.Y. June 5, 1991) ............................. 15

*Whitnack v. Douglas County*,
16 F.3d 954 (8th Cir. 1994) ........................................................................................ 21

*Winters v. United States*,
No. 10 Civ. 7571 (JMF), 2013 WL 1627950 (S.D.N.Y. Apr. 16, 2013) .................... 11, 12

*Wyland v. Brownfield*,
No. 08 Civ. 1601, 2011 WL 5445305 (W.D. Pa. Nov. 9, 2011) ...................................... 20

*Young v. United States*,
No. 12 Civ. 2342 (ARR) (SG), 2014 WL 1153911 (E.D.N.Y. Mar. 20, 2014)............... 11

**Statutes**

18 U.S.C. § 4042 ............................................................................................................ 10, 12

28 U.S.C. § 1346 .............................................................................................................. 1, 9

28 U.S.C. § 2680(a) ........................................................................................................ 10, 11

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................. 1, 8

Defendant United States of America (the "government"), by and through its attorney, Jay Clayton, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## PRELIMINARY STATEMENT

This Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq*., action arises from Plaintiff Joshua Schulte's ("Schulte") complaints concerning his conditions of confinement at the Metropolitan Correction Center ("MCC"), where he was housed from October 2018 through October 2021.  Since 2018, Schulte has been subject to strict conditions of confinement, known as Special Administrative Measures ("SAMs"), to prevent him from disclosing classified information.  Although Schulte has taken issue with his restrictive conditions of confinement—he has not established an entitlement to damages under the FTCA.

First, Schulte's FTCA claims must be dismissed for lack of jurisdiction because they fall within the discretionary function exception to the FTCA.  Schulte's claims challenge the Federal Bureau of Prison's ("BOP") decisions about how to: provide adequate ventilation; make timely plumbing repairs; and control the temperature and lighting.  These claims constitute precisely the kind of challenges to prison administrators' judgments that numerous courts have held are barred by the discretionary function exception.

Even if this Court were to hold that the discretionary function exception does not apply, the government is entitled to summary judgment on Schulte's negligence claims because no reasonable factfinder could conclude that the government breached its duty of reasonable care to him.  Undisputed facts demonstrate that the MCC complied with the BOP ventilation, plumbing, temperature and lighting policies, and that the MCC staff took numerous steps to ensure that the facility had adequate clean air circulation and sanitation.  Given the evidence of the MCC's

reasonable efforts, which show an institution committed to good housing management and Schulte's lack of evidence, he has failed to establish disputed material facts concerning any of his various negligence claims. His medical records further belie his assertions that he suffered illness and maladies at the MCC as a result of the conditions in the institution.

Accordingly, the court should enter summary judgment in favor of the government.

## BACKGROUND

### I.    Schulte's Criminal Case and Detention

On August 24, 2017, Schulte was arrested on child pornography charges. *See* Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("56.1 Statement") ¶ 1. On December 14, 2017, the court determined that Schulte violated his bail conditions and ordered his detention. *Id*. ¶ 4.

On June 18, 2018, the government superseded the indictment to add charges stemming from Schulte's theft of national defense information from the CIA and subsequent transmission of that information to Wikileaks. *Id*. ¶ 5. On October 31, 2018, the government superseded the indictment again to charge Schulte with: (i) violating the protective order entered in the criminal case by leaking a search warrant to *The New York Times* and *The Washington Post* and encouraging his family members to disseminate the search warrants (the "Contempt Count"); and (ii) smuggling contraband cell phones into the MCC to leak additional classified information to a reporter (the "MCC Leak Count"). *Id*. ¶ 6.

Following the government's discovery of the conduct that led to the Contempt and MCC Leak Counts, the U.S. Attorney's Office—in coordination with the Federal Bureau of Investigation ("FBI") and the Department of Justice's Counterintelligence and Export Control Section of the National Security Division—requested the imposition of Special Administrative Measures ("SAMs"). *Id*. ¶ 7. On or about October 26, 2018, the Attorney General issued a memorandum

directing the BOP to implement the SAMs. *Id.* ¶ 8. The memorandum stated that the Director of the CIA had certified "that the implementation of [SAMs] is reasonably necessary to prevent disclosure of classified information by [Plaintiff], and that the disclosure of such information would pose a threat to national security." *Id.* ¶ 9.

The SAMs limit Schulte's contacts and communications with others because such communications could result in the unauthorized disclosure of classified information. *Id.* ¶ 11. Except as allowed by the SAMs, Schulte is barred from "having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else . . . that could reasonably foreseeably result in [Schulte] communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting [Schulte's] ability to communicate (send or receive) classified information." *Id.* ¶ 12. The SAMs prohibit Schulte from being housed or communicating with another inmate. *Id.* ¶ 13.

Upon imposition of the SAMs, Schulte was moved to 10 South, the most restrictive Special Housing Unit ("SHU") at MCC, where his contacts and communications with others were severely limited. *Id.* ¶ 10. Schulte remained in 10 South until around October 18, 2021, at which time he was transferred to the Metropolitan Detention Center ("MDC"). *Id.* ¶ 14.

After the imposition of the SAMs, in February and March 2020, Schulte was tried on the second indictment and was found guilty of the Contempt Count as well as on a count of making false statements to the FBI. *Id.* ¶ 18. In June 2022, Schulte was tried and convicted on all counts in the third superseding indictment. *Id.* ¶¶ 23-24. On February 1, 2024, this Court sentenced Schulte to 480 months' imprisonment. *Id.* ¶ 25.

On or around February 15, 2024, Schulte was transferred to United States Penitentiary Florence ADMAX, where he is currently incarcerated. *Id.* ¶ 26.

## II.    The 10 South Unit at the MCC

There were six individual cells in 10 South, each numbered #1-6.  *See id.* ¶¶ 28-29.

Each cell had its own shower, toilet and sink.  *Id.* ¶ 28.

Inmates in 10 South were rotated to a different cell approximately every 21 days for

security reasons.  *Id.* ¶ 31.  10 South was monitored by a corrections officer 24/7.  *Id.* ¶ 32.  The

corrections officer typically sat at the officer station located in 10 South, but he or she would

conduct rounds every half hour, which involved looking through the window of the cell door to

ensure the inmate was safe and secure.  *Id.* ¶¶ 32, 37.  Each cell in 10 South was also monitored

by at least one video camera.  *Id.* ¶ 36.

Inmates in 10 South were subject to a two- or three-person hold, meaning that they could

be moved out of their cell only with two or three MCC staff present.  *Id.* ¶ 40.  Further, the

doors to each of the cells in 10 South were locked; to take an inmate out of his cell, the

operations or activities lieutenant had to unlock the cell door with a key.  *Id.* ¶ 41.

## III.    Schulte's FTCA Claims

### A.  Exposure to Sewage

Schulte claims that between October 2018 and June 2021, he experienced regular sewage

leaks, lack of water pressure in the sink and shower, lack of hot water, an inability to control the

temperature of the water, and other plumbing failures.  *Id.* ¶ 42.

Schulte claims that there were three occasions during which "putrid sewage" flooded his

cell in 10 South.  *Id.* ¶ 43.  He does not recall the date of two of the three incidents.  *Id.*  With

respect to the first two incidents, he concedes that he was moved out of his cell within a half hour

of reporting the leak to MCC staff and did not suffer any injury.  *Id.*

The purported third sewage incident occurred "around October 30, 2020."  *Id.* ¶ 44.  Schulte

claims that at approximately 5:00 p.m., after showering in his cell, he noticed that "sewage was

leaking from the toilet again." *Id*. He allegedly told the corrections officer on duty, who said he would have Schulte moved to another cell. *Id*. He claims that "sewage continued to accumulate on the floor of his cell" and that it was "several inches deep" when a corrections officer appeared outside his cell and began mopping the hallway. *Id*.

Schulte asserts that at approximately 8:30 p.m., he explained the situation to a lieutenant in the hallway and was told he would be moved to a different cell. *Id*. ¶ 45. However, the lieutenant allegedly did not return for hours and, during that time, the "flow of sewage intensified" and Schulte "started to feel sick." *Id*. Schulte claims he repeatedly communicated this to the corrections officer, who repeatedly assured him that he had called and told the lieutenant that he needed to be moved to a different cell. *Id*.

Schulte claims that at 12:00 a.m. on October 31, 2020, the lieutenant returned and said that it was "too late on a Friday" to move Schulte to different cell. *Id*. ¶ 46. Schulte claims that at approximately 2:00 a.m., he began vomiting and experiencing diarrhea and used the shower drain to vomit and relieve himself. *Id*. At approximately 3:00 a.m., he purportedly told a corrections officer passing by his cell that he had been vomiting for an extended period of time and requested medical attention. *Id*. At 7:30 a.m., Schulte purportedly told a different lieutenant passing by his cell that he was physically unable to eat after "spending the night soaking in sewage." *Id*. At 9:30 a.m., Schulte was purportedly moved to a different cell. *Id*.

### B. Exposure to Extreme Temperatures

Schulte contends that the BOP breached its duty of due care because he was "forced to endure entire winter seasons in the MCC's 10 South without working heat." *Id*. ¶ 100. Schulte alleges that during two of the three winters in 10 South—the winters of 2018-2019 and 2020-2021—the heating system did not work for prolonged periods of time. *Id*. He claims that cold air

blew out of the vents, he could not hold a book without losing feeling in his fingers, and a cup of water once froze inside his cell.  *Id*.

During the summer months, Schulte was allegedly exposed to high temperatures without access to air conditioning.  *Id*. ¶ 101.  He claims that the temperature in the MCC caused him to experience debilitating migraine headaches approximately once a week.  *Id*. ¶ 102.  Schulte concedes that he no longer feels any pain as a result of the temperature at the MCC.  *Id*. ¶ 105.

### C.  Sleep Deprivation

Schulte claims that while he was in 10 South, fluorescent light fixtures directly above the beds in 10 South cells were illuminated twenty-four hours a day which prevented him from sleeping.  *Id*. ¶ 127.  He also claims that the BOP officials working the night shift engaged in loud activities and conversations immediately adjacent to Cell #1 and that as a result, during his three-week rotations in Cell #1, he could not sleep for more than one hour each night and experienced migraines each lasting ten to twelve hours.  *Id*. ¶ 138.  However, he admits that once he complained about the noise, the TV was removed from the officer station.  *Id*. ¶ 139.

### D.  Exposure to Toxic Air

Schulte claims that the air in 10 South caused him to develop respiratory issues because: there was mold on the ceilings and walls of all six cells in 10 South; MCC ventilation systems circulated air from the SHU on the 9th floor into the cells in 10 South that sometimes contained pepper spray particles; air from the laundry unit was circulated into 10 South; and inmates infected with COVID-19 were moved to the SHU on the ninth floor, which caused Schulte to contract COVID-19.  *Id*. ¶¶ 83-86.

### E.  Prohibition of Outdoor Recreation and Limitation on Indoor Recreation

Schulte claims that he was denied any outdoor recreation and was sometimes denied indoor recreation for three to six weeks at a time.  *Id*. ¶ 182.  He also claims that the 10 South recreation room was too small to run or walk around and that two pieces of exercise equipment were painful to use.  *Id*. ¶ 183.  Schulte alleges that he developed hemorrhoids during an 18-month period of inactivity which made it painful for him to sit or sleep.  *Id*. ¶ 184.  He also claims he experienced increasingly frequent and acute heart palpitations and migraines due to lack of exercise.  *Id*.

## IV.  Procedural History

Schulte initiated this action through the filing of twelve separate complaints related to his detention at the MCC during June and July 2021.  *See* ECF Nos. 21 Civ. 4042, 4800, 5061, 5173, 5213, 5313, 5554, 5722, 5851, 5871, 6504.  His actions asserted claims under the FTCA and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and sought injunctive and monetary relief. *See id*.

On November 10, 2021, the Court issued an order denying Schulte's claims for injunctive relief as unavailable under the FTCA or *Bivens* and as moot given his transfer to the MDC.  ECF No. 9.  The Court also dismissed Schulte's *Bivens* claims for failure to allege the personal involvement of any of the individual defendants and failure to provide identifying information for the John Doe defendants.  *Id*.  On January 12, 2021, the Court granted the government's motion pursuant to Federal Rule of Civil Procedure 42 to consolidate Schulte's twelve actions.  ECF No. 18.

On February 3, 2022, the government moved to dismiss Schulte's claims as barred by sovereign immunity.  ECF Nos. 20-21.  On July 20, 2022, the Court directed the Clerk's Office to locate *pro bono* counsel to represent Schulte for the limited purpose of opposing the government's motion.  ECF No. 38.  On August 24, 2022, Schulte obtained *pro bono* counsel, who filed an

opposition to the government's motion to dismiss.  ECF Nos. 39, 46.  On February 22, 2023, the Court partially denied the government's motion to dismiss as to Schulte's sewage and plumbing claims.  ECF No. 48.  The Court also granted Schulte leave to file an amended complaint.  *Id*.

Schulte filed an amended complaint on March 23, 2023.  ECF No. 49.  The amended complaint asserts six separate FTCA claims seeking damages for negligence relating to: (1) "confinement in cell flooded with sewage"; (2) "exposure to extreme temperatures"; (3) "deprivation of sleep"; (4) "prohibition of exercise"; (5) "exposure to dangerous air quality"; and (6) "pattern and practice of failing to provide adequate sanitation, breathable air, and other rudiments."  *See id*. at 10-17.

On April 27, 2023, the government moved to dismiss the amended complaint for Schulte's failure to exhaust his FTCA administrative remedies, which the Court denied on February 1, 2024.  ECF No. 54-55, 64.  The parties then proceeded to discovery, which they completed on September 17, 2025.  *See* ECF No. 105.[1]

## LEGAL STANDARD

### I.    Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the burden of showing that it is entitled to summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When considering a motion for summary judgment, courts "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

---

[1]    During discovery, the government produced over 150 documents, that totaled over 3,300 pages and Schulte's apt counsel deposed ten current or former BOP employees.

reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (internal quotation marks omitted).

The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Saeli v. Chautauqua County*, 36 F.4th 445, 455 (2d Cir. 2022) (citation and internal quotation marks omitted). For a genuine dispute of material fact to exist, "the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (internal quotation marks omitted). The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Moreover, the existence of a factual dispute does not preclude summary judgment where "the evidence is merely colorable, or is not significantly probative." *Anderson*, 477 U.S. at 249 (citations omitted).

## II.    Law Applicable to FTCA Claims

The FTCA provides that the United States is liable for injury caused by the negligence of its employees under circumstances where a private person would be liable according to "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Kane v. United States*, 189 F. Supp. 2d 40, 51-52 (S.D.N.Y. 2002). Because the acts or omissions Schulte complains of occurred during his incarceration at the MCC, New York law applies. Under New York law, to prove a claim of negligence, a plaintiff must establish: (i) the defendant owed plaintiff a duty of care; (ii) the defendant breached that duty; and (iii) the breach proximately caused plaintiff's injury. *Kane*, 189 F. Supp. 2d at 51-52. The FTCA exempts the government from liability if the negligence claim is based upon an act or omission of a federal employee who exercised due care. 28 U.S.C. § 2680(a).

Although state law sets out the elements required to prove negligence, the standard of care for the BOP is "fixed by 18 U.S.C. § 4042, independent of [any] inconsistent state rule" allowing for a local jailer's immunity from suit, or a lesser duty. *United States v. Muniz*, 374 U.S. 150, 164 (1963). Section 4042(a)(2) requires that the BOP provide "suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). This statutory duty means that the BOP must exercise "ordinary diligence" or reasonable care "to keep prisoners safe and free from harm." *Jones v. United States*, 534 F.2d 53, 54 (5th Cir. 1976). "The government, of course, is not obligated to eliminate all risks in federal prison." *Herrington v. United States*, No. 83 Civ. 8007, 1984 WL 1279, at *2 (S.D.N.Y. Nov. 28, 1984) (citing *Cowart v. United States*, 617 F.2d 112, 116 (5th Cir. 1980)).

Although this statute requires the BOP to provide a general duty of care to manage and safekeep its prisoners, courts have consistently held that the BOP retains discretion with respect to how it fulfills that general duty of care. *See, e.g., Rinaldi v. United States*, 904 F.3d 257, 273-74 (3d Cir. 2018) (concluding that § 4042 affords the BOP discretion in deciding suitable housing assignments for inmates); *Chen v. United States*, No. 09 Civ. 2306, 2011 WL 2039433, at *7 (E.D.N.Y. May 24, 2011) (noting that § 4042(a)(2)-(3) "does not direct the manner by which the BOP must fulfill [its] duty" to provide "suitable quarters," "the safekeeping of" prisoners, and "the protection" of all federal inmates).

## ARGUMENT

### I.    Schulte's FTCA Claims Are Barred by the Discretionary Function Exception.

The FTCA's discretionary function exception (the "DFE"), 28 U.S.C. § 2680(a), bars Schulte's claims against the government. The FTCA excepts from its waiver of sovereign immunity any claim that is "based upon the exercise or performance or the failure to exercise or

perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  "A court lacks subject matter jurisdiction over any claim falling within the discretionary function exception."  *Young v. United States*, No. 12 Civ. 2342 (ARR) (SG), 2014 WL 1153911, at *13 (E.D.N.Y. Mar. 20, 2014) (citing *Fazi v. United States*, 935 F.2d 535, 537 (2d Cir. 1991)).

The purpose of the DFE "is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal quotation marks omitted).  "The Supreme Court has explained that the DFE 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'"  *Winters v. United States*, No. 10 Civ. 7571 (JMF), 2013 WL 1627950, at *4 (S.D.N.Y. Apr. 16, 2013) (quoting *United States v. S.A. Empresa de Vicao Aerea Rio Grandense*, 467 U.S. 797, 808 (1984)).  "A claim falls within the [DFE] if it satisfies a two-part test: (1) the challenged government conduct must be discretionary, meaning it involves an 'element of judgment or choice' and is not mandated by statute or regulation; and (2) the judgment must be grounded in 'considerations of public policy' or susceptible to policy analysis."  *Young*, 2014 WL 1153911, at *13 (quoting *Berkovitz v. United States*, 486 U.S. at 531, 536-37 (1988).  "If the governmental action is the product of judgment or choice, the [DFE] applies unless the plaintiff can show that the judgment is not of the kind that the exception was designed to shield."  *Enigwe v. Zenk*, No. 03 Civ. 854 (CBA), 2007 WL 2713849, at *8 (E.D.N.Y. Sept. 14, 2007) (citing *Gaubert*, 499 U.S. at 323).

Here, Schulte alleges that the government was negligent because the MCC suffered from regular plumbing issues, ventilated the facility in a way that caused dangerous airborne particles

11

to circulate into his cells, prohibited him from engaging in any outdoor recreation and limited his indoor recreation, exposed him to extreme temperatures, failed to prevent or abate buildups of mold, and subjected him to lighting that caused him sleep deprivation. Schulte's FTCA claims are precluded by the DFE because the relevant BOP decisions about prison housing management and maintenance are policy-oriented judgments committed to the discretion of prison officials.[2]

Pursuant to statute, the BOP must "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons" in their custody. 18 U.S.C. § 4042(a)(2). The statute "does not direct the BOP how to fulfill [these] duties, nor does the statute mandate particular conduct by the BOP"; rather, "[t]he statute gives the BOP officials great discretion to administer their duties as they see fit." *Ojo v. United States*, No. 16 Civ. 4112 (MKB) (LB), 2019 WL 3852391, at *7 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019); *Winters v. United States*, No. 10 Civ. 7571 (JMF), 2013 WL 1627950, at *5 (S.D.N.Y. Apr. 16, 2013) ("Section 4042 'does not set forth the particular manner by which the BOP must fulfill this duty,' it 'leaves judgment or choice to the BOP officials.'" (quoting *Ortiz v. United States*, No. 01 Civ. 4665 (AKH), 2002 WL 1492115, at *3 (S.D.N.Y. July 11, 2002)); *Enigwe*, 2007 WL 2713849, at *8 (noting that "in general decisions regarding the best way to safeguard prisoners are discretionary in nature"); *Scrima v. Hasty*, No. 97 Civ. 8433 (JGK), 1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998) ("The absence of specific guidelines of

---

[2] Except for Schulte's claim concerning sewage in his cell on October 30, 2020, his "complaint is with the policy decision[s] made by prison authorities, not with [their] negligent execution." *Brown v. United States*, No. 00 Civ. 529 (RR), 2001 WL 477250, at *2 (E.D.N.Y. Mar. 19, 2001); *see also Mejia v. United States*, No. 13 Civ. 5676 (AJN), 2015 WL 5138708, at *8 (S.D.N.Y. Sept. 1, 2015) (plaintiff bears "burden [] to allege facts which would support a finding that the alleged conduct was not 'grounded in the policy of the regulatory regime.'") (quoting *Gaubert*, 499 U.S. at 324-25).

appropriate conduct by BOP officials in administering" their duties to provide suitable quarters and provide for the safekeeping, care, and subsistence of inmates "leaves judgment or choice to BOP officials").

The BOP's decisions regarding housing management and facilities maintenance necessarily require balancing the competing needs of the institution in the face of limited personnel and financial resources, including keeping inmates, staff, and the public safe. Thus, "prison officials' day-to-day decisions []—regarding [] facility maintenance … fall within the scope of the discretionary function exception. These are not the type of determinations that a federal court should second guess." *Fernandini v. United States*, No. 15 Civ. 3843 (GHW), 2019 WL 1033797, at *5 (S.D.N.Y. Mar. 5, 2019); *see also Ortiz*, 2002 WL 1492115, at *2 (DFE "precludes claims based on day-to-day management decisions if those decisions require judgment as to which of a range of permissible course is the wisest") (citing *Gaubert*, 499 U.S. at 325).

In recognition of this, courts have routinely held that FTCA claims concerning BOP decisions about the maintenance of facilities are barred by the DFE. *See, e.g., Coulthurst v. United States*, 214 F.3d 106, 109-110 (2d Cir. 2000) (allegations regarding decisions establishing procedures and "how frequently [a safety] inspection should be conducted" involve elements of judgment or choice and a balancing of policy considerations, and are "shielded from suit by the DFE."); *Paulino-Duarte v. United States*, No. 02 Civ. 9499 (RCC), 2003 WL 22533401 (S.D.N.Y. Nov. 7, 2003) (decision to not put guardrails on prison bunk beds barred by the DFE); *Gongora Hinestroza v. United States*, No. 25 Civ. 61, 2025 WL 1588349, at *8 (S.D. Tex. June 4, 2025) (decisions regarding appropriate room temperature, depending on factors such as weather conditions and number of detainees in facility, fell within DFE); *Ross v. United States*, No. 13 Civ. 573-A, 2013 WL 5290498, at *4 (N.D. Tex. Sept. 18, 2013) ("FTCA complaints of overcrowding,

13

understaffing, and similar issues pertaining to a prisoner's living quarters are routinely found to be excluded from the FTCA by the [DFE]."); *Smith v. Snyder*, No. 05 Civ. 325 (JBC), 2006 WL 379516, at *1, 7 (E.D. Ky. Feb. 15, 2006) (claim that prison failed to prevent "accumulations of bird guano" that caused inmate to develop histoplasmosis barred by the DFE); *Lopez v. United States*, No. 5:18 Civ. 263, 2020 WL 1492804, at *5 (M.D. Fla. Mar. 27, 2020) (decision to change shower fixtures and thermostatically control water temperatures fell within discretionary function exception).

Accordingly, the DFE bars Schulte's negligence claims concerning the BOP's facilities maintenance decisions.

## II.    Schulte Cannot Show that the BOP Breached Any Duty to Him

If this Court were to hold that the DFE does not apply, it should nonetheless grant summary judgment for the government because Schulte has failed to raise a genuine issue of material fact as to whether the BOP breached its duty of due care.

### A.    Schulte Cannot Show that the BOP Acted Negligently with Respect to the Temperature at the MCC.

Schulte contends that the BOP breached its duty of due care because the temperature in 10 South was too cold in the winter and too hot in the summer.  However, as the court in *Smith v. United States*, explained:

> The exercise of "ordinary care" to provide "suitable quarters" does not require the BOP to make all these inmates comfortable, nor to provide them with individual thermostatic control. The BOP is merely required to act with due care to keep its facilities temperate, that is, within a reasonable range.

207 F. Supp. 2d 209, 216 (S.D.N.Y. 2002); *see also Smith v. United States,* 19 F.3d 22, 1994 WL 55559 at *1-2 (7th Cir. Feb. 24, 1994) (affirming dismissal of inmate's claim that he was burned by malfunctioning shower where the institution showed it acted with due care by providing

uncontroverted evidence that the plumbing was regularly maintained, that the water temperature regulators were widely used and reliable, and that malfunctions were not a chronic problem); *Cook v. U.S.*, No. 2:11 Civ. 4, 2011 WL 7139158, at *7 (N.D. W.Va. Dec. 22, 2011) (dismissing plaintiff's negligence claim despite minor burns caused by hot shower temperature because the BOP's weekly shower maintenance protocol and the lack of work order requests to address shower temperature showed that the BOP did not breach its duty to exercise reasonable care).[3]

BOP policy requires that the temperature at BOP facilities be targeted to 76 degrees Fahrenheit in the cooling season (May to October) and 68 degrees in the heating season (October to May).  56.1 Statement ¶ 106.  BOP policy further provides that "[a]ll spaces will be maintained as close to the targeted set point as possible.  However, due to issues such as the age of the cooling and heating systems and the inability to control temperatures in individual spaces, occupants may

---

[3]    The issue of temperature control has more often been litigated in the context of the Eighth Amendment, which prohibits cruel and unusual punishment, and thus requires a higher showing of deprivation.  These cases are instructive, however, and they reiterate that "'routine discomfort' is considered inherent in the fact of incarceration."  *Hylton v. Federal Bureau of Prisons*, No. 00 Civ. 5747 (RR), 2002 WL 720605 at *3 (E.D.N.Y. Mar. 11, 2002) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)); *see Smith v. Menifee*, No. 00 Civ. 2521 (DC), 2002 WL 461514, at *6 (S.D.N.Y. Mar. 26, 2002) (finding heat above 60 degrees adequate); *Steele v. Schomig*, No. 96 Civ. 99, 1996 WL 599640, at * 3 (N.D. Ill. Oct. 11, 1996) (finding mere fact that plaintiff wanted his cell heated to a higher temperature did not necessarily mean that heat supplied was inadequate); *Dugan v. Washington*, No. 99 Civ. 4382, 2001 WL 741626, at *5 (N.D. Ill. June 11, 2001) (noting prisoners need only be provided with "adequate heat") (citing *Del Raine v. Williford*, 32 F.3d 1024, 1035 (7th Cir. 1994)); *Waring v. Meachum*, 175 F. Supp. 2d 230, 243-44 (D. Conn. 2001) (finding heat above 60 degrees was adequate); *Strickler v. Waters*, 989 F.2d 1375, 1382 (4th Cir. 1993) (even accepting prisoner's complaint that cell temperatures were at times less than ideal, no Eighth Amendment violation where steps taken by prison officials including the issuance of blankets); *Weathersby v. Dalsheim*, No. 89 Civ. 1203 (LLS), 1991 WL 102507, at *4 (S.D.N.Y. June 5, 1991) (no Eighth Amendment violation where plaintiff given additional blankets and prison personnel checked heating system to make sure working properly); *Trammell v. Keane*, 338 F.3d 155, 164–65 (2d Cir. 2003) (concluding that the there was no evidence "that the cell in which [plaintiff] was housed was open to the elements, that it lacked adequate heat, or ... that the cell was 'bitter cold'").

experience a range of temperatures in their space that is a few degrees on either side of the targeted set point." *Id*. ¶ 107.

The MCC complied with this policy throughout Schulte's incarceration in 10 South. *Id*. ¶ 108. The MCC's heating and cooling system was set to the proper temperature targets and almost always remained within a few degrees of the set range. *Id*. ¶ 109. The MCC's heating and cooling system was never turned off entirely during the relevant time period and was only non-operational for periods of several hours at a time when it was undergoing maintenance. *Id*. In other words, the MCC never experienced any prolonged periods without heating or cooling. *Id*. ¶ 112.

Actual temperature readings from the facility confirm that the temperature inside the MCC, including 10 South, generally remained within the target range set by BOP policy. *See id*. ¶¶ 113-122. Further, inmates in 10 South, like all other MCC inmates, had access to jumpsuits, sweatsuits, thermal longjohns, and blankets. *Id*. ¶ 125. They also had two bedsheets and two blankets, and in the winter, they were provided with a wool blanket. *Id*. ¶ 126. The BOP staff that visited, worked and conducted rounds in 10 South were exposed to the same or similar temperatures as the inmates housed there. Schulte's subjective experience of inadequate temperatures is insufficient to show that the BOP was negligent. *See Flake v. Peck*, No. 9:12 Civ. 517 (MAD), 2014 WL 1289582, at *22 n.42 (N.D.N.Y. Mar. 31, 2014) (inmate's allegations that his cell was extremely cold did not create material issues of fact sufficient to defeat summary judgment where a regularly monitored and controlled central thermostat regulated temperatures in all cells, making it highly unlikely that one cell would be unbearably cold); *Nelson v. Plumley*, No. 9:12 Civ. 422, 2014 WL 4659327, at *10 (N.D.N.Y. Sept. 17, 2014) (granting defendant's motion for summary judgment despite plaintiff inmate's claims that he was subjected to extreme cold in his cell because officers

confirmed that the temperature in the unit was within a regulated range and provided him a blanket).

*Smith* is on point. There, an inmate complained that his cell was too cold and argued that the BOP breached its duty to provide him with suitable quarters. 207 F. Supp. 2d at 210. The court found that the plaintiff failed to show that his cell was unsuitable. Even if the plaintiff had made that showing, the court held that the government demonstrated due care by, among other things, taking temperature readings inside the plaintiff's cell, moving him to another cell, providing him with additional blankets and clothes, and placing a heater outside of his cell. *Id*. at 215–216.[4]

Accordingly, Schulte has not provided any competent evidence to show that the BOP negligently maintained the temperature inside the MCC, including 10 South.

### B. Schulte Cannot Show that the BOP Acted Negligently with Respect to the Plumbing at the MCC.

Schulte contends that the BOP breached its duty of due care because there were chronic plumbing and sewage issues in 10 South. *See* 56.1 Statement ¶ 42. But Schulte has not proffered any admissible evidence to create an issue of fact on his claim that the BOP breached its duty of care with respect to maintaining adequate plumbing at the MCC.

During the relevant time period, the MCC had two full-time plumbing foremen on staff. *Id*. ¶ 48. The MCC also had a work cadre of approximately four to ten inmates who performed

---

[4]    *See also Strothers v. Ohio Dep't of Rehab. and Corr.*, No. 00 Civ. 8354, 2002 WL 31948020, at *4-5 (Ct. of Claims of Ohio Oct. 17, 2002) (plaintiff-inmate failed to prove defendant's control of the heating systems fell below the standard of reasonable or ordinary care where heat was controlled by a central system and each cell got the same amount of heat unless the vents were blocked by an inmate).

plumbing repairs in the MCC.[5]  *Id.* ¶ 50.  Those plumbers regularly tested the plumbing system at the MCC in accordance with the requirements of the BOP's Facilities Operations Manual.  *Id.* ¶ 54.  For example, the plumbers routinely tested the backflow preventers, to ensure that contaminated water did not back into the clean water supply, as well as the wastewater outflows to ensure that there was no debris blocking the flow of wastewater to the sewer.  *Id.*  The plumbers also timely responded to plumbing maintenance requests.  *Id.* ¶ 53.

All of the toilets in the MCC were equipped with flushometers to control the flow of water for efficient and powerful flushing.  *Id.* ¶ 57.  The vast majority of plumbing issues at the MCC were caused by inmates intentionally flushing non-flushable items down the toilet or purposely destroying plumbing fixtures.  *Id.* ¶ 59.  Notably, the plumbing fixtures in 10 South were more modern than the rest of the facility.  *Id.* ¶ 63.

Schulte claims that, on one occasion, on or around October 30, 2020, sewage leaked from his toilet and accumulated on the floor of his cell until it was "several inches deep."  *Id.* ¶ 44.  He claims that the sewage leak began around 5 p.m., he was not moved out of his cell until the next morning at 9:30 a.m., and accordingly spent many hours exposed to "putrid sewage."  *Id.* ¶¶ 44-46.  But there is insufficient evidence from which a reasonable factfinder could find in Schulte's favor on this claim.

*First*, despite vast searches of BOP records, there is nothing to corroborate Schulte's allegation that he spent hours in a cell *flooded with putrid sewage*, as he claims.  *See id.* at ¶ 67.  The government searched the emails of various individuals who would have known about a sewage flood, including the correctional officers and operations lieutenants on duty at the time of the

---

[5]    Due to the restrictions on the inmates in 10 South, the work cadre did not perform plumbing work in that unit.

alleged sewage incident, and also searched the MCC's work orders system. *See id*. ¶¶ 68-82. Yet, there is no evidence supporting Schulte's version of events.

*Second*, the documents that do exist reflect that even if there was an issue with the toilet in Schulte's cell on or around October 30, 2020, the issue was far more benign than Schulte alleges. BOP records confirm that MCC facilities department staff activated a work order on November 3, 2020, which indicated that there was water (not sewage) leaking from the toilet in Cell #4 and that the work to be done was not a priority. *Id*. ¶ 69. That work order indicates that the toilet was leaking as a result of a compromised wax seal which prevents toilet water from seeping out from the base of the bowl. *Id*. ¶¶ 69-71. The wax seal on this toilet was replaced by MCC plumber Kenneth Alvarado. *Id*. This toilet was not leaking because it was clogged or because there was an issue with the piping connected to the toilet. *Id*. ¶¶ 72-73.

Had the toilet been leaking with sewage, as opposed to water, the work order would have been given a high priority status. *Id*. ¶ 74. If a substantial sewage leak had occurred (like one Schulte describes where several inches of sewage allegedly covered his cell floor), the MCC's Facilities Manager would have been made aware, and he would have contacted Roto-Rooter or another outside vendor to address the plumbing issue and contacted a professional cleaning service to disinfect the area. *Id*. ¶¶ 75-76. None of that happened.

*Third*, Edwin Matos, the corrections officer on duty in 10 South from 6 p.m. on October 30, 2020, through 6 a.m. on October 31, 2020, has no recollection of a sewage flood in Schulte's cell. *Id*. ¶ 77. Instead, he remembered a single incident in 2010, before Schulte's time at the MCC, where sewage, as opposed to water, flooded from a toilet. *Id*. ¶ 78. Further, Matos testified during his deposition that if an inmate's cell had flooded with sewage, he would "absolutely not" have

left the inmate in that cell overnight.  *Id*. ¶ 79.  Rather, he testified that he would call the facilities

staff and lieutenant, and they would move the inmate.  *Id*.

*Fourth*, Schulte's medical records belie his contention that he became sick as a result of

sewage flooding.  The BOP has no record of Schulte ever complaining of any physical effects as

a result of a sewage flood in his cell, despite daily medical rounds that occurred in 10 South.  *See*

*id*. ¶¶ 166-68.  In fact, on November 18, 2020, Schulte was examined by Dr. Robert Beaudouin,

the MCC's Acting Medical Director, just a few weeks after the alleged incident.  *Id*. ¶ 160.  Had

Schulte notified him that he had become sick because of a sewage issue in his cell 18 days prior,

Dr. Beaudouin would have recorded that in the notes from this visit.  *Id*. ¶ 166.  However, Dr.

Beaudouin's notes from this visit do not contain any reference to Schulte having been sick.  *Id*.

Accordingly, Schulte has no competent evidence to support his claims that the BOP was

negligent with respect to the plumbing in 10 South generally and that he was left in a cell overnight

that had flooded with sewage.[6]

---

[6]    Even if the court accepts Schulte's version of what occurred on October 30-31, 2020, he has still failed to show a breach of the duty of due care on the part of the BOP.  While the government is unaware of any case law on sewage exposure in the context of the FTCA, courts have repeatedly rejected attempts to prove Eighth Amendment violations based on a inmates' lengthy exposure to sewage.  *See Florio v. Canty*, 954 F. Supp. 2d 227, 235 (S.D.N.Y. 2013) (exposure to waste for a few brief periods did not amount to Eighth Amendment violation); *Myers v. City of N.Y.*, No. 11 Civ. 8525 (PAE), 2012 WL 3776707 at *6–7 (S.D.N.Y. Aug. 29, 2012) ("The only place to sit in the cell was on 'a urine and filth laden floor'.... [Plaintiff] alleges that his confinement in the holding cell lasted approximately 16 hours, … [d]iscomfort of this short duration does not rise to the level of a constitutional violation."); *Wyland v. Brownfield*, No. 08 Civ. 1601, 2011 WL 5445305 at *5 (W.D. Pa. Nov. 9, 2011) ("simply stated, ... having to clean a moldy shower with backed up sewage without gloves or a mask on [one] single occasion simply do[es] not give rise to a substantial risk of serious harm or challenge common standards of decency"); *Ortiz v. Dep't of Corr.*, No. 08 Civ. 2195 (RJS) (HBP), 2011 WL 2638137, at *8 (S.D.N.Y. Apr. 29, 2011) ("[P]laintiff was only exposed to waste for a relatively small number of hours; it appears that his total exposure was probably less than 24 hours. Although unpleasant, these incidents are simply too limited to withstand a motion to dismiss."); *Whitnack v. Douglas County*, 16 F.3d 954, 955–58 (8th Cir. 1994) (reversing jury verdict for plaintiff and finding no

### C. Schulte Cannot Show that the BOP Was Negligent with Respect to the Air Quality or other Conditions at the MCC.

Schulte has not established any competent evidence with respect to the BOP's allegedly negligent maintenance of air quality, mold, or other conditions at the MCC. BOP policy states that "[i]nstitutions must provide minimum ventilation rates to maintain human comfort in accordance with the Guide Book for the American Society of Heating and Refrigeration and Air Conditioning Engineers." *Id.* ¶ 87. Plaintiff has adduced no evidence that the ventilation at the MCC or in 10 South did not meet these standards or that the BOP was otherwise negligent with respect to the air quality in the MCC. To the contrary, the MCC's HVAC system was regularly maintained.

Each cell in 10 South had two types of ventilation: return ventilation, which supplied recirculated air, and exhaust ventilation, which removed air from the building. *Id.* ¶ 90. Both the

---

violation based on 24–hour exposure to vomit in sink, dried feces on toilet seat and dried urine puddles on floor before cleaning supplies were made available); *Odom v. Keane*, No. 95 Civ. 9941 (SS), 1997 WL 576088 at *5 (S.D.N.Y. Sept. 17, 1997) (condition where toilet failed to flush between 9 p.m. and 7 a.m. for several months "does not amount to cruel and unusual punishment"); *Evans v. Fogg*, 466 F. Supp. 949, 950 (S.D.N.Y. 1979) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell (a condition resulting from [plaintiff's] own acts) for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual punishment."); *Smith v. Copeland*, 87 F.3d 265, 268–69 (8th Cir. 1997) (no Eighth Amendment violation where prisoner "was subjected to an overflowed toilet in his cell for four days" and "was 'made to endure the stench of [his] own feces and urine' for those four days"); *Wang v. Vahldieck*, No. 09 Civ. 3783, 2012 WL 119591 at *9 (E.D.N.Y. Jan. 9, 2012) ("[P]laintiff alleges that she was detained for a maximum of six and a half hours in a dirty cell containing urine, cockroaches and used bathroom tissue.... Such temporary exposure, though perhaps quite unpleasant for [plaintiff], does not rise to the sort of conduct held 'repugnant to the conscience of mankind.'"); *Prellwitz v. Anderson*, No. 07 Civ. 2120 (PAM) (JSM), 2007 WL 2033804 at *2 (D. Minn. July 12, 2007) (allegation that there was waste water on the floor of plaintiff's cell for three hours, and that he had to endure the odor of an inoperable toilet for six hours insufficient to allege constitutional violation); *Burton v. Evans*, No. 01 Civ. 3328, 2002 WL 832590 at *5 (N.D. Ill. May 2, 2002) (allegations that plumbing malfunction caused plaintiff to live in cell without working plumbing and to breathe raw sewage for over 36 days insufficient to allege constitutional violation).

return and supply ventilation were powered by HVAC fans, which were programmed to constantly run and were turned off only when maintenance was being performed or pepper spray had been dispersed in the facility. *Id.* ¶¶ 90-92. To the extent a vent was not functioning properly, that was typically caused by the inmate in that cell clogging it with paper or other material. *See id.* ¶ 122. In addition to the vents that circulated air into each cell, 10 South also received air from the outside through open louvers in the 10 South recreation room. *Id.* ¶ 95.

Further, the MCC regularly had air flow testing done. *Id.* ¶ 97. Testing done on airflow throughout the facility, including in 10 South, on November 22, 2019, reflect that ventilation rates either met or exceeded the American Correctional Association's Ventilation Standards. *Id.* None of the MCC's routine air quality testing revealed the presence of dangerous airborne particles. *Id.* ¶ 98.

Schulte claims that the air in 10 South was polluted with laundry particles. *Id.* ¶ 85. But the laundry dryers at the MCC had dedicated ducts that direct air out of the facility. *Id.* ¶¶ 93-94. Accordingly, the air from the laundry ducts did not mix with any air that was recirculated into the building. *Id.*

Further, when pepper spray was dispersed anywhere in the MCC, the facilities department staff turned off the fans to temporarily stop air circulation throughout the building. *Id.* ¶ 88. That prevented the pepper spray from dispersing to different parts of the building. *Id.*

Finally, Schulte claims that he contracted COVID-19 because the unit below his was used as a quarantine unit for inmates infected with COVID-19. *Id.* ¶ 175. But Schulte's medical records reflect that he never complained to MCC medical staff about any COVID-19 symptoms. *Id.* ¶ 180. Schulte was offered the COVID-19 vaccine in May 2021 and declined it. *Id.* ¶ 181.

Schulte's general claim that the air in the MCC was polluted is further contravened by the fact that the air was shared by all inmates and staff alike. *Id*. ¶ 99. If there were issues with the air quality, those would have impacted all MCC inmates and staff.

Lastly, Schulte's claim that there was mold in the cells at the MCC is based on nothing more than his own speculation. The MCC's Facilities Manager was never made aware of mold growth in the cells. *Id*. ¶ 142. Photos of the 10 South unit do not reflect the "clearly visible brown, yellow, and black mold" which Schulte alleges "covered the ceilings and walls of all six cells in 10 South." *Id*. ¶ 141. And in any event, Schulte had cleaning products at his disposal. *Id*. ¶ 143. To the extent there was anything that looked like mold in the cells in 10 South, Schulte was free to clean it himself.

In sum, Schulte has failed to adduce evidence to show that the BOP failed to discharge its duty to provide him with safe and suitable living quarters. *See Jones v. United States*, No. 11 Civ. 2242 (DOC) (SP), 2014 WL 7240533, at *9 (C.D. Cal. Dec. 16, 2014) (BOP discharged its duty to use reasonable care in providing suitable living quarters in SHU where records reflected that SHU's ventilation system was regularly maintained and fully operational, air filters were replaced, and there were no work order requests regarding ventilation), *affirmed in part, vacated in part, and remanded by*, 698 Fed. App'x 536 (9th Cir. 2017).

### D. Schulte Cannot Show that the BOP Was Negligent in Depriving Him of Sleep.

Schulte claims that the BOP caused him to endure weeks at a time of less than one hour of sleep each night due to the fluorescent light above his cell beds and noise created by the MCC staff during night shifts. *Id*. ¶ 127. However, Schulte has failed to show any negligence because: (1) BOP complied with the lighting policy, *id*. ¶ 128-137; (2) Schulte admits that once he asked the MCC staff to be quieter at nighttime, they obliged, *id*. ¶¶ 138-39; and (3) Schulte's statements to

medical staff indicate his sleeping issues were alleviated once he began taking anxiety medication in 2019, *id*. ¶¶ 157-58.

BOP policy states that "[d]uring non-working hours, lighting is to be eliminated, except where necessary for safety and security." *Id*. ¶ 128. It further states that "[u]se of lighting controls such as occupancy sensors, timers, or similar types of devices must be implemented to the maximum extent practical [but that] [i]mplemented lighting controls must not hinder safety and security." *Id*. ¶ 129. The lighting scheme in 10 South complied with this policy.

The main lights in the cells in 10 South were typically on from 6 a.m. to 10 p.m. and off from 10 p.m. to 6 a.m. if they were not needed. *Id*. ¶¶ 130-31. Even when the main lights were turned off, a dim, smaller low-wattage bulb (described by one witness as a "nightlight") remained on inside one of the light panels in the cells in 10 South. *Id*. ¶ 132. Leaving this dim light on in the cells in 10 South was intended to aid in maintaining inmate security and safety in 10 South: it allowed MCC staff to see inside of the inmates' cells at nighttime, even when the remaining lights were turned off and provided for better video visibility on the cameras utilized to monitor the inmates in 10 South. *Id*. ¶¶ 132-37.

Schulte also complains that he was unable to sleep because of noise near the officer station in 10 South. But the BOP cannot be found to be negligent in this regard because, as Schulte concedes, the noise ceased once he raised the issue with MCC staff. *Id*. ¶ 138.

Finally, Schulte's claims concerning sleep deprivation are belied by his statements to MCC medical staff. In around 2019, he complained to medical staff that he had trouble sleeping. *Id*. ¶ 157. Medical staff prescribed him anti-anxiety medication to help improve his anxiety and sleep. *Id*. Schulte's medical records indicate that after he began taking anti-anxiety medication, he routinely denied experiencing any sleep issues. *Id*. ¶ 158.

For these reasons, Schulte has insufficient evidence to establish that the BOP was negligent with respect to his sleep.

### E.  Schulte Cannot Show that the BOP Negligently Prohibited Exercise.

Schulte claims that he was prohibited from engaging in any outdoor recreation and was severely limited in his indoor recreation.  *Id*. ¶ 182.  As a result, he asserts he was deprived of access to adequate exercise and involuntarily forced into inactivity.  *Id*. ¶ 184.

The BOP was not negligent with respect to Schulte's ability to exercise.  While Schulte was not permitted to participate in outdoor recreation because of his SAMs, he was regularly provided with an hour in the recreation room in 10 South.  *Id*. ¶¶ 187-88.  That room had an elliptical, an exercise bike, and an exercise mat.  *Id*. ¶ 185.  Further, both the recreation room, which was around 175 square feet, *id*. at ¶ 190, and all of the cells in 10 South had ample room for calisthenic and other cardiovascular exercise.  To the extent he was inactive, that was not due to any negligence on the part of the BOP.

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for the government and dismiss Schulte's amended complaint.

Date:  New York, New York
       February 18, 2026

                                               Respectfully submitted,

                                               JAY CLAYTON
                                               United States Attorney
                                             Southern District of New York

By:     */s/ Tara Schwartz*
                                             TARA SCHWARTZ
                                           Assistant United States Attorneys
                                           86 Chambers Street, 3rd Floor
                                           New York, New York 10007
                                           Telephone: (212) 637-2633
                                           Email: tara.schwartz@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, this brief complies with the word-count limitation of the rule, which is a maximum of 8,750.  Excluding the caption, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are 8,576 words in this brief.

Dated: New York, New York
        February 18, 2026

                                    /s/ Tara Schwartz
                                    TARA SCHWARTZ
                                    Assistant United States Attorney