JAY CLAYTON
United States Attorney for the
Southern District of New York
By:    TARA SCHWARTZ
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2633
Email: tara.schwartz@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSHUA ADAM SCHULTE,<br><br>                              Plaintiff,<br><br>          - against -<br><br>UNITED STATES OF AMERICA,<br><br>                              Defendant. | No. 21 Civ. 4042 (JMF)<br><br>**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1** |

   Pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and

Eastern Districts of New York, defendant United States of America (the "government"), by its

attorney, Jay Clayton, United States Attorney for the Southern District of New York, respectfully

submits this statement of undisputed material facts in support of its motion for summary judgment.

The government reserves the right to submit additional material undisputed facts in support of its

anticipated opposition to plaintiff Joshua Schulte's ("Schulte") cross-motion for summary

judgment and reply brief.

I.   **BACKGROUND**

   1.   On August 24, 2017, Schulte was arrested on child pornography charges.  *See*

*United States v. Schulte*, 17 Cr. 548, ECF No. 1, ECF Entry at 8/24/2017.[1]

---

[1]   Unless otherwise specified, all citations to ECF in this Background section refer to the

2. Initially, Schulte was ordered detained pending trial. *See* ECF No. 5.

3. On September 13, 2017, the court bailed Schulte with strict conditions, including a prohibition on possessing or using a computer, computer network, or the Internet without express authorization from Pretrial Services. *See* ECF No. 8.

4. On December 14, 2017, the court ordered that Schulte be detained after determining that he violated his bail conditions by using the Internet without authorization and was a danger to the community. *See* ECF No. 22.

5. On June 18, 2018, the government superseded the indictment to add charges stemming from Schulte's theft of national defense information from the Central Intelligence Agency ("CIA") and subsequent transmission of that information to Wikileaks. *See* ECF No. 47.

6. On October 31, 2018, the government filed a second superseding indictment to charge Schulte with: (i) violating the protective order entered in the criminal case by leaking a search warrant to The New York Times and The Washington Post and encouraging his family members to disseminate the search warrants (the "Contempt Count"); and (ii) smuggling contraband cell phones into the Metropolitan Correctional Center ("MCC") in New York, New York, to leak additional classified information to a reporter (the "MCC Leak Count"). *See* ECF No. 68.

7. Following the government's discovery of the conduct that led to the MCC Leak Count and the Contempt Count, the U.S. Attorney's Office—in coordination with the Federal Bureau of Investigation ("FBI") and the Department of Justice's Counterintelligence and Export Control Section of the National Security Division—requested the imposition of Special

---

docket in *United States v. Schulte*, 17 Cr. 548 (JMF).

Administrative Measures ("SAMs").  *See* ECF No. 92 at 124-140 ("SAMs Directive").

8.       On or about October 26, 2018, the Attorney General issued a written memorandum directing the Bureau of Prisons ("BOP") to implement the SAMs.  *See id.*

9.       The memorandum stated that the Director of the CIA had certified "that the implementation of [SAMs] is reasonably necessary to prevent disclosure of classified information by Schulte, and that the disclosure of such information would pose a threat to the national security." *Id.* at 1.

10.       When the SAMs were imposed on October 26, 2018, Schulte was moved to 10 South, the most restrictive housing unit at the MCC.  Declaration of Norman Reid dated Feb. 17, 2026, ECF No. 115 ("Reid Decl.") ¶ 18.

11.       As imposed on this date, the SAMs limited Schulte's contacts and communications with others because such communications could result in the unauthorized disclosure of classified information.  *See* SAMs Directive.

12.       Except as allowed by the SAMs, Schulte was barred from "having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else . . . that could reasonably foreseeably result in [Schulte] communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting [Schulte's] ability to communicate (send or receive) classified information." *Id.* at ¶ 1(c).

13.       The SAMs prohibited Schulte from being housed or communicating with another inmate. *See id.* ¶ 6.

14.       Schulte remained housed in 10 South until October 18, 2021, at which time he was transferred to the Metropolitan Detention Center ("MDC").  Reid Decl. ¶ 18.

15.     On May 10, 2019, Schulte moved to vacate the SAMs on the grounds that they are unconstitutional punishment and not reasonably necessary to prevent the disclosure of classified information.  *See* ECF No. 92.

16.     On August 14, 2019, the court denied Schulte's motion but modified the SAMs in two limited respects: first, to permit precleared non-attorney members of Schulte's legal team to disclose his communications for the sole purpose of preparing his defense, following consultation with and authorization by Schulte's cleared attorneys; and second, to permit Schulte monitored contacts (calls, visits, and mail) with non-immediate family members.  *See* ECF No. 127.

17.     In largely upholding the SAMs, the court noted that "[t]he SAMs are undoubtedly restrictive, but generally they are reasonably necessary to avoid further disclosure of classified information."  *Id*. at 8.

18.     In February and March 2020, the government tried Schulte on the second superseding indictment.  *See* Minute Entries for 2/3/2020, 2/4/2020, 2/5/2020, 2/6/2020, 2/10/2020, 2/11/2020, 2/12/2020, 2/13/2020, 2/18/2020, 2/19/2020, 2/21/2020, 2/24/2020, 2/25/2020, 2/26/2020, 2/17/2020, 2/18/2020, 3/2/2020, 3/9/2020.

19.     On March 9, 2020, the jury returned a verdict finding Schulte guilty on the Contempt Count as well as on a count of making false statements to the FBI, in violation of 18 U.S.C. § 1001 (the "False Statement Count").  *See* ECF No. 351.[2]

20.     On June 8, 2020, a third superseding indictment was filed on nine counts relating to Schulte's theft and dissemination of classified material from the CIA and leaking documents to WikiLeaks while incarcerated at the MCC.  ECF No. 405.

---

[2]     The jury did not reach a verdict on the remaining eight counts, and the Court declared a mistrial on those eight counts.  *See* ECF No. 351.

21.     On June 24, 2021, Schulte filed a second motion to vacate the SAMs.  *See* ECF No. 474.

22.     The court denied Schulte's second motion to vacate his SAMs on October 6, 2021.  *See* ECF No. 527.

23.     Beginning on June 13, 2022, Schulte was tried on the third superseding indictment.  *See* Minute Entry at 6/13/2022.

24.     The jury returned a verdict of guilty on all counts.  *See* Minute Entry at 7/13/2022.

25.     On February 1, 2024, the Court sentenced Schulte to 480 months' imprisonment. *See* ECF No. 1124.

26.     On or around February 15, 2024, Schulte was transferred to the United States Penitentiary Florence ADMAX in Florence, Colorado, where he is presently incarcerated.  *See* Reid Decl. Ex. 3 at BOP000031.

II.     **The 10 South Unit at the MCC**

27.     Schulte was housed in 10 South in MCC from October 1, 2018, through October 18, 2021 (the "Relevant Period").  Reid Decl. ¶ 18.

28.     10 South had the following rooms:

    a) Six cells that each had their own shower and toilet/sink combination unit;

    b) An officer station where the corrections officer assigned to 10 South sat, while he or she was not performing rounds in 10 South;

    c) A recreation room, used by inmates for exercise;

    d) Four separate rooms that were utilized for attorney or other inmate visits (at least one of those rooms also had a computer that could be utilized for legal research);

      e) A medical office; and

      f) Several additional rooms and offices that were used for storage or unoccupied. *Id*. ¶ 13.

29.     Each cell in 10 South could be occupied by only one inmate. *Id*. ¶ 14.

30.     For most of the Relevant Period, 10 South housed only five inmates: thus, there was always one empty cell. *See id*. ¶ 15; *see* Declaration of Tara Schwartz dated Feb. 18, 2026. ECF No. 117 ("Schwartz Decl.") Ex. 1 ("Licon-Vitale Dep.") at 58:15-20.

31.     Typically, inmates in 10 South were rotated to a different cell every 21 days for security reasons. *See* Licon-Vitale Dep. at 56:19-25; Schwartz Decl. Ex. 4 ("Bailey Dep.") 100:12-101:12.

32.     10 South was monitored by a corrections officer 24/7. Reid Decl. ¶ 17. The corrections officer typically sat at the officer station. *Id*. The corrections officer reported to the operations lieutenant for the facility. *Id*. The operations lieutenant was also at the facility 24/7. *Id*.; Licon-Vitale Dep. at 60:8-20.

33.     The operations lieutenant reported to the Warden of the MCC. Licon-Vitale Dep. at 60:8-20.

34.     Outside of the Warden's working hours, the operations lieutenant assumed the responsibilities of the Warden. Licon-Vitale Dep. at 60:8-20.

35.     Marti Licon-Vitale, who served as the Warden of the MCC from December 2019 to February 2021, conducted weekly rounds in 10 South. Licon-Vitale Dep. 9:6-14, 18:6-21.

36.     Each cell in 10 South had at least one camera that could be viewed by the corrections officer at the officer station. Reid Decl. ¶ 24; Bailey Dep. 30:2-20.

37.     Corrections officers in 10 South conducted rounds every half hour, which involved the corrections officer looking through the window of each cell in the unit to ensure

that the inmate was safe and secure. *See* Bailey Dep. at 11:23-12:6, 12:19-13:6; 20:15-17, 18:4-25; Schwartz Decl. Ex. 2 ("Matos Dep.") 62:10-65:7; Schwartz Decl. Ex. 3 ("Quamina Dep.") 48:9-25.

38.    Inmates in 10 South could report any issues to the corrections officers during their rounds. *See* Matos Dep. 65:8-66:17.

39.    Inmates in 10 South could also get the corrections officers' attention by shouting for the corrections officer from their cell or waving or putting their hand in front of the cameras in 10 South, which the corrections officer would then see on the screen from the officer station. *See* Bailey Dep. 35:11-22.

40.    Inmates in 10 South required a two- or three-person hold, meaning that they could not be moved in or out of their cell by a single corrections officer. *See* Bailey Dep. 36:6-10; Matos Dep. 15:11-17; Quamina Dep. 13:15-14:8.

41.    In order for inmates on 10 South to be removed from their cell to be taken to the recreation room, the attorney visit rooms, the law library, or another cell, the operations or activities lieutenant had to unlock the cell. *See* Matos Dep. at 13:10-14:17; Quamina Dep. 13:15-14:8.

III.    **Plumbing at the MCC and the Alleged Sewage Incident**

42.    Schulte claims that between October 2018 and June 2021, he experienced regular sewage leaks, lack of water pressure in the sink and shower, lack of hot water, an inability to control the temperature of the water, and other plumbing failures. ECF No. 45 ("Am. Compl.") ¶¶ 17-18.

43.    Schulte claims that there were three occasions during which "putrid sewage"

flooded his cell in 10 South.    Am. Compl. ¶ 20; Schwartz Decl. Ex. 7,[3] Response to

Interrogatory No. 16.    He does not recall the dates of two of the three incidents.    Response to

Interrogatory No. 16.    With respect to the first two incidents, Schulte concedes that he was

moved out of his cell within a half hour of reporting the leak to MCC staff and did not suffer

any injury as a result of the alleged leak.    Response to Interrogatory Nos. 17, 19-28.

44.    Schulte claims that he experienced a third incident "around October 30, 2020"

when he was in Cell #4.    Response to Interrogatory No. 16; Am. Compl. ¶ 21.    He claims that

at approximately 5:00 p.m. he took a shower in his cell, and when he finished, he noticed that

"sewage was leaking from the toilet again."    Response to Interrogatory No. 29.    He claims he

told the corrections officer on duty, who said he would have Schulte moved to another cell.    *Id*.

He claims that "sewage continued to accumulate on the floor of his cell" and that it was "several

inches deep" when a corrections officer appeared outside his cell and began mopping the

hallway.    *Id*.

45.    Schulte further claims that at approximately 8:30 p.m., he saw a lieutenant in the

hallway; he explained the situation to the lieutenant and the lieutenant told him he would be

moved to a different cell.    *Id*.    However, he claims that the lieutenant did not return for hours

and, during that time, the "flow of sewage intensified" and he "started to feel sick."    *Id*.    He

claims that he repeatedly communicated this to the corrections officer and the officer repeatedly

assured him that he had called the lieutenant and told him that Schulte needed to be moved to a

different cell.    *Id*.

46.    Schulte claims that at 12:00 a.m. on October 31, 2020, the lieutenant returned to

---

[3]    All citations to the Responses to Interrogatories contained herein reference Plaintiff's
Responses to Defendant's Interrogatories in Lieu of a Deposition, which is attached to the
Schwartz Declaration as Exhibit 7.

tell him that it was "too late on a Friday" to move him to a different cell.  *Id*.  Schulte claims

that at approximately 2:00 a.m., he began vomiting and experiencing diarrhea and used the

shower drain to vomit and relieve himself.  *Id*.  Schulte claims that at approximately 3:00 a.m.,

he told a corrections officer who passed by his cell that he had been vomiting for an extended

period of time and requested medical attention.  *Id*.  Schulte also claims that at 7:30 a.m., he

explained to a different lieutenant who passed by his cell during the breakfast distribution that

he was unable to eat after "spending the night soaking in sewage."  *Id*.  He says that at 9:30

a.m., he was moved to a different cell.  *Id*.

47.    Schulte claims that as a result of this incident, he experienced "acute intestinal

distress."  Am. Compl. ¶ 53.  His appetite came back after eight hours but he continued to suffer

diarrhea and gastrointestinal distress through the weekend and "other discomfort" for several

days after that.  Response to Interrogatory No. 57.

48.    The MCC regularly had two plumbing foremen on duty as well as a work cadre of

sentenced inmates who performed plumbing repairs.  Declaration of Kenneth Alvarado dated

February 17, 2026, ECF No. 113 ("Alvarado Decl.") ¶ 4.

49.    Kenneth Alvarado was one of the two plumbing foremen at the MCC from May

2016 through December 2021.  *Id*. at ¶ 1.

50.    Between four and ten work cadre inmates typically were assigned to the plumbing

detail at any one time.  *Id*. at ¶ 4.

51.    Typically, each of the plumbing foremen supervised half of the cadre inmates.  *Id*.

52.    Due to the restrictions on the inmates in the 10 South unit, most plumbing work in

that unit was done by one of the two plumbing foremen, rather than any of the cadre inmates.  *Id*.

at ¶ 8.

53.     The MCC's two plumbing foremen tried to make plumbing repairs as quickly as possible.  *Id*. at ¶ 9.  The MCC plumbing shop was fully stocked and had approximately 95% of the parts that were needed for any given plumbing repair job.  *Id*.  If the plumbing foremen needed a part that they did not already have in stock, they could usually order the part and get it the same or next day.  *Id*.  On very rare occasions, it could take a few more days to get a part that had to be shipped from out of state.  *Id*.

54.     The MCC plumbing foremen regularly tested the plumbing system at the MCC in accordance with the Facilities Operation Manual.  *Id*. at ¶ 15.  They regularly tested the backflow preventers, which are safety devices to stop contaminated or polluted water from reversing direction and flowing backward into the clean water supply.  *Id*.  They also regularly tested wastewater outflows to ensure that there was no debris blocking the flow of wastewater to the city sewer.  *Id*.

55.     The MCC did not experience any prolonged periods without hot water.  *Id*. at ¶ 14.

56.     There are approximately 400 toilets in the MCC, mostly in individual cells, including in 10 South.  *Id*. at ¶ 10.

57.     All of the toilets at the MCC were installed with flushometers.  Declaration of Christopher Nobile dated Feb. 16, 2026, ECF No. 114 ("Nobile Decl.") ¶ 49.  A flushometer is a plumbing device that controls the flow of water to flush toilets and urinals and is primarily used in commercial and public restrooms for efficient and powerful flushing.  *Id*.

58.     A flushometer operates differently from traditional toilets that rely on a tank to store and release water.  *Id.* at ¶ 50.  Instead, a flushometer connects directly to the building's

water supply, using water pressure to deliver a strong flush. *Id.* Flushometers are built to withstand heavy use. *Id.*

59. The vast majority of plumbing issues at the MCC, especially issues concerning toilets, were caused by inmates either flushing objects down the toilet or causing damage to the plumbing fixtures. *Id.* at ¶ 51; Alvarado Decl. ¶ 10.

60. If a plumbing repair needed to be done, a work order would typically be entered by the MCC Facilities Manager, the general foremen, or other MCC staff into the BOP's Computerized Maintenance Management Systems ("CMSS") work order system. Alvarado Decl. ¶ 5; Nobile Decl. ¶ 17. The work order would then be transmitted to one of the plumbing foremen. Alvarado Decl. ¶ 5.

61. Sometimes repairs of an emergency nature needed to be made; in those instances, MCC staff would sometimes notify the Facilities Department of an issue verbally. *Id.* at ¶ 6; Nobile Decl. ¶ 18. However, even when maintenance was done in response to a verbal request, a work order was always entered into CMSS. Nobile Decl. ¶ 18.

62. Like all other work orders, plumbing work orders were designated by priority. Priority work orders numbered "1" were considered urgent and were given preference over all active work orders. *See* Alvarado Decl. ¶ 7; Nobile Decl. ¶ 20. Priority work orders numbered "2" were considered routine and were completed in numerical order. *See id.*

63. The plumbing fixtures in 10 South were more modern than those in the rest of the facility because of a renovation done to build 10 South after 9/11. Alvarado Decl. ¶ 11; *see also* Reid Decl. ¶ 32.

64. Each cell in 10 South had its own toilet and sink combination unit. Alvarado Decl. ¶ 12.

65.     Each toilet and sink combination unit discharged into its own vertical stack line going from the 10th floor of the building all the way down to the basement level, and then out to the city sewer.  *Id*. at ¶ 12.

66.     Because the stack lines are independent from one another, breakage or blockage in one line would only affect that individual line, not any of the others.  *Id*. at ¶ 13.

67.     The BOP has no record of sewage flooding in Schulte's cell.  *See* Nobile Decl. ¶¶ 52-62; Schwartz Decl. ¶¶ 8-13; Alvarado Decl. ¶¶ 19-27.

68.     If Schulte's cell had flooded with sewage, the Facilities Manager, Christopher Nobile, would have been notified, and there would have been a work order entered in CMSS. Nobile Decl. ¶¶ 52-57.

69.     There were three work orders concerning the toilet in Schulte's cell in 10 South, Cell #4, from around October 30-31, 2020: work order 13607 reported that "when the toilet is flushed it leaks a lot of water out from the under side," and work order 13855 stated that the "toilet seems to be leaking substantially."  Nobile Decl. ¶ 57.  Those work orders pertain to the same leak, which were given priority "2" status meaning that the repair was not an emergency. *Id*.  Those two work orders reflect that the toilet needed a new wax seal, which MCC plumber Kenneth Alvarado installed on November 23, 2020.  *Id.*[4]

70.     The toilet needed a new wax seal because the existing wax seal had been breached.  Alvarado Decl. ¶ 23.

71.     A breached wax seal allows water from the toilet bowl to seep out from the base of the bowl when the toilet is flushed.  Alvarado Decl. ¶ 25; Nobile Decl. ¶ 59.

---

[4]     The third work order pertaining to the toilet/sink combination unit in 10 South from November 2020 indicates that the combination unit needed to be resealed to the wall.  Nobile Decl. ¶ 62.  This work order does not indicate any leak.  *Id*.  The MCC's general maintenance foreman, Geis Fermin, resealed the unit to the wall on November 30, 2020.  *Id.*

72.    The toilet in Cell #4 was not leaking because of a stoppage in the toilet.  *Id.* at

¶ 26.  If there had been a stoppage, the work order would reflect that the toilet was clogged and

needed to be cleared by a toilet augur or snake.  *Id.*

73.    The toilet in Cell #4 was not leaking as a result of a backup in the stack line

(piping) connected to this toilet.  *Id.* at ¶ 27.  If there had been a backup in the stack line, that

would have been reflected in the work order.  *Id.*  Accordingly, it is not the case that sewage

from the stack line was backing up and leaking from this toilet.  *Id.*

74.    If the toilet in Cell #4 had been leaking with sewage, as opposed to water, the

work orders relating to that toilet would have been marked as priority "1" and would have been

handled immediately.  Nobile Decl. ¶ 58.

75.    Further, if a substantial sewage leak had occurred, the MCC Facilities Staff would

have called Roto-Rooter or another outside vendor to address the plumbing issue and have

professional cleaners come to disinfect the affected area.  *Id*. at ¶ 60.

76.    The lack of work orders concerning vendors assisting with plumbing or cleaning

Cell #4 in 10 South means that the toilet did not cause any substantial sewage flood.  *Id*. at ¶ 61.

77.    The corrections officer on duty in 10 South from 6 p.m. on October 30, 2020,

through 6 a.m. on October 31, 2020, Edwin Matos, has no recollection of a sewage flood in

Schulte's cell.  Matos Dep. 110:9-111:22.

78.    Matos testified at his deposition that he remembered a single incident around

2010, before Schulte's time at the MCC, where sewage, as opposed to water, flooded from a

toilet.  *Id*. at 181:10-182:6.

79.    Further, Matos testified during his deposition that if an inmate's cell had flooded

with sewage, he would "absolutely not" have left the inmate in that cell overnight.  Matos Dep.

178:4-10.  Rather, he would have called the facilities staff and lieutenant, and they would have moved the inmate.  *Id*. at 178:12-180:19.

80.    The BOP searched the email files of Judith Woods and Marquea Rice, the two operations lieutenants on duty at the MCC during the 24-hour period from 6 p.m. on October 30, 2020, to 6 p.m. on October 31, 2020, for communications related to Schulte's allegations concerning the toilet flood.  Schwartz Decl. ¶¶ 8, 11.

81.    The BOP also searched the email files of Edwin Matos and Wilson Silva, the corrections officers on duty in 10 South from 6 p.m. on October 30, 2020, to 6 p.m. on October 31, 2020, for communications related to Schulte's allegations concerning the toilet flood.  *Id*. ¶ 9, 11.

82.    The emails do not contain any communications by or amongst the corrections officers or operations lieutenants regarding Schulte or any issue with the toilet in Cell #4.  *Id*. at ¶ 13.

## IV.    <u>HVAC – Air Quality & Other Conditions</u>

83.    Schulte claims there was clearly visible brown, yellow, and black mold covering the ceilings and walls of all six cells in 10 South.  Am. Compl. ¶ 38.

84.    Schulte also claims that the MCC ventilation system circulated air from the special housing unit ("SHU") on the 9th floor into the cells in 10 South that contained pepper spray particles.  *Id*. at ¶ 39.

85.    He further complains that air from the laundry unit was circulated into 10 South.  *Id*. at ¶ 40.

86.    Schulte also claims that inmates infected with COVID-19 were moved to the SHU on the ninth floor, which caused him to contract COVID-19 in or around March 2020.  *Id*.

at ¶ 41.

87.     BOP policy states that "[i]nstitutions must provide minimum ventilation rates to maintain human comfort in accordance with the Guide Book for the American Society of Heating and Refrigeration and Air Conditioning Engineers."  Nobile Decl. Ex. 3 at BOP001136.

88.     The fourth floor of the MCC housed fans that circulated air through the MCC building, including to all of the housing units.  Nobile Decl. ¶ 25.  The fans were programmed to always run and were turned off only when maintenance was being performed or if pepper spray (known as "OC-spray") had been dispersed in the facility.  *Id*.  Shutting off the fans prevented the OC-spray from circulating from the location where it was sprayed into other areas and floors of the facility.  *Id*.

89.     If there was ever a power outage, the fans would be powered by the MCC's generator.  *Id*. at ¶ 26.

90.     The MCC's housing units, including 10 South, had two types of ventilation— return ventilation, which supplies recirculated air, and exhaust ventilation, which removes air from the building.  *Id*. at ¶ 27.  The HVAC fans located on the fourth floor were part of the return ventilation system.  *Id*.

91.     The MCC's exhaust ventilation system was powered by a separate set of three fans, located on the MCC's roof, each of which serviced a different "range" (each comprising two tiers) of the MCC.  *Id*. at ¶ 28.  Exhaust vents in the MCC's bathrooms remove air from the bathrooms.  *Id*.

92.     Like the fourth floor fans, the exhaust fans were programmed to be always running.  *Id*. at ¶ 29.  The exhaust fans were connected to the MCC's generator, which powered the fans during any power outages.  *Id*.

93.    The main laundry facilities for the MCC were located in the basement of the building. *Id*. at ¶ 41.  The laundry dryers in the basement were connected to ductwork that led directly to the outside of the building.   *Id*.  Air from the laundry ducts did not mix with any air that was recirculated into the building. *Id*.

94.    Additionally, there was a single washer and dryer located on the ninth floor of the MCC. *Id*. at ¶ 42.  The single dryer on the ninth floor was also connected to ductwork that led directly to the outside of the building.  *Id*.  Thus, the air coming out of that dryer was not recirculated into the building.  *Id*.

95.    The 10 South unit was actually one of the only housing units in MCC that got fresh air directly from the outside.  *Id*. at ¶ 43.  That is because the recreation room in 10 South had fixed open louvers that allowed fresh air into the building.  *Id*.

96.    Further, MCC regularly had air flow testing done.  *Id*. at ¶ 44.

97.    For example, on November 22, 2019, the BOP's Northeast Regional Environmental and Safety Compliance Administrator ("E&SCA") conducted a site visit at the MCC to assess its compliance with the American Correctional Association's ("ACA") Ventilation and Lighting Standards.  *Id*. (citing Exhibit 11).  As indicated in the report, ACA standards require circulation of at least 15 cubic feet of circulated air per minute, per occupant for inmate cells/rooms and dining areas.  *See id*.  The E&SCA tested a representative sample of flow rates throughout the MCC's housing units, dining areas, and officer stations, including the cells in 10 South.  *Id*.  As documented in the E&SCA's November 22, 2019 report, ventilation rates either met or exceeded the ACA flow rates in all areas of the MCC that were tested.  *Id*.

98.    None of the MCC's routine air quality testing revealed the presence of dangerous airborne particles.  *Id*. at ¶ 45.

16

99.    All staff at the MCC breathed the same air as the inmates.  *See* Bailey Dep. 92:7-17 (10 South corrections officer stating "I never had any issues" with the air quality and "I never heard of any air concerns").

## V.    HVAC – Heating and Cooling

100.    Schulte contends that he was "forced to endure entire winter seasons in the MCC's 10 South without working heat."  Am. Compl. ¶ 59.  Specifically, Schulte claims that during two of the three winters that he spent in 10 South (2018-2019 and 2020-2021), the heating system did not work for long periods of time.   Am. Compl. ¶ 29; Response to Interrogatory No. 65.  He claims that the vents in his cell either expelled cold air or no air at all, that the heated air was insufficient and that a cup of water once froze in his cell.  Response to Interrogatory No. 65; Am. Compl. ¶ 59.

101.    He also contends that during the summer months, he was exposed to high temperatures without access to air conditioning.  Am. Compl. ¶ 31.

102.    He claims that the temperature at the MCC caused him to develop debilitating migraine headaches approximately once each week and that his extremities would go numb.  Am. Compl. ¶ 32; Response to Interrogatory No. 85.

103.    Schulte claims that the BOP "solved all the issues the second winter" (2019-2020) when the windows in the recreation room were closed.  Response to Interrogatory No. 66.

104.    He claims that he took Tylenol to treat these injuries and that it made him feel better.  Response to Interrogatory Nos. 88-89.

105.    He says that the effects of his injuries resulting from the cold temperatures in 10 South lasted years but gradually dissipated once he left the MCC.  Response to Interrogatory

No. 90.

106.    BOP policy requires that the temperature at BOP facilities be targeted to 76 degrees Fahrenheit in the cooling season (May to October) and 68 degrees in the heating season (October to May).  Nobile Decl. ¶ 30.

107.    BOP policy further provides that:

> All spaces will be maintained as close to the targeted set point as possible.  However, due to issues such as the age of the cooling and heating systems and the inability to control temperatures in individual spaces, occupants may experience a range of temperatures in their space that is a few degrees on either side of the targeted set point.  *Id*. at ¶ 31.

108.    The MCC was compliant with this policy the entire time that Schulte was housed in 10 South.  *See id*. at ¶ 32.

109.    The MCC's heating and cooling system was set to the proper temperature targets and almost always remained within a few degrees of the set range.  *Id*.

110.    The MCC's heating and cooling system was never turned off entirely during the relevant time period and was only non-operational for periods of several hours at a time when it was undergoing maintenance or being repaired.  *Id*.

111.    On occasion, a heating motor would go out.  *Id*.  But any such problems were resolved quickly—either the same day or the next day.  *Id*.

112.    In other words, the MCC never experienced any prolonged periods without heating or cooling.  *Id*.

113.    The BOP did not have a policy requiring temperature readings to be taken inside the building.  *Id*. at ¶ 33.

114.    However, Christopher Nobile, the Facilities Manager from May 2019 to January 2022, decided to conduct daily temperature readings throughout the building.  *Id*.

115.    Christopher Nobile and general foremen thus began measuring the temperature throughout the building with an ambient temperature reader, which is a handheld device with a wand attached. *Id*. at ¶ 35.

116.    They routinely took daily temperature readings in different parts of the building to get a wide understanding of the temperatures. *Id*.

117.    For some period of time, they even took temperature readings twice a day; the evening watch lieutenant would take temperature readings in the evening. *Id*.

118.    In or around February 2021, the Christopher Nobile learned that Schulte had complained about the lack of heat. *Id*. at ¶ 36.

119.    Around that time, he sent BOP counsel the temperature readings that he located for 10 South from May 2020 to the then-present date, February 17, 2021. *Id*.

120.    He also began taking temperature readings from inside and outside Schulte's cell specifically, as well as from the air coming out of the supply vent. *Id*. at ¶ 37.

121.    The temperature inside and outside of Schulte's cell was usually in the 70-degree Fahrenheit range. *Id*.

122.    Schulte sometimes intentionally clogged the vents in his cell with paper and other materials. *Id*. at ¶ 39.

123.    Inmates and staff sometimes complained to the Facilities Department staff about the temperature in the building, as not everyone is comfortable at the same temperature and neither staff nor inmates had their own thermostatic control over the temperature. *Id*. at ¶ 34.

124.    Those complaints occurred even though the temperature in the facility was in the target range. *Id*.

125.    Inmates in 10 South, like all other MCC inmates, had access to jumpsuits,

sweatsuits, thermal long johns, and blankets.  Reid Decl. ¶ 34; Bailey Dep. 63:11-18, 64:16-65:4; Quamina Dep. 73:12-22; Response to Interrogatory Nos. 73(d), 75.

126.    They also had two bed sheets and two blankets, and in the winter, they were provided with a wool blanket.  Reid Decl. ¶ 34; Bailey Dep. 64:16-65:4.

**VI.        Lighting and Sound Conditions in 10 South**

127.    Schulte claims that there was a large fluorescent light above his bed that remained on at all hours of the day and prevented him from sleeping.  Am. Compl. ¶ 33.

128.    BOP policy with respect to lighting states that "[d]uring non-working hours, lighting is to be eliminated, except where necessary for safety and security."  Nobile Decl. Ex. 3 at BOP001137.

129.    It further states that "[u]se of lighting controls such as occupancy sensors, timers, or similar types of devices must be implemented to the maximum extent practical [but that] [i]mplemented lighting controls must not hinder safety and security."  *Id.*

130.    The main lights in the cells in 10 South were typically on from 6 a.m. to 10 p.m. Reid Decl. ¶ 21.

131.    The main lights were typically off from 10 p.m. to 6 a.m. if they were not needed. *Id.*

132.    Even when the main lights were off, a dim, smaller low-wattage bulb remained on inside one of the light panels in the cells in 10 South.  *Id.* at ¶ 22; Quamina Dep. 86:19-87:9 (describing light that stays on all the time as "nightlight").

133.    Leaving this dim light on in the cells in 10 South was intended to aid in maintaining inmate security and safety.  Reid Decl. ¶ 23; Licon-Vitale Dep. 100:14-23; Quamina Dep. 89:21-90:7.

134.    The dim light allowed MCC staff to see inside the inmates' cells at nighttime, even when the remaining lights were turned off.  Reid Decl. ¶ 23.

135.    Given this dim light, the MCC staff who conducted rounds during the nighttime hours could see into the cells to ensure the well-being and security of the inmates without having to turn on the main light panel or otherwise shine their flashlight into the cell.  *Id*.

136.    Further, all of the cells in 10 South had video cameras that enabled staff to monitor the inmates in that unit.  Reid Decl. ¶ 24; Bailey Dep. 30:2-20.

137.    The dim light provided for video visibility of the cells in 10 South when the main lights were shut off.  Reid Decl. ¶ 24.

138.    Schulte also claims that BOP officials working the night shift would engage in continuously loud activities, *i.e.*, play movies and watch TV, at the staff station immediately adjacent to Cell #1.  Am. Compl. ¶ 34; Response to Interrogatory No. 136.  He claims that when he was moved into cells closer to this staff station, he had difficulty sleeping.  Am. Compl. ¶ 34.

139.    However, Schulte concedes that once he complained about the noise, the TV was removed.  Response to Interrogatory Nos. 138-139.

VII.    **Alleged Mold in 10 South**

140.    Schulte claims that "clearly visible brown, yellow, and black mold covered the ceilings and walls of all six cells in 10 South."  Am. Compl. ¶ 38.  He further claims that he "inhaled the mold in the 10 South cells."  Am. Compl. ¶ 39; *see also id*. at ¶ 86.

141.    Photographs of the 10 South unit, taken on January 24, 2017, do not show any clearly visible brown, yellow, or black mold covering any of the surfaces in Cell #6.  *See* Reid Decl. Ex. 1 at BOP000552-556.

142.    Christopher Nobile never observed anything in the MCC that he believed to be

mold, and the Facilities Department staff, who performed work all over the building, never reported to him that they believed there was mold or fungus anywhere in the building. Nobile Decl. ¶ 48.

143.    Inmates in 10 South were responsible for cleaning their own cells. *See* Quamina Dep. 92:25-93:24. Upon their request, they were provided with cleaning supplies, including a dustpan, broom, and liquid cleaning spray. *See id*. 96:16-97:6; Matos Dep. 138:15-139:14; Licon-Vitale Dep. 135:21-136:5, 137:3-138:4.

## VIII.    Medical Care on 10 South & Schulte's Health

144.    Inmates in the 10 South unit received the same medical treatment and attention as inmates in any other housing unit at the MCC. Declaration of Robert Beaudouin dated Feb. 18, 2026, ECF No. 116 ("Beaudouin Decl.") ¶ 13.

145.    Medical rounds were conducted daily in 10 South, typically by a physician assistant. *Id*. ¶ 14; Licon-Vitale Dep. 72:21-73:7; Quamina Dep. 51:6-11.

146.    Part of the daily medical rounds involved asking each inmate in 10 South if he had any medical problems or complaints. Beaudouin Decl. ¶ 14.

147.    If an inmate in 10 South made a complaint to the physician assistant or other medical staff during the medical rounds, that provider would have addressed the inmate's complaint. *Id*. ¶ 15.

148.    If an inmate in 10 South needed to be examined during daily medical rounds, the inmate would be removed from their cell and taken to the medical office in 10 South for a clinical encounter. *Id*. ¶ 16.

149.    10 South was the only housing unit in the MCC that had its own separate medical office. *Id*. ¶ 17; Quamina Dep. 50:22-51:5, 51:24-52:7.

150.    MCC medical staff generally used that medical office to examine inmates in 10 South.  Beaudouin Decl. ¶ 17.  However, if the medical staff needed to use special equipment that was not available in that office, such as the x-ray machine, they would conduct the examination in the main medical office of the MCC.  *Id*.

151.    Inmates in 10 South could request medical attention outside of rounds by notifying a corrections officer or other MCC staff member.  *Id*. ¶ 18; Licon-Vitale Dep. 73:8-13.

152.    Dr. Robert Beaudouin was the MCC's Acting Clinical Director from 2018 through October 2021.  Beaudouin Decl. ¶¶ 6, 9.

153.    Dr. Beaudoin's regular hours at the MCC were from Monday through Friday, 7:30 a.m. to 4:00 p.m.  *Id*. ¶ 8.  However, he was always on call outside of his regular working hours.  *Id*.

154.    As with all inmates, every clinical encounter with Schulte would have been documented in his electronic medical records.  *Id*. ¶ 22.

155.    Schulte's medical records reflect that when he made complaints during rounds in 10 South, those complaints were recorded in his medical records.  *Id*. ¶ 23.

156.    Schulte's medical records reflect that he had a congenital bicuspid aortic valve and hypertension.  *Id*. ¶ 24.  He was provided medication for his heart condition (lisinopril) and was followed by cardiologists at outside hospitals, including Beth Israel Hospital in New York.  *Id*.

157.    In or around 2019, Schulte complained that he had trouble sleeping.  *Id*. ¶ 25.  He was prescribed anti-anxiety medication (mirtazapine, also known as Remeron) to help improve his anxiety and sleep.  *Id*.

158.    Schulte's medical records indicate that the medication he took for anxiety worked as prescribed; after he began taking anti-anxiety medication, he routinely denied experiencing sleep issues. *Id*. ¶ 27.   For example, at a visit with a psychologist on December 20, 2019, Schulte reported as follows:

> He reported his appetite is normal. He stated he is eating his meals and drinking liquids. According to him, he is sleeping adequately with the Mirtazapine. He denied having any more nightmares. He denied having any memory issues now. He said his family is emotionally supportive. He said he spends his time looking at his discovery, working out, working on a civil case, and going to indoor recreation. He stated he had received the self help books on anxiety and sleep and the SHU Turning Point handouts. He said they were helpful. He stated he had listened to self help CDs. He was not currently interested in any self help materials. *Id*. (quoting Ex. 3 at BOP000493).

159.    Schulte's medical records reflect that, at certain times, he obtained his medication daily from medical staff through the "pill line."   *Id*. ¶ 28.   At other times, his medication was "self carry," meaning that he had the medication with him in his cell and could take it on his own.  *Id*.

160.    Dr. Beaudouin had a routine clinical encounter with Schulte on November 18, 2020.  *Id*. ¶ 29 (citing Ex. 4 at BOP00040-43).   During this encounter, Dr. Beaudouin took Schulte's vital signs, received his patient history, and examined him.   The physical examination included an eye exam, pulmonary exam, cardiovascular exam, abdominal exam, musculoskeletal exam, and neurological exam.   *Id*.   In connection with the physical examination, he also observed Schulte's posture, grooming, facial expression, affect, mood, and speech.  *Id*.

161.    Dr. Beaudouin took notes while taking Schulte's vitals and then input other notes into the electronic medical record system immediately after the encounter.  *Id*. ¶ 30.

162.    It was Dr. Beaudouin's practice to write everything the inmate told him about

their health in the clinical encounter report.  *Id*. ¶ 31.

163.    During the November 18, 2020 clinical encounter, Schulte reported that he was "doing well"; he denied experiencing headaches, dizziness, chest pain, dyspnea (shortness of breath), abdominal pain, and other gastrointestinal and genitourinary symptoms.  *Id*. ¶ 32.

164.    During this clinical encounter, Dr. Beaudouin renewed Schulte's prescriptions for mirtazapine, which his psychiatrist had prescribed for anxiety, and lisinopril, his blood pressure medication.  *Id*. ¶ 33.

165.    Dr. Beaudouin counseled Schulte concerning his diagnoses, diet, hygiene, exercise, and infection prevention.  *Id*. ¶ 34.

166.    If Schulte had reported to Dr. Beaudouin during their November 18, 2020 clinical encounter that he had experienced vomiting or intestinal illness as a result of exposure to sewage on or around October 30, 2020, Dr. Beaudouin would have noted that in the clinical encounter report.  *Id*. ¶¶ 35-36.  However, Schulte's medical records do not contain any mention of exposure to sewage or vomiting or illness resulting therefrom.  *See id*. at Ex. 4.

167.    Further, if Schulte had notified medical staff during their rounds in 10 South that he had experienced vomiting and intestinal illness, they would have input that information into his medical records.  Beaudouin Decl. ¶ 37.  However, Schulte's medical records do not contain any mention of exposure to sewage or vomiting or illness resulting therefrom.  *See id*. at Ex. 4.

168.    If Schulte had complained of experiencing several days of intestinal illness, MCC medical staff would have performed a physical examination of Schulte, which would generate a clinical encounter report.  Beaudouin Decl. ¶ 37.  However, Schulte's medical records do not contain any clinical encounter reports in the days following October 30, 2020.  *See id*. at Ex. 4.

169.    Schulte's unit manager in 10 South, Norman Reid, who typically spent a few hours a day in 10 South, never observed Schulte to be in any physical pain.  Reid Decl. ¶ 19.

170.    Warden Licon-Vitale never saw Schulte in any physical pain and did not have concerns about his physical or mental condition.  Licon-Vitale Dep. 76:9-16.

IX.    **Alleged Pepper Spray Affecting 10 South**

171.    Schulte claims that "[a]ny use of pepper spray in the 9th floor SHU unit resulted in pepper spray particles circulating into the 10 South cells."  Am. Compl. ¶ 39.  He claims that he struggled to breathe on these occasions.  *Id*.

172.    When OC-spray was used in the MCC, the facilities staff would shut off the fans to prevent the spray from circulating from the location where it was sprayed into other areas and floors of the facility.  Nobile Decl. ¶ 25.

173.    Further, the effects of OC-spray spray utilized in 9 South had very little, if any, impact on the air in 10 South.  Quamina Dep. 106:12-107:24; Bailey Dep. 90:19-91:22; Matos Dep. 160:20-163:3, 187:17-192:11.

174.    If Schulte ever felt the impacts of the OC-spray, he had constant access to a sink and shower to relieve any of his symptoms.  *See* Reid Decl. ¶ 10(a).

X.    **COVID-19 Protocol**

175.    Schulte claims that in or around March 2020, he contracted COVID-19.  Am. Compl. ¶ 41.  He claims that BOP officials moved the MCC general population detainees who were infected with COVID-19 to the SHU in 9 South.  Am. Compl. ¶ 41; Response to Interrogatory No. 53.   He claims that within days of this move, all detainees in 10 South, including him, contracted COVID-19.  Am. Compl. ¶ 41.

176.    At the beginning of the pandemic, before rapid COVID-19 testing was widely available, MCC medical staff would perform a physical evaluation of an inmate who complained of COVID-19 symptoms.  Beaudouin Decl. ¶ 38.  Specifically, MCC medical staff would check the inmate's temperature, vital signs, lungs, and oxygenation.  *Id*.  At times, MCC medical staff also performed a chest x-ray.  *Id*. If the inmate was not stable, they would be sent to the hospital, and the hospital would decide whether the patient needed to be admitted.  *Id*.

177.    If a patient in 10 South complained of COVID-19 symptoms, medical staff would follow this protocol.  *Id*. ¶ 39.

178.    Once rapid COVID-19 testing became available at the MCC, medical staff used such testing to diagnose any inmate who complained of COVID-19-like symptoms.  *Id*. ¶ 40.

179.    If an MCC inmate complained of COVID-19-like symptoms and/or was tested for COVID-19, there would be a record in their medical chart.  *Id*. ¶ 41.

180.    Schulte's medical records indicate that he never complained of COVID-19-like symptoms and was never tested for COVID-19 while at the MCC.  *Id*. ¶ 42.

181.    Schulte was offered the COVID-19 vaccine on May 21, 2021 by MCC medical staff.  *Id*. ¶ 43.  He refused the vaccine.  *See id*.

XI.    **Recreation for SAMs Inmates**

182.    Schulte alleges that while he was housed in 10 South, he was not permitted outdoor recreation and had only limited access to indoor recreation.  Am. Compl. ¶ 43.  He further claims that he was denied indoor recreation for three to six weeks at a time.  *Id*.

183.    He asserts that the indoor recreation room in 10 South was too small to run or walk around in and inmates used it to watch television, further limiting space for physical exercise.  *Id*. at ¶ 44.  He complains that the two pieces of exercise equipment in the room were

27

made entirely of metal and were painful to use.  *Id.*

184.    Schulte claims that as a result of his inactivity while housed in 10 South, he developed hemorrhoids, which lasted for 18 months, made it painful for him to sit or sleep, and caused him to develop acute ankle pain and experience muscle atrophy and persistent throbbing in his arms and legs.  *Id.* at ¶¶ 45-46.  He also claims he experienced increasingly frequent and acute heart palpitations and migraines due to lack of exercise.  *Id.* ¶ 46.

185.    10 South had a recreation room which had an exercise bike, exercise mat, elliptical machine, and a television.  Reid Decl. ¶ 26.

186.    The recreation room had louvers that allowed fresh air to come in.  *Id.* ¶ 28.

187.    10 South inmates were generally permitted to utilize the recreation room for one hour per day.  *Id.* ¶ 29; Bailey Dep. 80:20-22; Quamina Dep. 98:4-11.  Absent exigent circumstances at the MCC, the SAMs inmates, including Schulte, were provided with one hour of recreation time each day.  Reid Decl. ¶ 29; Quamina Dep. 99:4-102:20, 103:5-7; Bailey Dep. 80:23-81:9, 81:22-83:15.

188.    As a matter of BOP policy, SAMs inmates were not provided outdoor recreation time at the MCC.  Reid Decl. ¶ 30.  The only outdoor recreation area at the MCC was on the roof of the building.  *Id.*  Given the configuration of the MCC and the typical limitations on SAMs inmates communicating with other inmates or individuals, it would not have been possible to move the SAMs inmates to the roof to provide them with outdoor recreation time. *Id.*; Licon-Vitale at 172:2-13.

189.    Schulte claims that the recreation room was too small to run or walk around in. Am. Compl. ¶ 44.

190.    The area of the recreation room was around 175 square feet.  *See* Reid Decl. Ex.

4.

191.    Schulte claims that inmates in 10 South used the recreation room to watch television, which limited the space for physical exercise.  Am. Compl. ¶ 44.

192.    However, the inmates in 10 South were taken to the recreation room one at a time. *See* Matos Dep. 143:17-144:4.


Dated: February 18, 2026
      New York, New York

                                   JAY CLAYTON
                                   United States Attorney for the
                                   Southern District of New York
                                   *Attorney for Defendants*

               By:     */s/ Tara Schwartz*_____
                                   TARA SCHWARTZ
                                   Assistant United States Attorney