UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOSHUA ADAM SCHULTE<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 21-CV-4042 (JMF) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

MICHAEL W. MARTIN
IAN WEINSTEIN
Lincoln Sq. Legal Srvs., Inc.
150 W. 62nd St., 9th Floor
New York, NY 10023
(212) 636-6934
mwmartin@lsls.fordham.edu
*Attorneys for Mr. Joshua Adam Schulte*

*On the Memo:*
Macie Lavender
Basha Goldwater
Pierina Hernandez Luperdi
Sheena Qiao
*Legal Intern*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................................. 1

**BACKGROUND** ....................................................................................................................... 1

   I.   MR. SCHULTE'S RESTRICTIVE CONFINEMENT AT THE NOW CLOSED MCC. ..... 1

   II.  UNLAWFUL TREATMENT AT THE MCC. ................................................................. 3

      *I.   Exposure to Sewage.* .................................................................................. 3

      *II.  Exposure to Extreme Temperatures.* ........................................................ 4

      *III. Exposure to Toxic Air.* ............................................................................ 6

      *IV. Sleep Deprivation.* .................................................................................. 7

      *V.  Exercise Deprivation.* .............................................................................. 8

   III. PROCEDURAL HISTORY .......................................................................... 9

**LEGAL STANDARD** ............................................................................................................ 10

   A.  SUMMARY JUDGMENT ....................................................................................... 10

   A.  FEDERAL TORT CLAIMS ACT (FTCA) ............................................................. 10

   B.  NEW YORK COMMON LAW NEGLIGENCE ...................................................... 11

**ARGUMENT** ........................................................................................................................ 12

   I.   MR. SCHULTE SHOULD BE AWARDED SUMMARY JUDGMENT AS TO HIS SEWAGE AND TEMPERATURE CLAIMS. ....................................................... 12

      *A.  The Government is Liable under the FTCA for Mr. Schulte's Negligent Confinement with Sewage.* ........................................................................ 12

         i.   Mr. Schulte Suffered Physical Injury. ......................................... 13

         ii.  The DFE Does Not Protect the BOP from Liability. ................... 14

         iii. There is Liability under New York Law for Exposure to Sewage ........................... 14

      *B.  The Government is Liable under the FTCA for Exposing Mr. Schulte to Injuriously Cold and Hot Temperatures.* ............................................... 16

         i.   Mr. Schulte Suffered Physical Injury. ......................................... 16

         ii.  The DFE Does Not Insulate the BOP From Liability. ................. 17

         iii. The BOP Acted Negligently under New York State Law When Confining Mr. Schulte in Injurious Temperatures. ................... 18

   II.  THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO ANY OF MR. SCHULTE'S CLAIMS. ............................................................... 21

      *A.  There are Material Disputes that Bar Summary Judgement on Mr. Schulte's Air Quality Claim.* ................................................................... 21

      *B.  A Reasonable Factfinder Could Find that the BOP Negligently Deprived Mr. Schulte of Sleep.* .................................................................................. 23

      *C.  A Reasonable Factfinder Could Find Liability for Deprivation of Exercise.* ............... 25

      *D.  Mr. Schulte's Pattern and Practice Claim is Not in Dispute.* .................. 26

i

**CONCLUSION** ...................................................................................................................... **27**

## TABLE OF AUTHORITIES

**Cases**

*Adorno v. Correctional Services Corp.*, 312 F. Supp. 2d 505, 520 (S.D.N.Y. 2004)................... 25

*Bacon v. U.S.*, 104 Fed. Appx. 208, 210 (2d Cir. 2004) ................................................................. 25

*Banks v. United States*, 2011 WL 4100454 at *15 (S.D.N.Y. Sep. 15, 2011) ............................. 16

*Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) .......................................................... 10

*Colucci v. Stuyvescant Plaza, Inc.,* 157 A.D. 3d 1095, 1100 (Sup. Ct., App. Div., 3d Dept. Jan. 11, 2018) ......................................................................................................................................... 17

*Coulthurst v. U.S.*, 214 F.3d 106, 109 (2d Cir. 2000)................................................................... 11

*Davis v. U.S.*, 143 Fed. Appx. 371 (2005) .................................................................................... 17

*Dugan v. Washington*, No. 99 C 4382, 2001 WL 741626 *7 (N.D. Ill. June 11, 2001)............... 21

*F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) ............................................................................... 11

*Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 320 (2022) ....................................................... 12

*Gilmore v. Bostic*, 636 F. Supp. 2d 496, 514 (S.D.W. Va. 2009)................................................. 18

*Gurley v. Sheahan*, No. 06CV-3454, 2009 WL 2178685, at *7 (N.D. Ill. July 21, 2009) ........... 18

*Larson v. Eney*, 741 F. Supp. 2d 459, 462 (S.D.N.Y. 2010) ........................................................ 10

*Leon v. Johnson*, 96 F. Supp. 2d 244 (W.D.N.Y. 2000)............................................................... 19

*Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012) ............................................................ 10

*Lopez v. United States*, 2020 WL 1492804 *3 (M.D.Fla., 2020) ................................................. 19

*Maguire v. Coughlin*, 901 F. Supp. 101, 105 (N.D.N.Y. 1995) .................................................... 19

*Nabe v. U.S.,* 2014 WL 4678249, at *6 (E.D.N.Y. Sep. 19, 2014)................................................ 15

*Rivera v. Federal Bureau of Prisons*, 2018 WL 11312146, at *10 (S.D.N.Y. Dec. 14, 2018) .... 12

*Sanchez v. State of New York*, 99 N.Y.2d 247, 252-53 (2002) ...................................................... 12

*Scottish Air Intern., Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224 (2d Cir. 1996)......... 10

*Smith v. United States*, 207 F. Supp. 2d 209, 212 (S.D.N.Y. 2002) ............................................. 22

*USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111–12 (2d Cir. 2012) ..................................................................................................................................... 11

*Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967) ........................................................................ 19

*Young v. United States,* 2014 WL 1153911, at *15 (E.D.N.Y. Mar. 20, 2014)............................ 11

**Statutes**

18 U.S.C. § 4042(a)(2)............................................................................................................. 11, 24

28 U.S.C. § 2674......................................................................................................................... 10

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................................... 10

iii

## PRELIMINARY STATEMENT

Plaintiff Joshua Adam Schulte, through counsel, respectfully submits this Memorandum of Law in Support of His Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, ECF No. 118, pursuant to Federal Rule of Civil Procedure 56. Mr. Joshua Schulte brought this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671 *et seq.*, for injuries caused by the negligence of the United States during his detention at the Metropolitan Correctional Center in Manhattan ("MCC"). After years of problems with failing infrastructure, the Government announced the closure of the MCC in August 2021. Exposed to extreme temperatures, raw sewage, dirty air, and denied sleep and exercise, he suffered physical and emotional injuries that continue to plague him.

The Government's claim that this is a dispute about how the Federal Bureau of Prisons ("BOP") ran the MCC, Gov't Mem. Supp. Mot. Summ. J. ("Gov't MSJ") 12, ECF No. 118, must be rejected. This is not a dispute about the BOP's policies; this is an action based upon its failure to meet its legal obligations to one entrusted to its care. The record shows that the United States and the BOP knew of these conditions and unreasonably failed to address them, causing Mr. Schulte physical injuries. This Court should enter partial summary judgment for Mr. Schulte on liability and reject the Government's motion in its entirety.

## BACKGROUND

### I.    MR. SCHULTE'S RESTRICTIVE CONFINEMENT AT THE NOW CLOSED MCC.

Starting around October 1, 2018, to October 18, 2021, Mr. Joshua Schulte was alone in a cell for at least 23 hours a day and wholly dependent on his jailers. *See* Martin Decl., Ex. A, Am. Compl. ("AC") ¶ 15, 43, ECF No. 49; Decl. of Norman Reid ("Reid Decl.") ¶ 18, 30, ECF No. 115. Housed in the Special Housing Unit ("SHU") at the MCC, known as 10 South, he was subject

1

to rigorous conditions of confinement, pursuant to Special Administrative Measures (SAMs), issued by this Court. *See* Reid Decl., ECF No. 115, ¶ 30.

The door to his cell could not be opened by the staff on the unit; only a lieutenant had the key, and an additional staff member's presence was also required for movement. *See* Martin Decl., Ex. N, Dep. of Norman Reid ("Reid Dep.") 29:2-6, 38:9-13. There was a camera inside his cell, and a light remained on 24 hours a day so he could be monitored. *See* Reid Decl. ¶ 24. He ate, bathed, and relieved himself there, and a white noise machine ran continuously outside his cell. *See* Ex. N, Reid Dep. 118:12-13. When permitted a recreation period, it was in a windowless room with minimal exercise equipment and open louvers. *See* Martin Decl., Ex. X, Photos of MCC, at BOP000550–51.

During the three years Mr. Schulte was detained at the MCC, the institution experienced failures of infrastructure and services at every level, including repeated crises with plumbing, heating and cooling, fire protection, sanitation, and pest control. *See* Martin Decl., Ex. EE, Decision Paper Closing MCC, at BOP003027–30. When the building was finally shuttered in October 2021, Mr. Schulte was one of the last people transferred to the Metropolitan Detention Center ("MDC"). *See* Ex. A, AC ¶ 14.

After his transfer to the MDC, Mr. Schulte was convicted in two separate trials and sentenced. He is now incarcerated in the U.S. Penitentiary, Administrative Maximum facility (ADX) in Florence, Colorado. *See* 17-CR-548 (JMF), ECF No. 92 (hereinafter "SAM Agreement"). His direct appeal of his criminal case is pending. *United States v. Schulte*, 17-cr-548-1 (S.D.N.Y 2024).

2

## II.      UNLAWFUL TREATMENT AT THE MCC.

### I.  Exposure to Sewage.

10 South was plagued by plumbing issues, including corrosion of the facility's pipes and valves, Martin Decl., Ex. J, Dep. of Kenneth Alvarado ("Alvarado Dep.") 33:15-22, 54:2-6, and repeated toilet clogs and overflows. *See* Martin Decl., Ex. F, Dep. of Christopher A. Nobile ("Nobile Dep.") 148:21-24; Martin Decl., Ex. M, Dep. of Maurice Bailey ("Bailey Dep.") 46:3-4; Martin Decl., Ex. D, Interrog. Resps. of Mirsad Kandic ("Kandic Interrog.") No. 8; Martin Decl., Ex. I, Dep. of Edwin Matos ("Matos Dep.") 40:4-15.

Designated staff could request repairs by submitting work orders through the BOP system. Ex. F, Nobile Dep. 108:25-109:6, 113:17-114:11.  Orders would remain pending until facilities staff confirmed someone was available to complete the repair and then "activated" the order. *Id.* at 113–115.  Requests entered on weekends would typically be activated the following week. Martin Decl., Ex. L, Dep. of Marti Licon-Vitale ("Licon-Vitale Dep.") 87:20-88:4; Ex. F, Nobile Dep. 137:17–138:5, 150:2-21; Ex. J, Alvarado Dep. 69:15-24.  When notified of a leak, it was BOP policy to move the inmate to a vacant cell. *See id.* at 74:18–75:2; Ex. F, Nobile Dep. 134:23–135:11; Ex. L, Licon-Vitale Dep. 93:4-17; Reid Decl. ¶ 15 (one cell on 10 South was always left available).  Although problems arose unpredictably, no facilities staff worked nights or weekends. *See* Ex. J, Alvarado Dep. 16:11-25; Ex. I, Matos Dep. 83:9-16.

Mr. Schulte experienced two incidents of sewage leaking into his cell prior to October 30, 2020.  *See* Martin Decl., Ex. B, Interrog. Resps. of Joshua Schulte ("Schulte Interrog.") Nos. 17–22, 23–28.  In both, Mr. Schulte was moved to a different cell within 30 minutes of reporting the issue. *See id.* at 21(c), 27(c).

But after reporting a toilet leak on Friday, October 30, 2020, Mr. Schulte was not removed from Cell 304 (hereinafter "Cell 4") for over 14 hours. *See* Ex. B, Schulte Interrog. Nos. 29, 51; *see* Martin Decl., Ex. S, Inmate Quarters History, at BOP000035.  At approximately 5 pm, Mr. Schulte notified staff that his toilet was leaking sewage from the base. *See* Ex. B, Schulte Interrog. No. 29.  He was not moved. *See id.*  A lieutenant later passed by the cell and asked the corrections officer "what's that smell?"; in response, Mr. Schulte again reported the leak. *See id.*

At approximately 2am on October 31, Mr. Schulte began throwing up and having diarrhea. *See id.*  Mr. Schulte soon requested medical attention. *See id.*  Despite alerting multiple officers and lieutenants throughout the night about the accumulating sewage, Mr. Schulte was not transferred to an available cell, Cell 302 (hereinafter "Cell 2"), until 7:21am—over 14 hours after the leak began. *See id.*; *see* Ex. S, at BOP000035.

On Monday, November 2, a complaint was entered regarding Cell 4's toilet leak. *See* Exhibit P, 10 South Work Order Forms, at BOP000700.  The next day, a work order was activated, reporting that the toilet leaked "from the under side." *See id.* at BOP000706.  On November 23, the work order was completed after the toilet's broken wax seal was replaced. *See id.*  A broken wax seal allows sewage to leak from the toilet's base. *See* Ex. J, Alvarado Dep. 69:7.

In addition to the vomiting and diarrhea described above, Mr. Schulte continued to experience gastrointestinal symptoms for several days. *See* Ex. B, Schulte Interrog. Nos. 55, 57. Likening the experience to being trapped in a burning building, Mr. Schulte also suffered from emotional and psychological distress. *See id.* at 63a.

## II.  Exposure to Extreme Temperatures.

During the winters of 2018–2019 and 2020–2021, Mr. Schulte was exposed to injuriously cold temperatures in 10 South. *See id.* at 65, 85, 86.  The overnight temperatures in his cell were

4

cold enough to freeze a cup of water in his windowsill. *See id.* at 80. Mr. Schulte would lose feeling in his extremities from the cold, resulting in pain in his hands and feet. *See id.* at 85, 86. He was "[s]hivering, miserable, trapped" for months. *See id.* at 84.

During his first and third winter at the MCC, the BOP did not close the open louvers in the recreation room that exposed Mr. Schulte to the outside air. *See* Gov't MSJ, ECF No. 118, at 22; Ex. B, Schulte Interrog. No. 147. The BOP provided Mr. Schulte and others in 10 South with long johns and extra blankets, but those measures were inadequate. *See* Gov't MSJ, ECF No. 118, at 16; Ex. B, Schulte Interrog. Nos. 67, 74. Inmates, including Mr. Schulte, wore all their clothes and socks on their hands as gloves due to the extreme cold. *See id.* at 74; Ex. D, Kandic Interrog. No. 6. In contrast, MCC staff had access to ski coats, hats, and gloves in the facility. *See id.*; Ex. B, Schulte Interrog. No. 77; Martin Decl., Ex. C, Interrog. Resps. of Sajmir Alimehmeti ("Alimehmeti Interrog.") No. 6; Ex. I, Matos Dep. 113:2-3 ("I had to have my jacket in [10 South]"); Ex. M, Bailey Dep. 64:2-6 ("I came in with my jacket . . . I got my gear on.").

BOP night staff working from 12 am to 8 am experienced temperatures below 68 degrees in 10 South. *See id.* at 68:12-20. While the record contains more than 100 temperature readings taken during Mr. Schulte's time in 10 South, there is no temperature reading for any cell taken at night during the winter months. *See* Martin Decl., Ex. GG, Temperature Readings, BOP001291–1332; BOP1462–1585. The MCC provided neither a heater nor replaced the failing heating coils in the building. *See* Ex. EE, at BOP003027–30.

During the summer, Mr. Schulte was exposed to unreasonably hot temperatures in his cell. *See* Ex. B, Schulte Interrog. No. 103–104(b). In the summer of 2019, Mr. Schulte experienced debilitating heat from July 4 to September Solstice. *See id.* at 104(b). Confined in his cell, he would combat the heat by pressing his body against the cinder blocks, sleeping with no clothes on

or taking multiple cold showers a day. *See id.* at 104(b), 107, 108.  Mr. Schulte describes feeling "stuck" and "miserable," and he sought help from psychology at MCC. *See id.* at 114(c).

As a result of being exposed to unreasonable temperatures for a prolonged period, Mr. Schulte suffered from migraines and slept only one to three hours per night. *See id.* at 85, 106, 118; Ex. A, AC ¶ 35.

### III. Exposure to Toxic Air.

For years, the MCC's air ventilation system suffered structural issues, exposing Mr. Schulte to injurious recirculated dust, mold, fumes and other toxins. *See* Martin Decl., Exhibit W, MCC Building Assessment Report, at BOP001913.  The MCC's Building and Grounds Assessment Report from 2020 stated that the building's leaking plenums were "unsafe and inefficient" and its air dampers were "seized in a closed position," preventing the ventilation system from functioning correctly. *Id.*  Per this report, "it [was] not possible to regulate airflow or temperatures in the current HVAC configuration." *Id.*  Work orders further reveal a 2020 incident where the ventilation system in two 10 South cells was not circulating fresh air, but rather recycled air from other cells. *See* Ex. P at BOP000715; BOP000716.

The MCC's ventilation system was interconnected between floors, allowing air particles like pepper spray, laundry fibers, and orange lint to travel throughout the facility. *See* Ex. G, Quamina Dep. 105:7-13; Ex. D, Kandic Interrog. No. 9; Ex. I, Matos Dep. 166:3-24, 168:6-13. Inmates and prison officials in 10 South alike could tell when pepper spray had been used in other parts of the building as it stung their eyes and nose and made them cough. *See* Ex. C, Alimehmeti Interrog. Nos. 9, 10; Ex. D, Kandic Interrog. No. 9; Ex. B, Schulte Interrog. No. 149(d); Ex. G, Quamina Dep. 105:16-18; Ex. I, Matos Dep. 162:21-23.  BOP records show that between

November 2018 and January 2021, pepper spray was used roughly once a month in 9 South. *See* Martin Decl., Ex. U, Lists of Incidents Involving Chemicals, at BOP0002596.

Mr. Schulte and other detainees also confirm the presence of mold. *See* Ex. B, Schulte Interrog. No. 145(a)–145(c); Ex. D, Kandic Interrog. No. 9; Ex. C, Alimehmeti Interrog. No. 9. Mold was particularly pervasive on windowsills and the plexiglass in Cell 303 (hereinafter "Cell 3") and Cell 4. *See* Ex. B, Schulte Interrog. No. 145(b)–(c). After Mr. Alimehmeti's legal team complained about the air quality, staff attempted to clean but could not eliminate the mold behind the safety plexiglass windowsills. *See* Ex. C, Alimehmeti Interrog. No. 9. As a result of the poor air quality on 10 South, Mr. Schulte developed respiratory issues, including difficulty breathing and uncontrollable coughing. *See* Ex. B, Schulte Interrog. Nos. 149(d), 151(e), 153, 155.

**IV. Sleep Deprivation.**

Cells in 10 South were continuously lit, 24 hours a day. *See* Ex. I, Matos Dep. 137:17-20; Ex. D, Kandic Interrog. No. 19; Ex. C, Alimehmeti Interrog. No. 19. The lights were bright and interfered with sleep, *see* Ex. B, Schulte Interrog. No. 127; Ex. I, Matos Dep. 134:3-6, so inmates would try to cover them with towels. *See* Ex. I, Matos Dep. 66, 69–70:4, 91:20–92:12; Martin Decl., Ex. H, Dep. of Darrius Dupree ("Dupree Dep.") 30:24–31:3. Inmates could not control the lights, *see* Ex. I, Matos Dep. 67:3-9, and guards would typically leave the overhead light on at night. *See* Ex. B, Schulte Interrog. No. 125. However, even guards could not completely turn off all the lights within an inmate's cell; a light would always remain on so that the cell could be monitored by video. *See* Reid Decl. ¶ 5.

The constant light prevented Mr. Schulte, and others, from getting adequate sleep. *See* Ex. B, Schulte Interrog. No. 132; Ex. C, Alimehmeti Interrog. No. 21; Ex. D, Kandic Interrog. No. 21. While incarcerated in 10 South, Mr. Schulte could only sleep between one and three hours a night.

*See* Ex. B, Schulte Interrog. No. 118.  In addition to insomnia, Mr. Schulte suffered physical discomfort, migraines, and decreased cognitive processing. *See id.* at 132a, 132b, 143a.  Prolonged sleep deprivation further caused Mr. Schulte to feel heightened anxiety, and he was prescribed the anti-anxiety medication Mirtazapine on or around the beginning of 2021. *See id.* at 134a, 143d.

## V.  Exercise Deprivation.

10 South inmates were not allowed to have outside recreation time, *see id.* at 164; Reid Decl. ¶ 29, 30.  But the BOP had to provide inmates with one hour in 10 South's indoor recreation room, Monday to Friday. *See* Ex. I, Matos Dep. 143:13–144:4.  However, multiple inmates report that MCC staff frequently did not take them to recreation. *See* Ex. B, Schulte Interrog. Nos. 166, 167, 168b; Ex. D, Kandic Interrog. No. 11; Ex. C, Alimehmeti Interrog. No. 11; Ex. L, Licon-Vitale Dep. 173:9-20.  Mr. Schulte was denied access for three to six weeks at a time. *See* Ex. B, Schulte Interrog. No. 166.  Even when inmates were brought to the recreation room, the space was inadequate to provide sufficient exercise—it was too small and only had two pieces of metal equipment that were painful to use. *See id.* at 165; Ex. X, Photos of MCC at BOP000550–51.

Mr. Schulte developed frequent and severe migraines, heart palpitations, acute ankle pain, muscle atrophy, persistent throbbing in his legs and arms, and hemorrhoids. *See* Ex. B, Schulte Interrog. Nos. 171, 177, 189.  His hemorrhoids started within 6 months of entering 10 South and consisted of continuous pain, an inability to sit without pain, and difficulty sleeping in certain positions, lasting for approximately 18 months. *See id.* at 176, 179, 180.  Medical staff informed him that hemorrhoids are common among inmates in 10 South who had little access to physical activity and prescribed him medication. *See id.* at 175, 183a.  Additionally, Mr. Schulte experienced emotional and psychological distress from the lack of stimulation, including panic and a sense of hopelessness. *See id.* at 191a.

8

### III.     PROCEDURAL HISTORY

After filing administrative complaints, ECF No. 64 at 2 n.2, Mr. Schulte filed twelve separate complaints in federal court in June and July 2021, seeking injunctive and monetary relief under *Bivens* and the FTCA for injuries resulting from the conditions of his detention in MCC.  On November 10, 2021, the Court dismissed Mr. Schulte's *Bivens* claims and denied injunctive relief as moot. *See* ECF No. 9 at 3.

On January 12, 2022, the Court consolidated the twelve complaints into this action. *See* ECF No. 18.  The Government moved to dismiss the FTCA claims pursuant to FRCP 12(b)(1) for lack of subject-matter jurisdiction. ECF No. 20.  The Court granted Mr. Schulte's application for pro bono counsel, ECF No. 38, and current counsel entered the case on August 24, 2022. *See* ECF No. 39.  Counsel filed an opposition to the motion to dismiss and sought leave to amend. *See* ECF No. 46.  On February 22, 2023, the Court denied the motion to dismiss the plumbing and sewage claim and granted leave to file an amended complaint. ECF No. 48.  The Amended Complaint was filed on March 23, 2023 and laid out six claims arising from: (1) confinement in a cell with putrid sewage; (2) exposure to extreme temperatures; (3) deprivation of sleep; (4) prohibition of exercise; (5) exposure to dangerous air quality; and (6) pattern and practice of failing to provide adequate sanitation, breathable air, and other rudiments. *See* ECF No. 49.

On February 1, 2024, the Court denied the Government's motion to dismiss the amended complaint for failure to present the claims, as required by the FTCA. *See* ECF Nos. 54–55, 64.  The parties engaged in discovery and agreed that Mr. Schulte and several other former detainees would submit interrogatories in lieu of depositions.  Discovery was completed on September 17, 2025.

## <u>LEGAL STANDARD</u>

### A.  SUMMARY JUDGMENT

Summary judgment must be granted when there is no genuine dispute as to any material fact and judgment is warranted as a matter of law. Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  At summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A plaintiff moving for summary judgment may satisfy their burden of proof by presenting affirmative evidence establishing all elements of their claim. *See generally Scottish Air Intern., Inc. v. British Caledonian Grp., PLC,* 81 F.3d 1224 (2d Cir. 1996); *see also Larson v. Eney*, 741 F. Supp. 2d 459, 462 (S.D.N.Y. 2010).

### A.  FEDERAL TORT CLAIMS ACT (FTCA)

The Federal Tort Claims Act ("FTCA") waives sovereign immunity, *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012), to create a federal cause of action in tort for "personal injury . . . where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (cleaned up); *see also* 28 U.S.C. § 2674.

Two additional legal requirements are relevant to this action: (1) prior showing of physical injury for a mental or emotional injury, *see* 28 U.S.C. 1346(b)(2), and (2) the discretionary function exception ("DFE"). *See* 29 U.S.C. § 2680(a).  For the DFE to apply, "(1) the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation, and (2) the judgment or choice in question must be grounded

10

in considerations of public policy or susceptible to policy analysis." *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111–12 (2d Cir. 2012).

But government actors' conduct is unprotected under the second prong where it involves "negligence unrelated to any plausible policy objectives." *Coulthurst v. United States*, 214 F.3d 106, 109-11 (2d Cir. 2000).  Under the "negligent guard theory," the Second Circuit has held that an official's "lazy or careless failure to perform their discretionary duties" is a negligent act. *See id.* at 110; *see also Young v. United States,* 2014 WL 1153911, at *15 (E.D.N.Y. Mar. 20, 2014) (stating that a "[p]laintiff can overcome the FTCA's discretionary function exception if he can demonstrate that the officers' actions in [his] case were the result of laziness, carelessness, or inattentiveness, rather than grounded in policy considerations").

## B.  NEW YORK COMMON LAW NEGLIGENCE

Under New York State law, where this negligence occurred, a plaintiff must prove (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, and (3) an injury that was proximately caused by the breach. *See Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 320 (N.Y. 2022) (Wilson, J., dissenting); *see also Rivera v. Federal Bureau of Prisons*, 2018 WL 11312146, at *10 (S.D.N.Y. Dec. 14, 2018). The BOP owes a statutory duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence" of the inmates in its care, including to those in the MCC. 18 U.S.C. § 4042(a)(2).  This duty is particularly significant in the detention context, where the State controls almost all aspects of an inmate's living conditions. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199 (1989) ("[B]ecause the prisoner is unable by reason of the deprivation of his liberty to care for himself, it is only just that the State be required to care for him." (quoting *Spicer v. Williamson*, 191 N.C. 487, 490 (1926)).

11

Under NY law, a jailer breaches its duty to inmates where it fails to exercise reasonable care to mitigate foreseeable risks, including those arising from inadequate supervision or unsafe conditions. *See Sanchez v. State of New York*, 99 N.Y.2d 247, 252–53 (2002) ("Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, the [s]tate [or its political subdivisions] owe a duty of care to safeguard inmates").

## ARGUMENT

The Government's motion for summary judgment should be denied in its entirety. Rather, the record supports granting Mr. Schulte summary judgment for his claims arising from exposure to raw sewage and extreme temperatures at the now defunct MCC. Similarly, the record contains sufficient evidence that the DFE does not bar any of Mr. Schulte's claims, and that the BOP breached its custodial duty to care for Mr. Schulte by negligently exposing him to contaminated air and depriving him of sleep and exercise. Mr. Schulte suffered foreseeable and demonstrated physical injuries as a result of the BOP's negligence, therefore fully undermining the Government's claims to the contrary.

I.    **MR. SCHULTE SHOULD BE AWARDED SUMMARY JUDGMENT AS TO HIS SEWAGE AND TEMPERATURE CLAIMS.**

### A. The Government is Liable under the FTCA for Mr. Schulte's Negligent Confinement with Sewage.

On October 30, 2020, MCC staff negligently failed to remove Mr. Schulte from his cell causing him foreseeable physical injury and rendering the United States liable. Mr. Schulte's first-hand account of those horrendous fourteen hours exposed to sewage is undisputed. On October 30, the toilet in his cell began to leak sewage. Although he notified staff, he was not moved until the next morning. *See* Ex. B, Schulte Interrog. Nos. 29–32. The MCC cell log shows that he was removed from Cell 4 at 7:21am on Saturday, October 31, after only a few days, rather than the usual 21-day routine. *See* Ex. S, at BOP000035; Licon-Vitale Dep. 56:19-25. A work order

12

activated the following Tuesday described a leak from the underside of Cell 4's toilet from a faulty wax seal.  *See* Ex. P, at BOP000706; *see also* Ex. F, Nobile Dep. 152:8-11 (confirming that "waste water" leaks from a breached wax seal); Ex. J, Alvarado Dep. 69:2-7.

The Government disputes Mr. Schulte's account of October 30, citing statements that MCC staff did not remember the incident.  *See* Ex. I, Matos Dep. 110:23-25, 111:20-23 (denying remembering an incident on October 30–31 or moving Mr. Schulte); Ex. H, Dupree Dep. 25:23–26:2, 30:5-9 (testifying that he did not recall moving Mr. Schulte).  However, this argument must be rejected as a lapse in memory is not equivalent to a denial. *See Savarese v. City of New York*, 547 F.Supp.3d 305, 349 (S.D.N.Y. 2021) ("Testimony of a witness that he does not remember whether an event occurred does not contradict positive testimony that such an event took place." (internal citation and quotation omitted)).  The Second Circuit has established that witness memory lapses cannot create triable issues of material fact. *See F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 75 (2d Cir. 2000).  Mr. Schulte's account is thus uncontradicted.

These undisputed facts show that the United States is liable for negligence under New York State law.  Because Mr. Schulte suffered a physical injury and the guards' failure to remove him was due to negligence, rather than discretion, this Court has jurisdiction to hear Mr. Schulte's claim under the FTCA.

### i. *Mr. Schulte Suffered Physical Injury.*

Mr. Schulte suffered physical injuries from his extended exposure to sewage, including gastrointestinal distress, vomiting, and diarrhea, which lasted several days. *See* Ex. B, Schulte Interrog. Nos. 29, 54, 55, 57.  Moreover, the Government has previously conceded that his allegations satisfy the FTCA's physical injury requirement. *See* ECF No. 47 ("Gov't Reply") at 3.

13

### ii.    The DFE Does Not Protect the BOP from Liability.

Because the officers carelessly disregarded both MCC protocol and Mr. Schulte's health by confining him overnight in a cell flooding with sewage, the DFE provides no shield.  There is no plausible policy justification for this conduct.  The Government concedes that staff decisions related to the October 30 incident were not policy-oriented judgments. *See* Gov't MSJ at 12 n.2.

Even if their actions were discretionary, the guards' failure to move Mr. Schulte fits within the negligent guard theory exception to the DFE. *See Young*, 2014 WL 1153911, at *15.  MCC staff testified that they "have to" move inmates out of their cells if there was an "inoperable" issue, such as a broken toilet. *See* Ex. I, Matos Dep. 101:16-25, 102:2-3; Ex. F, Nobile Dep. 135:2-11 (leaving an inmate in sewage would be "inhumane").  On two prior occasions, Mr. Schulte was transferred to another cell within a half hour of reporting a toilet leak. *See* Ex. B, Schulte Interrog. Nos. 21, 21(a), 21(b), 21(c), 27, 27(a), 27(b), 27(c); *see also Nabe v. United States*, No. 10-CV-3232, 2014 WL 4678249, at *6 (E.D.N.Y. Sep. 19, 2014) (collecting cases) (describing cases invoking the "negligent guard theory" as instances where the "negligent discretion at issue was the decision to disregard the official policy").  The officer's actions were the result of laziness or inattentiveness and thus the DFE does not bar Mr. Schulte's sewage claim.

### iii.    There is Liability under New York Law for Exposure to Sewage

The United States is liable for negligence under New York State law.  By knowingly exposing Mr. Schulte to sewage for more than 14 hours, the BOP breached its duty to maintain safe inmate living quarters. *See Rivera*, 2018 WL 11312146, at *11 (describing the BOP's statutory duty to provide for the "safekeeping, care, and subsistence of all inmates…in its custody.").

Defendant breached its duty to respond to Mr. Schulte's requests for aid.  Staff and inmates from 10 South noted the history of plumbing problems, including overflowing toilet; the October

14

30 incident was foreseeable. *See, e.g.*, Ex. F, Nobile Dep. 148:21-24; Ex. J, Alvarado Dep. 47:6-17; Ex. C, Alimehmeti Interrog. Nos. 7, 8 (describing a previous leak in Cell 4's plumbing chaste that smelled of sewage and "filled that cell with stench"); Ex. D, Kandic Interrog. No. 8; Ex. I, Matos Dep. 40:4-15.  Mr. Schulte repeatedly alerted guards to the worsening leak, so they had notice.  *See* Ex. B, Schulte Interrog. No. 29.  Yet, he was not moved until the next morning—a breach of the BOP's duty. *See* Ex. S, at BOP000035.

Mr. Schulte's situation required no complex considerations, unlike when a guard must respond to violence between inmates. *See, e.g., Banks v. United States*, No. 10-CV-6613, 2011 WL 4100454 at *15 (S.D.N.Y. Sep. 15, 2011).  Indeed, there was always one vacant cell in the unit to which he could have been moved. *See* ECF 115, Reid Decl. ¶ 15; Licon-Vitale Dep., Ex. L at 59:2-5.  The calculus here was simple: Mr. Schulte should have been moved out of the cell once it became hazardous, as MCC policy required.  The staff's actions were an impermissible deviation from what a reasonable guard would do in the situation.

While the Government disclaims liability for breaching a duty to maintain the facility's plumbing, this focus is misplaced.  Because Mr. Schulte's claim relates specifically to the BOP's negligent failure to safeguard Mr. Schulte from the sewage leak on October 30—a clear breach of the BOP's duty—the Government remains liable regardless of any factual disputes as to the facility's maintenance and plumbing infrastructure.

Finally, the record demonstrates that Mr. Schulte's injuries were the direct and proximate result of the BOP's breach of its duty to safeguard inmates from exposure to hazards. *See Davis v. United States*, 143 F. App'x 371, 372 (2005); *see also Colucci v. Stuyvesant Plaza, Inc.*, 157 A.D.3d 1095, 1100 (N.Y. App. Div., 3d Dept. Jan. 11, 2018) (explaining state causation requirement for toxic exposure).  As a result of his exposure to sewage, Mr. Schulte suffered

15

gastrointestinal injuries, *see* Ex. B, Schulte Interrog. Nos. 54, 55, and his diarrhea and vomit were coupled with psychological distress. *See id.* at 63(a).  Mr. Schulte recounted feeling as if he was "trapped in a burning building with no escape" as the MCC guards ignored his pleas for help amidst both the leak and his health problems' increasing severity. *See id.*  He experienced physical symptoms for several days, and his psychological injuries have persisted. *See id.* at 57, 63(b).

The Government asserts that the medical records dispute Mr. Schulte's account of his injuries. But this challenge fails as the absence of evidence under the sole control of the Government cannot create a dispute with respect to otherwise uncontradicted injuries.  BOP personnel confirmed that it was MCC policy for physicians' assistants (PAs) to record inmate complaints daily. *See* Ex. O, Beaudouin Dep. 34:5-18 (testifying that PAs completed "Form 291" after daily rounds).  However, the Government produced no such forms during discovery.  Mr. Schulte's testimony that he sought medical attention thus remains undisputed.

The elements of negligence under New York State law are therefore satisfied.  Because no disputes regarding material issues of fact remain as to Mr. Schulte's FTCA and underlying state negligence claim, this Court should grant him summary judgment on liability.

### B.  The Government is Liable under the FTCA for Exposing Mr. Schulte to Injuriously Cold and Hot Temperatures.

The United States is liable for negligence under New York State law because the record shows that the MCC negligently failed to regulate the temperatures in inmate cells, causing Mr. Schulte foreseeable physical injuries.  Because Mr. Schulte suffered physical injuries and the defendant is not protected by the DFE, this Court has jurisdiction over his FTCA claim.

### i.  Mr. Schulte Suffered Physical Injury.

Mr. Schulte suffered physical injuries from the excessively cold and hot temperatures in his cell, including debilitating migraines, lethargy, undue sweating, sleep deprivation, muscle

16

atrophy, and hemorrhoids, which led to long-term psychological harm. *See* Ex. B, Schulte Interrog. Nos. 105–14, 175–77.   Mr. Schulte's pain and suffering from his exposure to unjustifiable temperatures satisfies § 1346(b)(2)'s physical injury requirement. *See e.g.*, *Gurley v. Sheahan*, No. 06-CV-3454, 2009 WL 2178685, at *7 (N.D. Ill. July 21, 2009) ("[T]he court can think of no reason why sleep deprivation and headaches would not constitute physical injury."); *Gilmore v. Bostic*, 636 F. Supp. 2d 496, 514 (S.D. W. Va. 2009) (finding that "stomach and lower intestinal problems, headaches, cold sweats, rashes, nightmares, vomiting, and teeth grinding" satisfied physical injury requirement).[1]

### ii.   The DFE Does Not Insulate the BOP From Liability.

The temperature claim is not barred by the DFE.  BOP policy divests the United States of any discretion as to the temperatures in federal facilities and mandates that temperatures be maintained at 76 degrees Fahrenheit in the cooling season and 68 degrees Fahrenheit in the heating season. *See* Ex. Q, BOP Facilities Operations Manual, at BOP000690–91 ("target temperatures"); *see also Lopez v. United States*, No. 5:18-CV-263-OC-34, 2020 WL 1492804 *3 (M.D. Fla. 2020) (finding that if a plaintiff "identif[ies] a controlling federal statute, regulation, or policy that specifically prescribes a course of action . . . [they] escape the discretionary function exception").

Inmates may not "experience" temperatures more than "a few degrees" off the target temperatures per BOP policy, even if the heating and cooling systems were outdated and temperatures varied in individual spaces. *See* Ex. Q, at BOP000691.  The provision of additional

---

[1] Deprivation of warmth itself is a sufficient injury under the PLRA. *Cf. Maguire v. Coughlin*, 901 F. Supp. 101, 105 (N.D.N.Y. 1995) ("'[A] low cell temperature at night combined with a failure to issue blankets' may deprive the prisoner of an identifiable human need—warmth—in violation of the Eighth Amendment."); *Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967) (holding that "deliberate exposure of inmates by prison authorities to bitter cold while in solitary confinement would be evidence of cruel and unusual punishment"); *Leon v. Johnson*, 96 F. Supp. 2d 244 (W.D.N.Y. 2000) ("Although the [PLRA] itself does not define 'physical injury,' there is authority that the standard is essentially the same as that under the Eighth Amendment.").

blankets or clothing does not relieve the BOP from its mandatory duty to maintain the temperature in "[a]ll spaces" "as close to the targeted set point as possible." *See id.*  The extreme temperatures that Mr. Schulte, other 10 South inmates, and overnight staff experienced in the winter were more than a few degrees from the target temperatures. *See* Ex. M, Bailey Dep. 68:12-20; Ex. I, Matos Dep. 128:18-24; Ex. C, Alimehmeti Interrog. No. 3; Ex. D, Kandic Interrog. No. 2; Ex. E, Interrogatory Responses of Sayfullo Habibull Saipov ("Saipov Interrog.") No. 2; Ex. B, Schulte Interrog. No. 69.

Even if decisions about the MCC's heating and cooling were found to be discretionary, there are no policy grounds that justify housing inmates in injurious temperatures. *See USAA Cas. Ins. Co.*, 681 F.3d at 111–12.  Thus, the DFE does not bar Mr. Schulte's temperature claim.

### iii.    The BOP Acted Negligently under New York State Law When Confining Mr. Schulte in Injurious Temperatures.

Defendant is liable under New York State tort law.  The undisputed evidence shows that the BOP negligently failed to meet its duty to provide safe indoor temperatures, despite repeated complaints, and Mr. Schulte was injured as a result. *See Smith*, 207 F. Supp. 2d at 216 (holding that the BOP is "required to act with due care to keep its facilities temperate, that is, within a reasonable range").  Defendant failed to take reasonable steps to address the injuriously low temperatures in the winter by: (1) not covering the open louvers in the recreation room and (2) not ensuring that "all spaces" remained within the target temperatures.  During the summer, the BOP failed to provide adequate cooling, resulting in "debilitating" heat. *See* Ex. B, Schulte Interrog. No. 104(b).

The undisputed facts establish that the BOP had notice of the extreme temperatures in 10 South. *See* Martin Decl., Ex. W, 2020 Buildings and Grounds Assessment Report, at BOP001911, BOP001913 (showing how heat exchangers were "extremely worn or damaged" and the removal

of reheat coils led to staff and inmate complaints in the winter).  Mr. Schulte submitted multiple complaints regarding the "freezing" temperatures and excessive heat in his cell. *See e.g.*, Ex. GG, at BOP001339 ("We haven't had heat all winter" on Dec. 7, 2020); Martin Decl., Ex. CC, at BOP000258 ("It is freezing cold! No heat!" on Dec. 14, 2021); *Id.*, at BOP000260 ("Only cold air blows from the vents – no heat" on Dec. 15, 2021); Ex. B, Schulte Interrog. No. 102 (testifying that he reported excessive temperatures to unit managers, officers, and the Warden).  Thus, injury from the extreme temperatures was foreseeable.

The BOP breached its duty to provide suitable housing and failed to take reasonable steps to regulate the extreme temperatures in 10 South.  The MCC Building and Grounds Inspection from 2020 revealed that it was not possible to regulate the heating and cooling systems' temperatures at the MCC. *See* Ex. W, at BOP001913 ("It is not possible to regulate airflow or temperatures in the current HVAC configuration.").  Before closing in 2021, the MCC required an emergency replacement of its heating coils. *See* Ex. EE, at BOP003028. Thus, defendant's assertion that the MCC heating and cooling systems "remained within a few degrees of the set range," Gov't MSJ, ECF No. 118, at 16, is not supported by the record.

It is undisputed that cold air from the outside entered 10 South from the fixed open louvers in the recreation room. *See id.* at 22; Gov't 56.1 Statement, ECF No. 119, at ¶ 95 ("[T]he recreation room in 10 South had fixed open louvers that allowed fresh air into the building.").  Defendant did not take steps to "keep the elements from the inmates" by covering the louvers in the recreation room during the winter months. *Cf. Dugan v. Washington*, No. 99 C 4382, 2001 WL 741626, at *7 (N.D. Ill. June 11, 2001) (finding that correctional facility "took precautions" by "erect[ing] the construction barrier and cover[ing] the exposed windows at night").  As a result of the BOP's

19

failure to close the louvers during the first and third winters, Mr. Schulte was exposed to the elements, including the winter air.

*Smith*, on which the Government relies, is inapposite. In *Smith*, the staff closed the "leaks around [the] cell window" with "caulk[], cardboard, duct tape, and plastic." *Smith*, 207 F. Supp. 2d at 212. Here, the BOP did not stop the outside air from coming through the louvers in the rec room. The winter air entered the cells. *See* Gov't MSJ, ECF No. 118, at 22; Gov't 56.1 Statement, ECF No. 119, at ¶ 95. Moreover, the BOP did not "provid[e] a portable heater in the hallway outside of [Mr. Schulte's] cell; [nor] transfer [] plaintiff to other cells." *See Smith*, 207 F. Supp. 2d at 215–16. Therefore, the Government failed to exercise due care to address Mr. Schulte's unsuitable quarters.

It is undisputed that Mr. Schulte and others on 10 South experienced very cold overnight temperatures. The 10 South inmates were the only ones in their cells from 12 am to 8 am, *see* Ex. M, Bailey Dep. 18:4–19:20 ("I have no keys to those doors, so anything I can do [during the overnight shift] is just monitor."), and the inmates testified that the temperatures did not remain within a normal range. *See* Ex. C, Alimehmeti Interrog. No. 3 (stating how "on [the] worst [sic] days [the cold] was incapacitating" and prevented inmates from "concentrat[ing] on even simple tasks" like reading a book or exercising). Some nights, Mr. Schulte wore all his clothes to sleep and wrapped bedsheets around his neck and face. *See* Ex. B, Schulte Interrog. No. 74. On one occasion, the temperature in Mr. Schulte's cell was low enough for water in his cup to freeze overnight. *See id.* at 80. BOP night staff also experienced particularly cold temperatures during their rounds in 10 South. *See* Ex. M, Bailey Dep. 68:12-20; Ex. I, Matos Dep. 128:18-24.

The temperature readings on which the Government relies do not raise a genuine issue of material fact as to the injurious temperatures in Mr. Schulte's cell overnight. Defendant has not

provided any temperature readings from 10 South cells between 12 and 8 am during the winter months. *See* Ex. GG, at BOP001291–1332; BOP1462–1585.   Contrary to the Government's assertion, the temperature readings do not confirm that the cell temperatures remained within the target range at night.

The BOP's negligent conduct is the proximate cause of Mr. Schulte's physical injuries.  As a result of the unreasonable temperatures in his cell during the winters of 2018–2019 and 2020–2021 and summer months, Mr. Schulte suffered debilitating migraines, lethargy, excessive sweating, loss of sleep, muscle atrophy, and hemorrhoids. *See* Ex. B, Schulte Interrog. Nos. 105–9, 171, 175–77.  Mr. Schulte experienced emotional and psychological distress from the cold and overheating in his cell. *See* Ex. B, Schulte Interrog. No. 114, 114(a).  Because no material disputes remain as to the BOP's negligent regulation of temperature in 10 South cells, Mr. Schulte should be awarded summary judgment on his claim.

## II.  THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT AS TO ANY OF MR. SCHULTE'S CLAIMS.

### A.  There are Material Disputes that Bar Summary Judgement on Mr. Schulte's Air Quality Claim.

A reasonable factfinder, resolving material factual disputes in Mr. Schulte's favor, could grant judgment on liability on his air quality claim.  Courts have denied the State summary judgment on similar claims involving poor air quality and inadequate ventilation in correctional faculties where, as here, there is evidence that the facility's air filtration system failed to provide adequate ventilation. *See, e.g., Butler v. Suffolk County*, No. 11-CV-2602, 2023 WL 5096218, at *1 (E.D.N.Y. Aug. 9, 2023).

Here, the Government's own disclosures provide evidence of systemic air filtration issues. Though the Government claims the MCC's HVAC system was regularly maintained, this is directly contradicted by the MCC's 2020 Building and Grounds Assessment. *See* Ex. W, at

21

BOP001912 (designating the HVAC's Air Handling Units as "Critical" (the highest level of repair urgency)).

Both detainees and staff further report that when pepper spray was used in the building, it would disperse throughout the entire facility. *See* Ex. G, Quamina Dep. 105:16-18 (describing how "you would feel it in your throat or your eyes would start burning"); Ex. B, Schulte Interrog. Nos. 149(e) (explaining he felt the effects of pepper spray for hours); Ex. C, Alimehmeti Interrog. No. 9. Mr. Schulte reports having inhaled pepper spray at least monthly, *see* Ex. B, Schulte Interrog. No. 149(a), and BOP records confirm that pepper spray was used this frequently. *See* Ex. U, Incidents Involving Chemicals, at BOP002596.

Detainees were also exposed to airborne fibers and mold. Mr. Schulte's ability to breathe was inhibited by laundry particles, which made the air have an "unpleasant heaviness." *See* Ex. B, Schulte Interrog. Nos. 151, 151(a)–(f). Staff testimony confirms lint would linger in the air. Ex. I, Matos Dep. 166–68, 186:10-25. Mr. Schulte moreover described brown, black, and yellow mold covering some cell's ceiling and walls, prompting him to ask to be moved on several occasions. *See* Ex. B, Schulte Interrog. Nos. 48, 145(c). The Government's claim that Mr. Schulte's description is "nothing more than his own speculation" is rebutted by the record. *See* Ex. C, Alimehmeti Interrog. No. 9 (describing how MCC staff unsuccessfully attempted to clean the mold after he raised the issue with his legal team); Ex. D, Kandic Interrog. No. 9 ("Mold was all over."). Furthermore, as the non-movant, Mr. Schulte's testimony must be accepted on summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Mr. Schulte suffered physical injuries due to the poor air quality, including trouble breathing, congestion, sore throat, and headaches. *See* Ex. B, Schulte Interrog. Nos. 153, 154. In

22

particular, as a result of his exposure to pepper spray, Mr. Schulte struggled to breathe, developed respiratory issues, and experienced persistent and uncontrollable coughing. *See id.* at 149(d).

A reasonable factfinder could determine from this record that the BOP breached its duty to provide for Mr. Schulte's wellbeing by failing to take reasonable care to remedy or even mitigate the documented air quality problems at the MCC, thus rendering defendant liable for the foreseeable respiratory injuries Mr. Schulte suffered as a result of its negligence. This Court should reject the Government's motion for summary judgment on the air quality claim.

**B. A Reasonable Factfinder Could Find that the BOP Negligently Deprived Mr. Schulte of Sleep.**

Summary judgment is likewise inappropriate for Mr. Schulte's sleep deprivation claim because the record supports a finding that the BOP acted negligently by subjecting Mr. Schulte to continuous bright light. Courts in FTCA negligence cases have precluded awarding summary judgment when factual questions remained regarding foreseeability and injury. *See Adorno v. Correctional Services Corp.*, 312 F. Supp. 2d 505, 520 (S.D.N.Y. 2004) (denying summary judgment in FTCA claim in part because plaintiff's testimony alone was enough to create a triable issue of fact); *Bacon v. United States*, 104 F. App'x 208, 210 (2d Cir. 2004) (reversing lower court grant of summary judgment in FTCA claim where reasonable minds could differ as to foreseeability).[2]

---

[2] *C.f. Holmes v. Grant*, 2006 WL 851753 at *3, 11–12 (S.D.N.Y. Mar. 31, 2006) (denying motion to dismiss plaintiff's claim that 24-hour illumination during his 35 days of confinement caused fatigue, loss of appetite, migraines and other mental problems because, as alleged, it would sustain an Eighth Amendment analysis (collecting cases)); *accord Keenan v. Hall*, 83 F.3d 1088, 1091 (9th Cir. 1996) (overturning grant of summary judgment dismissing inmate's Eighth Amendment claim that he was harmed by exposure to constant lighting for 13 days because factual issues existed as to brightness of continuous lighting in the cell, the effect of the continuous lighting, and as to whether prison officials were deliberately indifferent); *Shepherd v. Ault*, 982 F. Supp. 643 (N.D. Io. 1997) (denying summary judgment on inmate's Eighth Amendment claim that long-term confinement in disciplinary detention cells, which were continuously illuminated with 60–watt bulbs, interfered with their sleep, where there were factual issues regarding the security justification for the lighting policy).

The Government breached its duty of care by exposing him to excessively bright and is liable in negligence for the foreseeable results—prolonged sleep deprivation and the toll on his health. Defendant admits that 10 South's cells were continuously lit. *See* Gov't MSJ, ECF No. 118, at 24 (conceding that at least one cell light always remained on even when the main lights were turned off); Ex. I, Matos Dep. 137:17-20 (describing how one light was on 24 hours a day so inmates could be monitored); Ex. B, Schulte Interrog. No. 125 (light right above the bed stayed on at night).

Defendant's principal justification—that a constant light was required to ensure inmate's safety—is rebutted by the evidence indicating that 10 South's lights were so bright as to actually harm inmate's safety. The recharacterization of the cell light as "dim" and akin to a "nightlight," is disputed. *See* Gov't MSJ, ECF No. 118, at 24; *see, e.g.,* Ex. B, Schulte Interrog. No. 127 (describing very bright lighting). Mr. Schulte made multiple complaints about the bright lights, *see* Martin Decl.*,* Ex. Y, Schulte Administrative Remedy, at BOP000009, 18, 22 (administrative records of four complaints raised about the lighting); *see id.* at BOP000030 ("disable 24/7 torture lights"), as did others. *See* Ex. C, Alimehmeti Interrog. No. 21; Ex. D, Kandic Interrog. No. 21; *see also* Ex. I, Matos Dep. 102:15-19, 134:3-6 (describing moving inmates and the "very bright" lights).

Because of the lighting, Mr. Schulte only slept two to three hours a night while confined in 10 South. *See* Ex. B, Schulte Interrog. No. 118. He suffered insomnia, migraines, physical discomfort, and delayed cognitive processing. *See id.* at 132, 132(a), 132(b), 143(a). He also experienced emotional and psychological distress. *See id.* at 143(a).

Mr. Schulte suffered heightened anxiety due to exhaustion, *see id.* at No. 143(a), as confirmed by his prescription for anti-anxiety medication. The BOP's negligent lighting policies

24

were the direct and proximate cause of his reported injuries.  Defendant again mischaracterizes Mr. Schulte's medical records, relying only on the declaration of Dr. Beaudouin—who met with Mr. Schulte just three times out of his 66 recorded medical visits.  The Government's characterization that he "routinely" denied sleep issues after taking his anxiety medication is mistaken. *See* Martin Decl., Ex. Z, Schulte Medical R. (2020); Martin Decl., Ex. AA, Schulte Medical R. (2021); Martin Decl., Ex. BB, Schulte Medical R. (2022); Gov't MSJ, ECF No. 118, at 24.  Mr. Schulte noted "having normal sleeping [] habits" only once out of 66 recorded medical visits, on December 14, 2022—after leaving the MCC. *See* Ex. BB, at BOP000199.

A reasonable factfinder could find that Mr. Schulte suffered injuries related to sleep deprivation as a result of the BOP's negligence.  This Court should deny defendant's motion for summary judgment on the deprivation of sleep claim.

**C.  A Reasonable Factfinder Could Find Liability for Deprivation of Exercise.**

Defendant's motion for summary judgement on the exercise claim should also be denied. A reasonable factfinder could find that the BOP negligently deprived Mr. Schulte of exercise. Courts have concluded that "exercise is one of the basic human needs;" the BOP's failure to provide Mr. Schulte with opportunities to exercise is thus a breach of its statutory duty to provide for inmate wellbeing. *Cf. Williams v. Goord*, 111 F. Supp. 2d 280, 292 (S.D.N.Y. 2000).

The BOP was responsible for facilitating an hour per day of indoor recreation time from Monday to Friday. *See* Ex. I, Matos Dep. 143:13-20; Ex. M, Bailey Dep. 80:20-22; Ex. G, Quamina Dep. 98:6-11, 99:2-3.  Federal regulations require recreational programs for those in control units like 10 South. *See* 28 C.F.R. § 541.46(e).  Viewing the record in the light most favorable to Mr. Schulte, there is evidence that the BOP negligently deprived Mr. Schulte of exercise. *See* Ex. B, Schulte Interrog. Nos. 166, 167 ("I was denied access for three to six weeks");

*see also* Ex. D, Kandic Interrog. No. 11; Ex. C, Alimehmeti Interrog. No. 11. Defendant's focus on the features of the recreation room is misplaced—the BOP's negligence stems not from the room itself being inadequate, but from the MCC staff's negligent failure to facilitate Mr. Schulte's use of the recreational room.

The guards' denial of recreation time falls under the negligent guard theory carve-out and the Government's assertion of the DFE must be rejected. There is evidence that the guards would "come up [sic] with excuses" or not even bother to give the inmates any reason for denying "rec," *see* Ex. D, Kandic Interrog. No. 11, and would cancel recreation if an individual guard "felt that he had too much going on." *See* Ex. C, Alimehmeti Interrog. No. 11. As the Second Circuit explained in *Coulthurst*, guards who are simply acting lazily or carelessly and failing to perform their duties should not be protected under the DFE. *See* 214 F.3d at 109–11. Accordingly, Mr. Schulte's FTCA claim for deprivation of exercise is not barred, and the BOP is liable for the foreseeable health consequences that stem from its negligence.

Lastly, the BOP's negligence caused him physical injury, including frequent and severe migraines, heart palpitations, acute ankle pain, muscle atrophy. *See id.* 171, 177, 189.

Because there is sufficient evidence that the Government is indeed liable for negligently depriving Mr. Schulte of exercise, defendant's motion for summary judgement should be denied.

**D. Mr. Schulte's Pattern and Practice Claim is Not in Dispute.**

The BOP failed to provide Mr. Schulte with adequate, safe living conditions which, in turn, resulted in excessive risk to Mr. Schulte's health and safety and in physical and psychological harm. *See* AC ¶ 98. The Government does not dispute this claim. *See* Gov't MSJ, ECF No. 118, at 10–25.

26

**CONCLUSION**

WHEREFORE, it is respectfully submitted that the Court should grant the Plaintiff's motion for summary judgment as to liability on the first and second causes of action herein, deny Defendant's motion for summary judgment in its entirety, and grant such other and further relief as the Court deems just and proper.

Date:   New York, New York
        March 20, 2026

                                                    Respectfully submitted,

                                                    */s/Michael W. Martin*
*On the Memo*:                                      MICHAEL W. MARTIN
Macie Lavender                                      IAN WEINSTEIN
Basha Goldwater
Pierina Hernandez Luperdi                           Lincoln Sq. Legal Srvs., Inc.
Sheena Qiao                                         150 W. 62nd St., 9th Floor
*Legal Interns*                                     New York, New York 10023
                                                    (212) 636-6934
                                                    mwmartin@lsls.fordham.edu
                                                    *Attorneys for Mr. Joshua Adam Schulte*

27

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the undersigned hereby certifies that, measured by the word processing program used to prepare this brief, this brief complies with the word-count limitation of the rule, which is a maximum of 8,750. Excluding the caption, table of contents, table of authorities, signature blocks, or any required certificates, but including material contained in footnotes or endnotes, there are not more than 8725 words in this memo.

Dated: New York, New York
　　　　March 20, 2026

　　　　　　　　　　　　　　　　　　　　/s/ Michael W. Martin
　　　　　　　　　　　　　　　　　　　　MICHAEL W. MARTIN
　　　　　　　　　　　　　　　　　　　　Lincoln Square Legal Services, Inc.
　　　　　　　　　　　　　　　　　　　　150 W 62nd St, 9th Floor
　　　　　　　　　　　　　　　　　　　　New York, New York 10023
　　　　　　　　　　　　　　　　　　　　(212) 636-6934
　　　　　　　　　　　　　　　　　　　　mwmartin@lsls.fordham.edu