UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOSHUA ADAM SCHULTE<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 21-CV-4042 (JMF) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1g**

MICHAEL W. MARTIN
IAN WEINSTEIN
Lincoln Sq. Legal Srvs., Inc.
150 W. 62nd St., 9th Floor
New York, NY 10023
Tel.: (212) 636-6934
Email: mwmartin@lsls.fordham.edu
*Attorneys for Plaintiff*

On the response:
Macie Lavender
Basha Goldwater
Pierina Hernandez Luperdi
Sheena Qiao
*Legal Interns*

Plaintiff, Joshua A. Schulte, by counsel and pursuant to Local Rule 56.1(B) of the United States District Courts for the Southern and Eastern Districts of New York, respectfully submits this response to Defendant United States of America's Statement of Undisputed Material Facts.

1. On August 24, 2017, Schulte was arrested on child pornography charges. *See United States v. Schulte*, 17 Cr. 548, ECF No. 1, at 8/24/2017.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

2. Initially, Schulte was ordered detained pending trial. *See* ECF No. 5.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

3. On September 13, 2017, the court bailed Schulte with strict conditions, including a prohibition on possessing or using a computer, computer network, or the Internet without express authorization from Pretrial Services. *See* ECF No. 8.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

4. On December 14, 2017, the court ordered that Schulte be detained after determining that he violated his bail conditions by using the Internet without authorization and was a danger to the community. *See* ECF No. 22.

1

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ."  This fact is not material to the motion.

5. On June 18, 2018, the government superseded the indictment to add charges stemming from Schulte's theft of national defense information from the Central Intelligence Agency ("CIA") and subsequent transmission of that information to Wikileaks. *See* ECF No. 47.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ."  This fact is not material to the motion.

6. On October 31, 2018, the government filed a second superseding indictment to charge Schulte with: (i) violating the protective order entered in the criminal case by leaking a search warrant to The New York Times and The Washington Post and encouraging his family members to disseminate the search warrants (the "Contempt Count"); and (ii) smuggling contraband cell phones into the Metropolitan Correctional Center ("MCC") in New York, New York, to leak additional classified information to a reporter (the "MCC Leak Count"). *See* ECF No. 68.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ."  This fact is not material to the motion.

7. Following the government's discovery of the conduct that led to the MCC Leak Count and the Contempt Count, the U.S. Attorney's Office—in coordination with the Federal Bureau of Investigation ("FBI") and the Department of Justice's Counterintelligence and Export Control Section of the National Security Division—requested the imposition of Special Administrative Measures ("SAMs"). *See* ECF No. 92 at 124-140 ("SAMs Directive").

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ."  This fact is not material to the motion.

8. On or about October 26, 2018, the Attorney General issued a written memorandum directing the Bureau of Prisons ("BOP") to implement the SAMs. *See id.*

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ."  This fact is not material to the motion.

9. The memorandum stated that the Director of the CIA had certified "that the implementation of [SAMs] is reasonably necessary to prevent disclosure of classified information by Schulte, and that the disclosure of such information would pose a threat to the national security." *Id*. at 1.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ."  This fact is not material to the motion.

10. When the SAMs were imposed on October 26, 2018, Schulte was moved to 10 South, the most restrictive housing unit at the MCC. Declaration of Norman Reid dated Feb. 17, 2026, ECF No. 115 ("Reid Decl.") ¶ 18.

**Plaintiff Response** Undisputed.

11. As imposed on this date, the SAMs limited Schulte's contacts and communications with others because such communications could result in the unauthorized disclosure of classified information. *See* SAMs Directive.

3

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

12. Except as allowed by the SAMs, Schulte was barred from "having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else . . . that could reasonably foreseeably result in [Schulte] communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting [Schulte's] ability to communicate (send or receive) classified information." *Id*. at ¶ 1(c).

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

13. The SAMs prohibited Schulte from being housed or communicating with another inmate. *See id.* ¶ 6.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

14. Schulte remained housed in 10 South until October 18, 2021, at which time he was transferred to the Metropolitan Detention Center ("MDC"). Reid Decl. ¶ 18.

**Plaintiff Response**, Undisputed.

15. On May 10, 2019, Schulte moved to vacate the SAMs on the grounds that they are unconstitutional punishment and not reasonably necessary to prevent the disclosure of classified information. *See* ECF No. 92.

4

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

16. On August 14, 2019, the court denied Schulte's motion but modified the SAMs in two limited respects: first, to permit precleared non-attorney members of Schulte's legal team to disclose his communications for the sole purpose of preparing his defense, following consultation with and authorization by Schulte's cleared attorneys; and second, to permit Schulte monitored contacts (calls, visits, and mail) with non-immediate family members. *See* ECF No. 127.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

17. In largely upholding the SAMs, the court noted that "[t]he SAMs are undoubtedly restrictive, but generally they are reasonably necessary to avoid further disclosure of classified information." *Id*. at 8.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

18. In February and March 2020, the government tried Schulte on the second superseding indictment. See Minute Entries for 2/3/2020, 2/4/2020, 2/5/2020, 2/6/2020, 2/10/2020, 2/11/2020, 2/12/2020, 2/13/2020, 2/18/2020, 2/19/2020, 2/21/2020, 2/24/2020, 2/25/2020, 2/26/2020, 2/17/2020, 2/18/2020, 3/2/2020, 3/9/2020.

5

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

19. On March 9, 2020, the jury returned a verdict finding Schulte guilty on the Contempt Count as well as on a count of making false statements to the FBI, in violation of 18 U.S.C. § 1001 (the "False Statement Count"). *See* ECF No. 351.2.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

20. On June 8, 2020, a third superseding indictment was filed on nine counts relating to Schulte's theft and dissemination of classified material from the CIA and leaking documents to WikiLeaks while incarcerated at the MCC. ECF No. 405.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

21. On June 24, 2021, Schulte filed a second motion to vacate the SAMs. *See* ECF No. 474.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

22. The court denied Schulte's second motion to vacate his SAMs on October 6, 2021. *See* ECF No. 527.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

23. Beginning on June 13, 2022, Schulte was tried on the third superseding indictment. See Minute Entry at 6/13/2022.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

24. The jury returned a verdict of guilty on all counts. *See* Minute Entry at 7/13/2022.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

25. On February 1, 2024, the Court sentenced Schulte to 480 months' imprisonment. *See* ECF No. 1124.

**Plaintiff Response**, Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

26. On or around February 15, 2024, Schulte was transferred to the United States Penitentiary Florence ADMAX in Florence, Colorado, where he is presently incarcerated. *See* Reid Decl. Ex. 3 at BOP000031.

**Plaintiff Response**,  Undisputed, but irrelevant and violates Local Rule 56.1's admonition for a "short and concise statement . . . of the material facts . . . ." This fact is not material to the motion.

7

27. Schulte was housed in 10 South in MCC from October 1, 2018, through October 18, 2021 (the "Relevant Period"). Reid Decl. ¶ 18.

**Plaintiff Response**, Undisputed.

28. 10 South had the following rooms:

a) Six cells that each had their own shower and toilet/sink combination unit;

b) An officer station where the corrections officer assigned to 10 South sat, while he or she was not performing rounds in 10 South;

c) A recreation room, used by inmates for exercise;

d) Four separate rooms that were utilized for attorney or other inmate visits (at least one of those rooms also had a computer that could be utilized for legal research);

e) A medical office; and

f) Several additional rooms and offices that were used for storage or unoccupied. *Id*. ¶ 13.

**Plaintiff Response**, Undisputed.

29. Each cell in 10 South could be occupied by only one inmate. *Id*. ¶ 14.

**Plaintiff Response**, Undisputed.

30. For most of the Relevant Period, 10 South housed only five inmates: thus, there was always one empty cell. *See id*. ¶ 15; *see* Declaration of Tara Schwartz dated Feb. 18, 2026. ECF No. 117 ("Schwartz Decl.") Ex. 1 ("Licon-Vitale Dep.") at 58:15-20.

**Plaintiff Response**, Undisputed.

31. Typically, inmates in 10 South were rotated to a different cell every 21 days for security reasons. *See* Licon-Vitale Dep. at 56:19-25; Schwartz Decl. Ex. 4 ("Bailey Dep.") 100:12-101:12.

**Plaintiff Response**, Undisputed.

8

32. 10 South was monitored by a corrections officer 24/7. Reid Decl. ¶ 17. The corrections officer typically sat at the officer station. *Id.* The corrections officer reported to the operations lieutenant for the facility. *Id.* The operations lieutenant was also at the facility 24/7. *Id.*; Licon-Vitale Dep. at 60:8-20.

**Plaintiff Response**, Disputed to the extent that the paragraph asserts that the operations lieutenant was on 10 South 24/7, but undisputed that the operations lieutenant was supposed to be at the MCC 24/7. Undisputed that 10 South was supposed to be monitored by a corrections officer 24/7. Undisputed that the corrections officer typically sat at the officer station. Undisputed that the corrections officer reported to the operations lieutenant for the facility.

33. The operations lieutenant reported to the Warden of the MCC. Licon-Vitale Dep. at 60:8-20.

**Plaintiff Response**, Undisputed.

34. Outside of the Warden's working hours, the operations lieutenant assumed the responsibilities of the Warden. Licon-Vitale Dep. at 60:8-20.

**Plaintiff Response**, Undisputed.

35. Marti Licon-Vitale, who served as the Warden of the MCC from December 2019 to February 2021, conducted weekly rounds in 10 South. Licon-Vitale Dep. 9:6-14, 18:6-21.

**Plaintiff Response**, Disputed only to the extent that this paragraph claims weekly rounds occurred without exception.

36. Each cell in 10 South had at least one camera that could be viewed by the corrections officer at the officer station. Reid Decl. ¶ 24; Bailey Dep. 30:2-20.

**Plaintiff Response**, Undisputed.

37. Corrections officers in 10 South conducted rounds every half hour, which involved the corrections officer looking through the window of each cell in the unit to ensure that the inmate

9

was safe and secure. See Bailey Dep. at 11:23-12:6, 12:19-13:6; 20:15-17, 18:4- 25; Schwartz Decl. Ex. 2 ("Matos Dep.") 62:10-65:7; Schwartz Decl. Ex. 3 ("Quamina Dep.") 48:9-25.

**Plaintiff Response**, Disputed only to the extent that this paragraph claims correction officers in 10 South conducted rounds every half hour without exception.

38. Inmates in 10 South could report any issues to the corrections officers during their rounds. *See* Matos Dep. 65:8-66:17.

**Plaintiff Response**, Disputed only to the extent that this paragraph claims this could occur without exception.

39. Inmates in 10 South could also get the corrections officers' attention by shouting for the corrections officer from their cell or waving or putting their hand in front of the cameras in 10 South, which the corrections officer would then see on the screen from the officer station. *See* Bailey Dep. 35:11-22.

**Plaintiff Response**, Disputed only to the extent that this paragraph claims this could occur without exception.

40. Inmates in 10 South required a two- or three-person hold, meaning that they could not be moved in or out of their cell by a single corrections officer. *See* Bailey Dep. 36:6- 10; Matos Dep. 15:11-17; Quamina Dep. 13:15-14:8.

**Plaintiff Response**, Disputed to the extent that this paragraph asserts that an inmate in 10 South could be moved only with a two-person hold of corrections officers without a lieutenant present. *See* Martin Decl., Ex. N, Dep. of Norman Reid ("Reid Dep.") 29:2-6, 38:9-13 (describing how lieutenants are the only ones authorized to move 10 South inmates and that SAMs restrictions required a two-man hold plus a lieutenant to move an inmate in 10 South). Undisputed that inmates in 10 South could not be moved in or out of their cell by a single corrections officer.

41. In order for inmates on 10 South to be removed from their cell to be taken to the recreation room, the attorney visit rooms, the law library, or another cell, the operations or activities lieutenant had to unlock the cell. *See* Matos Dep. at 13:10-14:17; Quamina Dep. 13:15-14:8.

**Plaintiff Response**, Undisputed.  Only lieutenants had keys to inmates' cells in 10 South. *See* Martin Decl., Ex. I, Dep. of Edwin Matos ("Matos Dep.") 28:10-24.

42. Schulte claims that between October 2018 and June 2021, he experienced regular sewage leaks, lack of water pressure in the sink and shower, lack of hot water, an inability to control the temperature of the water, and other plumbing failures. ECF No. 45 ("Am. Compl.") ¶¶ 17-18.

**Plaintiff Response**, Undisputed.

43. Schulte claims that there were three occasions during which "putrid sewage" flooded his cell in 10 South. Am. Compl. ¶ 20; Schwartz Decl. Ex. 7, 3 Response to Interrogatory No. 16. He does not recall the dates of two of the three incidents. Response to Interrogatory No. 16. With respect to the first two incidents, Schulte concedes that he was moved out of his cell within a half hour of reporting the leak to MCC staff and did not suffer any injury as a result of the alleged leak. Response to Interrogatory Nos. 17, 19-28.

**Plaintiff Response**, Undisputed.

44. Schulte claims that he experienced a third incident "around October 30, 2020" when he was in Cell #4. Response to Interrogatory No. 16; Am. Compl. ¶ 21. He claims that at approximately 5:00 p.m. he took a shower in his cell, and when he finished, he noticed that "sewage was leaking from the toilet again." Response to Interrogatory No. 29. He claims he told the corrections officer on duty, who said he would have Schulte moved to another cell. *Id*. He claims that "sewage continued to accumulate on the floor of his cell" and that it was "several inches deep" when a corrections officer appeared outside his cell and began mopping the hallway. *Id*.

11

**Plaintiff Response**, Undisputed.

45. Schulte further claims that at approximately 8:30 p.m., he saw a lieutenant in the hallway; he explained the situation to the lieutenant and the lieutenant told him he would be moved to a different cell. *Id*. However, he claims that the lieutenant did not return for hours and, during that time, the "flow of sewage intensified" and he "started to feel sick." *Id*. He claims that he repeatedly communicated this to the corrections officer and the officer repeatedly assured him that he had called the lieutenant and told him that Schulte needed to be moved to a different cell. *Id*.

**Plaintiff Response**, Undisputed that Mr. Schulte explained the situation to the lieutenant at approximately 8:30 p.m. Disputed to the extent that this paragraph asserts that Mr. Schulte initiated the interaction with the lieutenant. Rather, Mr. Schulte responded to the lieutenant holding his nose and asking the corrections officer "what is that smell?" *See* Martin Decl., Ex. B, Interrog. Resps. of Joshua Schulte ("Schulte Interrog.") No. 29. Undisputed that the lieutenant did not return for hours, and during that time, the flow of sewage intensified, and Mr. Schulte started to feel sick. Undisputed that he repeatedly communicated this to the corrections officer and the officer repeatedly assured him that he had called the lieutenant to tell him that Mr. Schulte needed to be moved to a different cell.

46. Schulte claims that at 12:00 a.m. on October 31, 2020, the lieutenant returned to tell him that it was "too late on a Friday" to move him to a different cell. *Id*. Schulte claims that at approximately 2:00 a.m., he began vomiting and experiencing diarrhea and used the shower drain to vomit and relieve himself. *Id*. Schulte claims that at approximately 3:00 a.m., he told a corrections officer who passed by his cell that he had been vomiting for an extended period of time and requested medical attention. *Id*. Schulte also claims that at 7:30 a.m., he explained to a

12

different lieutenant who passed by his cell during the breakfast distribution that he was unable to eat after "spending the night soaking in sewage." *Id*. He says that at 9:30 a.m., he was moved to a different cell. *Id*.

**Plaintiff Response**, Undisputed.

47. Schulte claims that as a result of this incident, he experienced "acute intestinal distress." Am. Compl. ¶ 53. His appetite came back after eight hours but he continued to suffer diarrhea and gastrointestinal distress through the weekend and "other discomfort" for several days after that. Response to Interrogatory No. 57.

**Plaintiff Response**, Undisputed.

48. The MCC regularly had two plumbing foremen on duty as well as a work cadre of sentenced inmates who performed plumbing repairs. Declaration of Kenneth Alvarado dated February 17, 2026, ECF No. 113 ("Alvarado Decl.") ¶ 4.

**Plaintiff Response**, Disputed. During the COVID-19 pandemic, which overlapped with the Relevant Period, the MCC was understaffed and therefore did not regularly have 2 plumbing foreman on duty. *See* Martin Decl., Ex. J, Dep. of Kenneth Alvarado ("Alvarado Dep.") 91:21-25 ("[During COVID] the response time, it took longer to get these repairs done. When you only have one foreman and you've got 1200 inmates in a high-rise building, it's very tough to keep up"). During the COVID-19 pandemic, the MCC also did not have an inmate detail to perform plumbing repairs. *See id*. at 89:3-12.

49. Kenneth Alvarado was one of the two plumbing foremen at the MCC from May 2016 through December 2021. *Id*. at ¶ 1.

**Plaintiff Response**, Undisputed.

13

50. Between four and ten work cadre inmates typically were assigned to the plumbing detail at any one time. *Id.* at ¶ 4.

**Plaintiff Response**, Disputed to the extent this paragraph asserts that there were four to ten work cadre inmates during the COVID-19 pandemic, which overlaps with the Relevant Period. *See* Martin Decl., Ex. J, Alvarado Dep. 89:3-12.

51. Typically, each of the plumbing foremen supervised half of the cadre inmates. *Id.*

**Plaintiff Response**, Disputed to the extent this paragraph asserts that the plumbing foreman supervised half of the cadre inmates during the COVID-19 pandemic, when there was no inmate cadre, which overlaps with the Relevant Period. *See* Martin Decl., Ex. J., Alvarado Dep. 89:3-12.

52. Due to the restrictions on the inmates in the 10 South unit, most plumbing work in that unit was done by one of the two plumbing foremen, rather than any of the cadre inmates. *Id.* at ¶ 8.

**Plaintiff Response**, Undisputed.

53. The MCC's two plumbing foremen tried to make plumbing repairs as quickly as possible. *Id.* at ¶ 9. The MCC plumbing shop was fully stocked and had approximately 95% of the parts that were needed for any given plumbing repair job. *Id.* If the plumbing foremen needed a part that they did not already have in stock, they could usually order the part and get it the same or next day. *Id.* On very rare occasions, it could take a few more days to get a part that had to be shipped from out of state. *Id.*

**Plaintiff Response**, Disputed to the extent that this paragraph claims that plumbing repairs were done as quickly as possible without exception.

54. The MCC plumbing foremen regularly tested the plumbing system at the MCC in accordance with the Facilities Operation Manual. *Id.* at ¶ 15. They regularly tested the backflow preventers, which are safety devices to stop contaminated or polluted water from reversing direction and

flowing backward into the clean water supply. *Id*. They also regularly tested wastewater outflows to ensure that there was no debris blocking the flow of wastewater to the city sewer. *Id*.

**Plaintiff Response**, Undisputed.

55. The MCC did not experience any prolonged periods without hot water. *Id*. at ¶ 14.

**Plaintiff Response**, Disputed. Mr. Schulte testified as to not having hot water and made repeated complaints to that effect. *See* Martin Decl., Ex. B, Schulte Interrog. No. 13; Martin Decl., Ex. Y, Schulte Administrative Remedy, at BOP000340 ("lack of hot water" administrative complaint from Mr. Schulte dated November 4, 2019); *id.* at BOP000342 ("lack of hot water" administrative complaint from Mr. Schulte dated May 13, 2019); *id.* at BOP000352 ("lack of hot water" administrative complaint from Mr. Schulte dated July 19, 2019).

56. There are approximately 400 toilets in the MCC, mostly in individual cells, including in 10 South. *Id*. at ¶ 10.

**Plaintiff Response**, Undisputed.

57. All of the toilets at the MCC were installed with flushometers. Declaration of Christopher Nobile dated Feb. 16, 2026, ECF No. 114 ("Nobile Decl.") ¶ 49. A flushometer is a plumbing device that controls the flow of water to flush toilets and urinals and is primarily used in commercial and public restrooms for efficient and powerful flushing. *Id*.

**Plaintiff Response**, Undisputed.

58. A flushometer operates differently from traditional toilets that rely on a tank to store and release water. *Id*. at ¶ 50. Instead, a flushometer connects directly to the building's water supply, using water pressure to deliver a strong flush. *Id*. Flushometers are built to withstand heavy use. *Id*.

**Plaintiff Response**, Undisputed.

59. The vast majority of plumbing issues at the MCC, especially issues concerning toilets, were caused by inmates either flushing objects down the toilet or causing damage to the plumbing fixtures. *Id*. at ¶ 51; Alvarado Decl. ¶ 10.

**Plaintiff Response**, Disputed to the extent that this paragraph attempts to generalize plumbing issues at the MCC as being the result of inmate behavior. *See* Martin Decl., Ex. J, Alvarado Dep. 33:15-22 (explaining that the MCC's cast iron pipes corroded "from time to time"). Undisputed that inmates on lower levels flushing objects down the toilets did lead to backups and overflows in 10 South's toilets as the plumbing ran vertically throughout the MCC. *See id*. at 34:3-14; *see also* Martin Decl., Ex. F, Dep. of Christopher A. Nobile ("Nobile Dep.") 148:21-24 (describing how clogging would occur on the floors below 10 South and backup the toilet system).

60. If a plumbing repair needed to be done, a work order would typically be entered by the MCC Facilities Manager, the general foremen, or other MCC staff into the BOP's Computerized Maintenance Management Systems ("CMSS") work order system. Alvarado Decl. ¶ 5; Nobile Decl. ¶ 17. The work order would then be transmitted to one of the plumbing foremen. Alvarado Decl. ¶ 5.

**Plaintiff Response**, Undisputed.

61. Sometimes repairs of an emergency nature needed to be made; in those instances, MCC staff would sometimes notify the Facilities Department of an issue verbally. *Id*. at ¶ 6; Nobile Decl. ¶ 18. However, even when maintenance was done in response to a verbal request, a work order was always entered into CMSS. Nobile Decl. ¶ 18.

**Plaintiff Response**, Disputed only to the extent that this paragraph claims work orders were "always" entered without exception.

62. Like all other work orders, plumbing work orders were designated by priority. Priority work orders numbered "1" were considered urgent and were given preference over all active work orders. See Alvarado Decl. ¶ 7; Nobile Decl. ¶ 20. Priority work orders numbered "2" were considered routine and were completed in numerical order. *See id.*

**Plaintiff Response**, Disputed that work orders numbered "2" were routine. *See* Martin Decl., Ex. J, Alvarado Dep. 30:16-17 ("Priority two is also a priority. I try to get there same day."). Undisputed that work orders were designated by priority and that Priority "1" was the most urgent.

63. The plumbing fixtures in 10 South were more modern than those in the rest of the facility because of a renovation done to build 10 South after 9/11. Alvarado Decl. ¶ 11; see also Reid Decl. ¶ 32.

**Plaintiff Response**, Disputed to the extent that this paragraph asserts that *all* plumbing fixtures in 10 South were more modern than the rest of the facility. *See* Martin Decl., Ex. J, Alvarado Dep. 35:4-13 ("most of that plumbing was all redone").  Undisputed that 10 South was renovated.

64. Each cell in 10 South had its own toilet and sink combination unit. Alvarado Decl. ¶ 12.

**Plaintiff Response**, Undisputed.

65. Each toilet and sink combination unit discharged into its own vertical stack line going from the 10th floor of the building all the way down to the basement level, and then out to the city sewer. *Id*. at ¶ 12.

**Plaintiff Response**, Undisputed.

66. Because the stack lines are independent from one another, breakage or blockage in one line would only affect that individual line, not any of the others. *Id*. at ¶ 13.

**Plaintiff Response**, Undisputed.

67. The BOP has no record of sewage flooding in Schulte's cell. See Nobile Decl. ¶¶ 52-62; Schwartz Decl. ¶¶ 8-13; Alvarado Decl. ¶¶ 19-27.

**Plaintiff Response**, Disputed to the extent that this paragraph asserts that the BOP has no record of Mr. Schulte's cell toilet leaking.  There was a complaint entered into the BOP system on Monday, November 2, 2020, that the toilet in Cell 4 (the cell Mr. Schulte occupied up until Saturday, October 31st) was leaking. *See* Martin Decl., Ex. DD, 10 South Complaint Log ("Complaint Log"), at BOP000700.  There was a work order activated on November 3, stating that the toilet in Cell 4 was leaking. *See* Martin Decl., Ex. P, 10 South Work Order Forms ("Work Order Forms"), at BOP000706.  Undisputed that the BOP's records do not specify "sewage flooding."  Disputed that the BOP never had a record of sewage flooding in Schulte's cell—it should be undisputed that discovery reflected that records were difficult to obtain and that certain records may have been lost or otherwise no longer available.

68. If Schulte's cell had flooded with sewage, the Facilities Manager, Christopher Nobile, would have been notified, and there would have been a work order entered in CMSS. Nobile Decl. ¶¶ 52-57.

**Plaintiff Response**, Disputed.  This paragraph states a hypothetical, not a statement of fact as required by Rule 56(c)(1)(A).  Nothing in the records supports that Nobile *would have* been notified—despite official policy, there is no confirmation that individuals on duty complied without exception.  Nobile also did not work on nights or weekends, so he could not have been notified of the October 30-31 incident until the following Monday, November 2. *See* Martin Decl., Ex. F, Nobile Dep. 150:18-151:2.  Nobile further testified that during the weekend, toilet issues may have been left unresolved until the following Monday. *See id,* at 150:22-151:2.  The

18

following Monday, November 2, a complaint was entered regarding a leaking toilet in Cell 4, which Mr. Schulte occupied the night of October 30-31. *See* Martin Decl., Ex. DD, Complaint Log, at BOP000700.  A work order was activated in the CMSS system on November 3 confirming that the toilet in Cell 4 was leaking from the "underside" and later resolved by replacing the toilet's wax seal, which prevented sewage water from leaking out of the bottom. *See* Martin Decl., Ex. P, at BOP000706; *see also* Martin Decl., Ex. F, Nobile Dep. 152:8.

69. There were three work orders concerning the toilet in Schulte's cell in 10 South, Cell 4, from around October 30-31, 2020: work order 13607 reported that "when the toilet is flushed it leaks a lot of water out from the underside," and work order 13855 stated that the "toilet seems to be leaking substantially." Nobile Decl. ¶ 57. Those work orders pertain to the same leak, which were given priority "2" status meaning that the repair was not an emergency. *Id.* Those two work orders reflect that the toilet needed a new wax seal, which MCC plumber Kenneth Alvarado installed on November 23, 2020. *Id.*

**Plaintiff Response**, Undisputed that there were three separate work orders from November 2020 pertaining to Cell 4 referenced herein: November 3, November 17, and November 27. *See* Martin Decl., Ex. P, at BOP000706-709.  Disputed as to the claim that these three work orders, spanning across a month, all relate to the same leak in Mr. Schulte's cell on October 30–31.  It is possible that these were three different incidents of plumbing issues in the same cell. *See* Martin Decl., Ex. J, Alvarado Dep. 71–72 (when asked whether the work order from November 3 and an email from November 13 were referencing the same leak, Alvarado responded that "it could be a different plumbing issue.").  Undisputed as to what work order 13607 and 13855 say. Undisputed that they were each marked as priority "2".

19

70. The toilet needed a new wax seal because the existing wax seal had been breached. Alvarado Decl. ¶ 23.

**Plaintiff Response**, Undisputed.

71. A breached wax seal allows water from the toilet bowl to seep out from the base of the bowl when the toilet is flushed. Alvarado Decl. ¶ 25; Nobile Decl. ¶ 59.

**Plaintiff Response**, Disputed to the extent that this paragraph asserts that a breached wax seal only leaks *water*.  Then Facility Manager Christopher Nobile testified that the wax seal prevented "sewage water" and/or "wastewater" from leaking from the base of the toilet. *See* Martin Decl., Ex. F, Nobile Dep. 152:8-11 (confirming that it is "waste water" coming from a breached wax seal).

72. The toilet in Cell #4 was not leaking because of a stoppage in the toilet. *Id*. at ¶ 26. If there had been a stoppage, the work order would reflect that the toilet was clogged and needed to be cleared by a toilet augur or snake. *Id*.

**Plaintiff Response**, Undisputed.

73. The toilet in Cell #4 was not leaking as a result of a backup in the stack line (piping) connected to this toilet. *Id*. at ¶ 27. If there had been a backup in the stack line, that would have been reflected in the work order. *Id*. Accordingly, it is not the case that sewage from the stack line was backing up and leaking from this toilet. *Id*.

**Plaintiff Response**, Undisputed that Cell 4 was not leaking as a result of a backup in the stack line or that it would have been reflected in the work order.  Disputed as to the extent that this paragraph asserts that sewage was not leaking from Cell 4's toilet on October 30-31.  Sewage leaks from the base of the toilet from a breached wax seal, regardless of a backup in the stack

20

line. *See* Martin Decl., Ex. F, Nobile Dep. 152:8-11 (confirming that "waste water" leaks from a breached wax seal).

74. If the toilet in Cell #4 had been leaking with sewage, as opposed to water, the work orders relating to that toilet would have been marked as priority "1" and would have been handled immediately. Nobile Decl. ¶ 58.

**Plaintiff Response**, Disputed.  Cell 4's toilet was leaking sewage water from its base due to the breached wax seal. *See* Martin Decl., Ex. F, Nobile Dep. 152:8-11.  Even so, the work order relating to that toilet was marked as priority "2" and was not handled immediately but rather completed 20 days after its activation. *See* Martin Decl., Ex. P, at BOP000706. In fact, it could not have been handled immediately, as facilities department employees did not work on the weekends. *See* Martin Decl., Ex. F, Nobile Dep. 150:18-151:2 (confirming that work orders were resolved during the week because "that's when the facilities department employees were there" and that "during the weekend, issues like this toilet may have been left unresolved until a facilities department employee was there on Monday").

75. Further, if a substantial sewage leak had occurred, the MCC Facilities Staff would have called Roto-Rooter or another outside vendor to address the plumbing issue and have professional cleaners come to disinfect the affected area. *Id*. at ¶ 60.

**Plaintiff Response**, Disputed. This paragraph states a hypothetical, not a statement of fact as required by Rule 56(c)(1)(A). Even if it was protocol to do so, there is no confirmation that individuals on duty complied without exception.

76. The lack of work orders concerning vendors assisting with plumbing or cleaning Cell #4 in 10 South means that the toilet did not cause any substantial sewage flood. *Id*. at ¶ 61.

21

**Plaintiff Response**, Disputed.  This paragraph states an unsupported conclusion — that the lack of work orders concerning vendors necessarily means that the toilet in Cell 4 did not cause a substantial sewage flood — not a statement of fact as required by Rule 56(c)(1)(A).  Disputed that the BOP never had a record of sewage flooding in Schulte's cell.  It should be undisputed that discovery reflected that records were difficult to obtain and that certain records may have been lost or otherwise no longer available.

77. The corrections officer on duty in 10 South from 6 p.m. on October 30, 2020, through 6 a.m. on October 31, 2020, Edwin Matos, has no recollection of a sewage flood in Schulte's cell. Matos Dep. 110:9-111:22.

**Plaintiff Response**, Undisputed.

78. Matos testified at his deposition that he remembered a single incident around 2010, before Schulte's time at the MCC, where sewage, as opposed to water, flooded from a toilet. *Id*. at 181:10-182:6.

**Plaintiff Response**, Undisputed.

79. Further, Matos testified during his deposition that if an inmate's cell had flooded with sewage, he would "absolutely not" have left the inmate in that cell overnight. Matos Dep. 178:4-10. Rather, he would have called the facilities staff and lieutenant, and they would have moved the inmate. *Id*. at 178:12-180:19.

**Plaintiff Response**, Undisputed that Matos testified that he would not have left an inmate overnight in a cell flooded with sewage and would have moved the inmate. Disputed as to the extent that this paragraph suggests a factual assertion regarding Matos' conduct on October 30-31, which he did not recall during his testimony. *See* Martin Decl., Ex. I, Matos Dep. 109–111.

22

80. The BOP searched the email files of Judith Woods and Marquea Rice, the two operations lieutenants on duty at the MCC during the 24-hour period from 6 p.m. on October 30, 2020, to 6 p.m. on October 31, 2020, for communications related to Schulte's allegations concerning the toilet flood. Schwartz Decl. ¶¶ 8, 11.

**Plaintiff Response**, Undisputed.

81. The BOP also searched the email files of Edwin Matos and Wilson Silva, the corrections officers on duty in 10 South from 6 p.m. on October 30, 2020, to 6 p.m. on October 31, 2020, for communications related to Schulte's allegations concerning the toilet flood. *Id*. ¶ 9, 11.

**Plaintiff Response**, Undisputed only to the extent that the BOP claimed it searched the email files of Edwin Matos and Wilson Silva, the corrections officers on duty in 10 South from 6 pm on October 30, 2020, to 6 pm on October 31, 2020, for communications related to Schulte's allegations concerning the toilet flood.

82. The emails do not contain any communications by or amongst the corrections officers or operations lieutenants regarding Schulte or any issue with the toilet in Cell #4. *Id*. at ¶ 13.

**Plaintiff Response**, Undisputed only to the extent that the email accounts do not currently contain any communications by or amongst the corrections officers or operations lieutenants regarding Schulte or any issue with the toilet in Cell 4. *See* Pl. Resps., *supra*, ¶ 13.

83. Schulte claims there was clearly visible brown, yellow, and black mold covering the ceilings and walls of all six cells in 10 South. Am. Compl. ¶ 38.

**Plaintiff Response**, Undisputed.

84. Schulte also claims that the MCC ventilation system circulated air from the special housing unit ("SHU") on the 9th floor into the cells in 10 South that contained pepper spray particles. *Id*. at ¶ 39.

23

**Plaintiff Response**, Undisputed.

85. He further complains that air from the laundry unit was circulated into 10 South. *Id*. at ¶ 40.

**Plaintiff Response**, Undisputed.

86. Schulte also claims that inmates infected with COVID-19 were moved to the SHU on the ninth floor, which caused him to contract COVID-19 in or around March 2020. *Id*. at ¶ 41.

**Plaintiff Response**, Undisputed.

87. BOP policy states that "[i]nstitutions must provide minimum ventilation rates to maintain human comfort in accordance with the Guide Book for the American Society of Heating and Refrigeration and Air Conditioning Engineers." Nobile Decl. Ex. 3 at BOP001136.

**Plaintiff Response**, Undisputed, though irrelevant to the extent that such policy does not extend back to October 2018 to October 2021 ("Relevant Time Period").

88. The fourth floor of the MCC housed fans that circulated air through the MCC building, including to all of the housing units. Nobile Decl. ¶ 25. The fans were programmed to always run and were turned off only when maintenance was being performed or if pepper spray (known as "OC-spray") had been dispersed in the facility. *Id*. Shutting off the fans prevented the OC-spray from circulating from the location where it was sprayed into other areas and floors of the facility. *Id*.

**Plaintiff Response**, Undisputed that Nobile testified to the substance of this paragraph. Undisputed that the fourth floor housed fans and that these fans were programmed to always run except as laid out in this paragraph.  Disputed that fans were always shut off without exception when pepper spray was used.  Disputed that shutting off the fans prevented the OC-spray from circulating.  Multiple inmates reported they smelled and breathed in the pepper spray in 10 South, despite it being sprayed primarily on 9 South. *See* Martin Decl., Ex. C, Interrog. of Sajmir

24

Alimehmeti ("Alimehmeti Interrog.") No. 9 ("if pepper spray was used elsewhere in the prison, it would come through our ventilation."); Martin Decl., Ex. D, Interrog. of Mirsad Kandic ("Kandic Interrog.") No. 9; Martin Decl., Ex. B, Schulte Interrog. No. 149(a) (when asked how many times he inhaled pepper spray while in 10 South, Mr. Schulte responded that it was "Every time pepper spray was used in the special housing unit on the 9th floor below 10 South").

89. If there was ever a power outage, the fans would be powered by the MCC's generator. *Id.* at ¶ 26.

**Plaintiff Response**, Undisputed.

90. The MCC's housing units, including 10 South, had two types of ventilation— return ventilation, which supplies recirculated air, and exhaust ventilation, which removes air from the building. Id. at ¶ 27. The HVAC fans located on the fourth floor were part of the return ventilation system. Id.

**Plaintiff Response**, Undisputed.

91. The MCC's exhaust ventilation system was powered by a separate set of three fans, located on the MCC's roof, each of which serviced a different "range" (each comprising two tiers) of the MCC. *Id.* at ¶ 28. Exhaust vents in the MCC's bathrooms remove air from the bathrooms. *Id.*

**Plaintiff Response**, Undisputed.

92. Like the fourth floor fans, the exhaust fans were programmed to be always running. *Id.* at ¶ 29. The exhaust fans were connected to the MCC's generator, which powered the fans during any power outages. *Id.*

**Plaintiff Response**, Disputed to the extent that this paragraph claims this "always" occurred without exception.

25

93. The main laundry facilities for the MCC were located in the basement of the building. *Id.* at ¶ 41. The laundry dryers in the basement were connected to ductwork that led directly to the outside of the building. *Id.* Air from the laundry ducts did not mix with any air that was recirculated into the building. *Id.*

**Plaintiff Response**, Disputed to the extent that this paragraph asserts that no air from the laundry unit(s) recirculated into the rest of the building. *See* Martin Decl, Ex. B, Schulte Interrog. No. 146 ("The ventilation system would circulate air from the laundry unit and the special housing unit a floor below [on the 9th floor]"); Martin Decl., Ex. I, Matos Dep. 166:20–167:5. Undisputed that the laundry dryers in the basement were connected to ductwork leading outside.

94. Additionally, there was a single washer and dryer located on the ninth floor of the MCC. *Id.* at ¶ 42. The single dryer on the ninth floor was also connected to ductwork that led directly to the outside of the building. *Id.* Thus, the air coming out of that dryer was not recirculated into the building. *Id.*

**Plaintiff Response**, Undisputed.

95. The 10 South unit was actually one of the only housing units in MCC that got fresh air directly from the outside. *Id.* at ¶ 43. That is because the recreation room in 10 South had fixed open louvers that allowed fresh air into the building. *Id.*

**Plaintiff Response**, Undisputed that the louvers were fixed, open, and allowed air into 10 South.

96. Further, MCC regularly had air flow testing done. *Id.* at ¶ 44.

**Plaintiff Response**, Undisputed that Nobile testified to the substance of this paragraph.

97. For example, on November 22, 2019, the BOP's Northeast Regional Environmental and Safety Compliance Administrator ("E&SCA") conducted a site visit at the MCC to assess its compliance with the American Correctional Association's ("ACA") Ventilation and Lighting

26

Standards. *Id*. (citing Exhibit 11). As indicated in the report, ACA standards require circulation of at least 15 cubic feet of circulated air per minute, per occupant for inmate cells/rooms and dining areas. *See id*. The E&SCA tested a representative sample of flow rates throughout the MCC's housing units, dining areas, and officer stations, including the cells in 10 South. *Id*. As documented in the E&SCA's November 22, 2019 report, ventilation rates either met or exceeded the ACA flow rates in all areas of the MCC that were tested. *Id*.

**Plaintiff Response** Undisputed to the substance of this paragraph, except to the extent that it claims that this was "regular."

98. None of the MCC's routine air quality testing revealed the presence of dangerous airborne particles. *Id*. at ¶ 45.

**Plaintiff Response**, Disputed. An inspection by TESTOR (Testor Technology Environmental Services, Inc.) in December 2019 revealed that there were compounds with higher than recommended Carcinogenic Regional Screening Levels. *See* Martin Decl, Ex. V, MCC Air Quality Report, at BOP001884–85.  Disputed as to whether the quality testing was "routine."

99. All staff at the MCC breathed the same air as the inmates. *See* Bailey Dep. 92:7- 17 (10 South corrections officer stating "I never had any issues" with the air quality and "I never heard of any air concerns").

**Plaintiff Response**, Disputed that "all staff" breathed the same air as the inmates 24/7. Evidence shows that various failures in the MCC's ventilation system impacted air flow. The Building and Assessment Report from 2020 showed that the plenums of the air handling units were "unsafe and inefficient" and there were holes in the plenums that interfered with air flow. *See* Martin Decl., Ex. W, MCC Building Assessment Report, at BOP001912.  Moreover, it was not possible to regulate airflow with the MCC's HVAC configuration. *See id.* at BOP001913.  There were

multiple complaints from 10 South inmates that the ventilation in their cells was not working. *See* Martin Decl., Ex. DD, Complaint Log, at BOP000700.

100. Schulte contends that he was "forced to endure entire winter seasons in the MCC's 10 South without working heat." Am. Compl. ¶ 59. Specifically, Schulte claims that during two of the three winters that he spent in 10 South (2018-2019 and 2020-2021), the heating system did not work for long periods of time. Am. Compl. ¶ 29; Response to Interrogatory No. 65. He claims that the vents in his cell either expelled cold air or no air at all, that the heated air was insufficient and that a cup of water once froze in his cell. Response to Interrogatory No. 65; Am. Compl. ¶ 59.

**Plaintiff Response**, Undisputed.

101. He also contends that during the summer months, he was exposed to high temperatures without access to air conditioning. Am. Compl. ¶ 31.

**Plaintiff Response**, Undisputed.

102. He claims that the temperature at the MCC caused him to develop debilitating migraine headaches approximately once each week and that his extremities would go numb. Am. Compl. ¶ 32; Response to Interrogatory No. 85.

**Plaintiff Response**, Undisputed.

103. Schulte claims that the BOP "solved all the issues the second winter" (2019- 2020) when the windows in the recreation room were closed. Response to Interrogatory No. 66.

**Plaintiff Response**, Disputed to the extent that "all the issues" extends beyond "the complex heating issues" of which Mr. Schulte was testifying. *See* Martin Decl., Ex. B, Schulte Interrog. No. 66 ("Of the complex heating issue, they solved all the issues the second winter when they

28

shut off the recreation room. I do know the recreation cell windows were closed, so there was no heat escaping. I know that my cell was not freezing that winter.").

104. He claims that he took Tylenol to treat these injuries and that it made him feel better. Response to Interrogatory Nos. **88-89**.

**Plaintiff Response**, Disputed. Mr. Schulte testified that the Tylenol "helped" some of his injuries, but that the effects from the cold temperatures lasted for years. *See* Martin Decl., Ex. B, Schulte Interrog. Nos. 88(c), 90.

105. He says that the effects of his injuries resulting from the cold temperatures in 10 South lasted years but gradually dissipated once he left the MCC. Response to Interrogatory No. 90.

**Plaintiff Response**, Undisputed.

106. BOP policy requires that the temperature at BOP facilities be targeted to 76 degrees Fahrenheit in the cooling season (May to October) and 68 degrees in the heating season (October to May). Nobile Decl. ¶ 30.

**Plaintiff Response**, Undisputed that the target temperatures were 76 degrees Fahrenheit in the cooling season and 68 degrees in the heating season.  Disputed that the heating and cooling season months are set, as "[s]easonal months may vary depending on the institution's geographical location." *See* Ex. Q, BOP Facilities Operations Manual, at BO000690.

107. BOP policy further provides that:

> All spaces will be maintained as close to the targeted set point as possible. However, due to issues such as the age of the cooling and heating systems and the inability to control temperatures in individual spaces, occupants may experience a range of temperatures in their space that is a few degrees on either side of the targeted set point. *Id*. at ¶ 31.

**Plaintiff Response**, Undisputed, except to the extent that some change to this policy post-dates the Relevant Time Period.

108. The MCC was compliant with this policy the entire time that Schulte was housed in 10 South. *See id.* at ¶ 32.

**Plaintiff Response**, Disputed.  Inmates and BOP staff experienced temperatures more than a few degrees from the target temperatures. *See* Martin Decl., Ex. W, MCC Building Assessment Report, at BOP001913 ("Many reheat coils have been removed from the duct work. This causes staff and inmate complaints during the colder months."); Martin Decl., Ex. M, Dep. of Maurice Bailey ("Bailey Dep.") 68:12-20 ("It was colder [than 68, 70 degrees]"); Martin Decl., Ex. I, Matos Dep. 128:18-24 (testifying that it was colder than 68 degrees in 10 South); Martin Decl., Ex. C, Alimehmeti Interrog. No. 3 ("[I]t felt like my bones were frozen and my joints were stiff."); Martin Decl., Ex. D, Kandic Interrog. No. 2 (testifying that it was "extremely cold" during the winter months); Martin Decl., Ex. E, Interrog. of Sayfullo Habibull Saipov ("Saipov Interrog.") No. 2 (testifying that it was "very cold" during the winter months and that "there was no heating");  Martin Decl., Ex. B, Schulte Interrog. No. 69 ("It was freezing. Water in my cell would freeze over."); Martin Decl., Ex. I, Matos Dep. 113:2-3 ("I had to have my jacket in [10 South]"); Martin Decl., Ex. M, Bailey Dep. 64:2-6 ("I came in with my jacket . . . I got my gear on.").

109. The MCC's heating and cooling system was set to the proper temperature targets and almost always remained within a few degrees of the set range. *Id.*

**Plaintiff Response**, Disputed. Building inspection report from 2020 shows that it was not possible to regulate the heating and cooling systems' temperatures. *See* Martin Decl., Ex. W,

MCC Building Assessment Report BOP001913 ("It is not possible to regulate airflow or temperatures in the current HVAC configuration."). *See* Pl.'s Resps, *supra*, at ¶¶ 108.

110. The MCC's heating and cooling system was never turned off entirely during the relevant time period and was only non-operational for periods of several hours at a time when it was undergoing maintenance or being repaired. *Id.*

**Plaintiff Response**, Disputed.  There were recorded issues with the heat exchangers. *See* Martin Decl., Ex. W, MCC Building Assessment Report, at BOP001913 ("Many reheat coils have been removed from the duct work. This causes staff and inmate complaints during the colder months.").  Moreover, the valve actuators, dampers, and louvers were not connected or functioning. *See id.* ("There are no sensors to provide feedback or control actuators. It is not possible to regulate airflow or temperatures in the current HVAC configuration.").

111. On occasion, a heating motor would go out. *Id.* But any such problems were resolved quickly—either the same day or the next day. *Id.*

**Plaintiff Response**, Disputed.  When the MCC closed, it required $694,500 worth of emergency replacement of heating coils. *See* Martin Decl., Ex. EE, Decision Paper Closing MCC, at BOP003028; *see* Pl.'s Resps, *supra*, at ¶¶ 108-10.

112. In other words, the MCC never experienced any prolonged periods without heating or cooling. *Id.*

**Plaintiff Response**, Disputed. The heating coils did not function properly and led to staff and inmate complaints during the winter months. See Martin Decl., Ex. W, MCC Building Assessment Report, at BOP001913 ("Many reheat coils have been removed from the duct work. This causes staff and inmate complaints during the colder months."); *see also* Pl.'s Resps., *supra*, at ¶¶ 108-10.

113. The BOP did not have a policy requiring temperature readings to be taken inside the building. *Id*. at ¶ 33.

**Plaintiff Response**, Undisputed that Christopher Nobile testified to the substance of this paragraph.

114. However, Christopher Nobile, the Facilities Manager from May 2019 to January 2022, decided to conduct daily temperature readings throughout the building. *Id*.

**Plaintiff Response**, Undisputed that Nobile testified that he decided to conduct temperature readings.  Disputed that the temperature readings were conducted "daily throughout the building."  Most of these temperature readings taken on 10 South were taken in 2021, between January and July. *See* Martin Decl., Ex. GG, Temperature Readings.  In December 2019, there were six days when temperature readings were recorded on 10 South. *See id.* at BOP001402–43.  During winter months (December, January and February) of 2020, there were only ten days when temperature readings were taken on 10 South. *See id.* at BOP001334–38; BOP001358–94.

115. Christopher Nobile and general foremen thus began measuring the temperature throughout the building with an ambient temperature reader, which is a handheld device with a wand attached. *Id*. at ¶ 35.

**Plaintiff Response**, Disputed that Nobile and general foremen "began measuring the temperature" with "an ambient temperature reader."  Nobile testified that when he started measuring the temperature at the MCC, he used "the wrong tool . . . a little gun with an infrared."  Martin Decl., Ex. F, Nobile Dep. 164:20–165:13.  He does not know if the temperature readings from the infrared thermometers were accurate. *See id*.  These "wrong" temperature readings, unlike the ambient temperature probe that prints out the temperature, were written on a piece of paper. *Id.* at 165:14–20.  Disputed that the temperatures were taken "throughout the building."

32

The temperature measurements did not have a standardized policy. Martin Decl., Ex. F, Nobile Dep. 162:19–22.

116. They routinely took daily temperature readings in different parts of the building to get a wide understanding of the temperatures. *Id*.

**Plaintiff Response**, Undisputed that Nobile testified to the substance of this paragraph. Disputed as to "routinely."

117. For some period of time, they even took temperature readings twice a day; the evening watch lieutenant would take temperature readings in the evening. *Id*.

**Plaintiff Response**, Disputed to the extent that "evening" is past 12 am, as nearly all temperature nighttime readings occurred before then. *See* Ex. GG, Temperature readings. Moreover, the evening guards could not enter 10 South cells in the evening shift without a lieutenant and one other staff member there, and they would need to make lieutenants aware of any issues to enter the cells. *See* Martin Decl., Ex. M, Bailey Dep. 76:3-9; Ex. GG, at BOP001304–05 (noting that Mr. Schulte's cell specified a "3 man hold").

118. In or around February 2021, the Christopher Nobile learned that Schulte had complained about the lack of heat. *Id*. at ¶ 36.

**Plaintiff Response**, Undisputed that Nobile testified to the substance of this paragraph. Disputed to the extent that Defendant asserts that Mr. Schulte did not complain about the lack of heat prior to February 2021. Mr. Schulte has recorded complaints about the lack of heat in 10 South from December 2019. Martin Decl., Ex. GG, Temperature Readings BOP001586 ("No heat on 10S. There is no heat in any of the 10S cells. I complained about this last year and it was never resolved. There is heat in the attorney/visit rooms on 10S, but no heat to the cells. Please provide heat."). Facilities measured the temperatures of the cells. *Id*. ("Facilities staff took

33

temperatures of cells on 10 south."). Nobile started working at the MCC in February 2019 as facility manager and started conducting temperature readings around that time. *See* Martin Decl., Ex. F, Nobile Dep. 14:17–15:6; Nobile Dec. ¶ 4, 33.

119. Around that time, he sent BOP counsel the temperature readings that he located for 10 South from May 2020 to the then-present date, February 17, 2021. *Id.*

**Plaintiff Response**, Undisputed that Nobile testified to the substance of this paragraph.

120. He also began taking temperature readings from inside and outside Schulte's cell specifically, as well as from the air coming out of the supply vent. *See* Nobile Dec. ¶ 37.

**Plaintiff Response**, Disputed that the temperature readings began in 2021, as temperature readings were provided since 2019, see Martin Decl., Ex. GG, Temperature Readings BOP001358–378, around the time when Christopher Nobile started working at the MCC and taking temperature measurements. *See* Nobile Decl., ¶ 4, 33.

121. The temperature inside and outside of Schulte's cell was usually in the 70-degree Fahrenheit range. *Id.*

**Plaintiff Response**, Disputed. There are no temperature readings provided by Defendant to account for the temperatures in Mr. Schulte's cell overnight. *See* Martin Decl., Ex. GG, Temperature Readings. Disputed as to "usually."

122. Schulte sometimes intentionally clogged the vents in his cell with paper and other materials. *Id.* at ¶ 39.

**Plaintiff Response**, Undisputed to the extent that Mr. Schulte did try to stop cold air from coming into his frigid cell through the vents. *See* Martin Decl., Ex. F, Nobile Dep. 82:18-19.

123. Inmates and staff sometimes complained to the Facilities Department staff about the temperature in the building, as not everyone is comfortable at the same temperature and neither staff nor inmates had their own thermostatic control over the temperature. *Id*. at ¶ 34.

**Plaintiff Response**, Undisputed that inmates and staff complained about the temperature. Disputed to the extent that the complaints were only due to differences in "comfort[]" or lack of "thermostatic control." *See* Martin Decl., Ex. M, Bailey Dep. 65:15–66:2–5 (testifying that the "rec deck" and cinder block and steel in 10 South would make it feel colder "than the rest of the buildings"); Martin Decl., Ex. I, Matos Dep. 128:18-22; Martin Decl., Ex. C, Alimehmeti Interrog. No. 3 ("[I]t felt like my bones were frozen and my joints were stiff."); Martin Decl., Ex D, Kandic Interrog. No. 2 (testifying that it was "extremely cold" during the winter months); Martin Decl., Ex. E, Saipov Interrog. No. 2 (testifying that it was "very cold" during the winter months and that "there was no heating"); Martin Decl., Ex. B, Schulte Interrog. No. 69 ("It was freezing."). Disputed as to this paragraph's self-serving, dismissive conclusion that not everyone is comfortable at the same temperature. Few are comfortable in excessive temperatures.

124. Those complaints occurred even though the temperature in the facility was in the target range. *Id*.

**Plaintiff Response**, Undisputed that Nobile testified to this paragraph's substance. Disputed that the temperature in the facility was in the target range. There are no temperature readings overnight. This violates Rule 56(c)(1)(A) because the cited declaration does not support the fact asserted and is a conclusory inference or argument, not a fact.

125. Inmates in 10 South, like all other MCC inmates, had access to jumpsuits, sweatsuits, thermal long johns, and blankets. Reid Decl. ¶ 34; Bailey Dep. 63:11-18, 64:16- 65:4; Quamina Dep. 73:12-22; Response to Interrogatory Nos. 73(d), 75.

35

**Plaintiff Response**, Disputed that "all other MCC inmates" received these. *See* Martin Decl., Ex. M, Bailey Dep. 63:11-22, 65:9-13 (testifying that additional winter material was not a "unit-wide policy" but "[j]ust on 10 [South] because it was a little colder in the wintertime up there"). Moreover, 10 South inmates had to request extra clothing through a "cop-out" form. *See* Martin Decl., Ex. I, Matos Dep. 118:8-18.

126. They also had two bed sheets and two blankets, and in the winter, they were provided with a wool blanket. Reid Decl. ¶ 34; Bailey Dep. 64:16-65:4.

**Plaintiff Response**, Disputed to the extent that inmates were "provided" with extra blankets. Inmates had to submit a complaint to receive extra blankets and only received jackets after speaking to the warden. *See* Martin Decl., Ex. M, Bailey Dep. 64:16-65:8.

127. Schulte claims that there was a large fluorescent light above his bed that remained on at all hours of the day and prevented him from sleeping. Am. Compl. ¶ 33.

**Plaintiff Response**, Undisputed.

128. BOP policy with respect to lighting states that "[d]uring non-working hours, lighting is to be eliminated, except where necessary for safety and security." Nobile Decl. Ex. 3 at BOP001137.

**Plaintiff Response**, Undisputed.

129. It further states that "[u]se of lighting controls such as occupancy sensors, timers, or similar types of devices must be implemented to the maximum extent practical [but that] [i]mplemented lighting controls must not hinder safety and security." *Id*.

**Plaintiff Response**, Undisputed.

130. The main lights in the cells in 10 South were typically on from 6 a.m. to 10 p.m. Reid Decl. ¶ 21.

36

**Plaintiff Response**, Undisputed.

131. The main lights were typically off from 10 p.m. to 6 a.m. if they were not needed. *Id.*

**Plaintiff Response**, Undisputed.

132. Even when the main lights were off, a dim, smaller low-wattage bulb remained on inside one of the light panels in the cells in 10 South. *Id.* at ¶ 22; Quamina Dep. 86:19-87:9 (describing light that stays on all the time as "nightlight").

**Plaintiff Response**, Disputed to the extent that the light is characterized as "dim" and as a "nightlight." *See* Martin Decl., Ex. B, Schulte Interrog. No. 132; Martin Decl., Ex. C, Alimehmeti Interrog. No. 21; Martin Decl., Ex. D, Kandic Interrog. No. 21.

133. Leaving this dim light on in the cells in 10 South was intended to aid in maintaining inmate security and safety. Reid Decl. ¶ 23; Licon-Vitale Dep. 100:14-23; Quamina Dep. 89:21-90:7.

**Plaintiff Response**, Disputed as to "dim."

134. The dim light allowed MCC staff to see inside the inmates' cells at nighttime, even when the remaining lights were turned off. Reid Decl. ¶ 23.

**Plaintiff Response**, Disputed as to "dim."

135. Given this dim light, the MCC staff who conducted rounds during the nighttime hours could see into the cells to ensure the well-being and security of the inmates without having to turn on the main light panel or otherwise shine their flashlight into the cell. *Id.*

**Plaintiff Response**, Disputed as to "dim."  Disputed that the light would ensure the "well-being" of inmates as the light prevented inmates from sleeping regular hours. *See* Martin Decl., Ex. B, Schulte Interrog. No. 132; Martin Decl., Ex. C, Alimehmeti Interrog. No. 21; Martin Decl., Ex. D, Kandic Interrog. No. 21.  Mr. Schulte could only sleep between one to three hours a night. *See* Martin Decl., Ex. B, Schulte Interrog. No. 118.

37

136. Further, all of the cells in 10 South had video cameras that enabled staff to monitor the inmates in that unit. Reid Decl. ¶ 24; Bailey Dep. 30:2-20.

**Plaintiff Response**, Undisputed.

137. The dim light provided for video visibility of the cells in 10 South when the main lights were shut off. Reid Decl. ¶ 24.

**Plaintiff Response**, Disputed as to "dim."

138. Schulte also claims that BOP officials working the night shift would engage in continuously loud activities, i.e., play movies and watch TV, at the staff station immediately adjacent to Cell #1. Am. Compl. ¶ 34; Response to Interrogatory No. 136. He claims that when he was moved into cells closer to this staff station, he had difficulty sleeping. Am. Compl. ¶ 34.

**Plaintiff Response**, Undisputed.

139. However, Schulte concedes that once he complained about the noise, the TV was removed. Response to Interrogatory Nos. 138-139.

**Plaintiff Response**, Undisputed.

140. Schulte claims that "clearly visible brown, yellow, and black mold covered the ceilings and walls of all six cells in 10 South." Am. Compl. ¶ 38. He further claims that he "inhaled the mold in the 10 South cells." Am. Compl. ¶ 39; *see also id*. at ¶ 86.

**Plaintiff Response**, Undisputed.

141. Photographs of the 10 South unit, taken on January 24, 2017, do not show any clearly visible brown, yellow, or black mold covering any of the surfaces in Cell #6. See Reid Decl. Ex. 1 at BOP000552-556.

**Plaintiff Response**, Disputed to the extent that this assumes the photographs were taken at a distance and resolution that could capture mold.  Disputed that these photos depict the conditions

38

on any other day, beyond January 24, 2017.  Disputed that these photos depict the conditions in

other cells, beyond Cell 6.  In fact, Mr. Schulte and another 10 South inmate testified that mold

was worst in Cells 3 and 4. *See* Martin Decl., Ex. B, Schulte Interrog. No. 145(c); Martin Decl.,

Ex. C, Alimehmeti Interrog. No. 9 ("This was especially the case with cells #3 & #4 which had

plexi-glass [*sic*] and caused moisture to build behind it.").  Other 10 South inmates also testified

to the mold in 10 South cells. *See* Martin Decl. Ex. C, Alimehmeti Interrog. No. 9; Martin Decl.,

Ex. D, Kandic Interrog. No. 9 ("Mold was all over").

142. Christopher Nobile never observed anything in the MCC that he believed to be mold, and

the Facilities Department staff, who performed work all over the building, never reported to him

that they believed there was mold or fungus anywhere in the building. Nobile Decl. ¶ 48.

**Plaintiff Response**, Undisputed that Nobile submitted a post-deposition declaration that claims

this paragraph's substance.

143. Inmates in 10 South were responsible for cleaning their own cells. *See* Quamina Dep.

92:25-93:24. Upon their request, they were provided with cleaning supplies, including a dustpan,

broom, and liquid cleaning spray. *See id*. 96:16-97:6; Matos Dep. 138:15-139:14; Licon-Vitale

Dep. 135:21-136:5, 137:3-138:4.

**Plaintiff Response**, Undisputed.

144. Inmates in the 10 South unit received the same medical treatment and attention as inmates

in any other housing unit at the MCC. Declaration of Robert Beaudouin dated Feb. 18, 2026,

ECF No. 116 ("Beaudouin Decl.") ¶ 13.

**Plaintiff Response**, Disputed to the extent that medical staff required the presence of a

lieutenant and at least one other officer to the able to access an inmate in 10 South for medical

care. *See* Martin Decl., Ex. O, Dep. of Robert Beaudouin ("Beaudoin Dep.") 17:4-9; Martin Decl., Ex. N, Reid Dep. 29:2-6, 38:9-13.

145. Medical rounds were conducted daily in 10 South, typically by a physician assistant. *Id.* ¶ 14; Licon-Vitale Dep. 72:21–73:7; Quamina Dep. 51:6-11.

**Plaintiff Response**, Disputed only to the extent that this paragraph claims daily rounds occurred with each inmate without exception.

146. Part of the daily medical rounds involved asking each inmate in 10 South if he had any medical problems or complaints. Beaudouin Decl. ¶ 14.

**Plaintiff Response**, Disputed.  This paragraph violates Rule 56(c)(1)(A) because the cited declarant cannot support the fact asserted.  Dr. Beaudoin did not conduct daily rounds or review the Form 291s that the physician assistants filled out during their daily medical rounds. *See* Martin Decl., Ex. O, Beaudoin Dep. 34:5–35:3.  Inmates only saw Dr. Beaudoin when there was "need for [him] to." *Id.* at 36:2-9.  Disputed also to the extent that this paragraph claims daily rounds occurred with each inmate without exception.

147. If an inmate in 10 South made a complaint to the physician assistant or other medical staff during the medical rounds, that provider would have addressed the inmate's complaint. *Id.* ¶ 15.

**Plaintiff Response**, Disputed.  This paragraph states an inference, not statement of fact as required by Rule 56(c)(1)(A).  Dr. Beaudoin did not conduct the daily medical rounds and thus cannot assert whether the providers addressed all the inmates' complaints. Martin Decl., Ex. O, Beaudoin Dep. 33:7-15 ("[I]f there is nothing reported, then I will not be doing anything about it.").  Disputed also to the extent that the statement claims daily rounds occurred with each inmate without exception.

148. If an inmate in 10 South needed to be examined during daily medical rounds, the inmate would be removed from their cell and taken to the medical office in 10 South for a clinical encounter. *Id*. ¶ 16.

**Plaintiff Response**, Disputed.  This paragraph states an inference, not a statement of fact as required by Rule 56(c)(1)(A) because the cited declarant cannot support the fact asserted.  Dr. Beaudoin did not conduct daily rounds or make the decision about whether an inmate "needed" to be taken out of their cell and taken to the examination room. *See* Martin Decl., Ex. O, Beaudoin Dep. 38:3-7, 41:8-20.  Moreover, Dr. Beaudoin did not discuss the daily rounds with their team. *Id.* at 33:4-7.  Disputed also to the extent that this paragraph claims daily rounds occurred with each inmate without exception.

149. 10 South was the only housing unit in the MCC that had its own separate medical office. *Id*. ¶ 17; Quamina Dep. 50:22-51:5, 51:24-52:7.

**Plaintiff Response**, Disputed. This paragraph violates Rule 56(c)(1)(A) because the cited declarations do not support the fact asserted.

150. MCC medical staff generally used that medical office to examine inmates in 10 South. Beaudouin Decl. ¶ 17. However, if the medical staff needed to use special equipment that was not available in that office, such as the x-ray machine, they would conduct the examination in the main medical office of the MCC. *Id*.

**Plaintiff Response**, Undisputed.

151. Inmates in 10 South could request medical attention outside of rounds by notifying a corrections officer or other MCC staff member. *Id*. ¶ 18; Licon-Vitale Dep. 73:8-13.

41

**Plaintiff Response**, Disputed.  There was no medical staff at the MCC after 10 pm.  At that point, "if there [was] any problem . . . [Dr. Beaudoin] was on call." *See* Martin Decl., Ex. O, Beaudoin Dep. 36:20-25.

152. Dr. Robert Beaudouin was the MCC's Acting Clinical Director from 2018 through October 2021. *See* Beaudouin Decl. ¶¶ 6, 9.

**Plaintiff Response**, Undisputed.

153. Dr. Beaudoin's regular hours at the MCC were from Monday through Friday, 7:30 a.m. to 4:00 p.m. *Id*. ¶ 8. However, he was always on call outside of his regular working hours. *Id*.

**Plaintiff Response**, Disputed to the extent this paragraph implies being on call is the equivalent of being available.  Disputed as to "always."

154. As with all inmates, every clinical encounter with Schulte would have been documented in his electronic medical records. *Id*. ¶ 22.

**Plaintiff Response**, Disputed that "every clinical encounter" would have been documented.  Disputed as speculative as this paragraph makes an inference and is not a statement of fact as required by 56(c)(1)(A).  Moreover, inmates noted that medical staff did not report all cop-out complaints in medical records. *See* Martin Decl., Ex. D, Kandic Interrog. No. 10 ("I would send cop-outs to the doctor out of painful desperation, but I've noticed that [medical staff] . . . are ordered . . . to keep our medical records clear of any significant health issues that may bring about lawsuits[.]").

155. Schulte's medical records reflect that when he made complaints during rounds in 10 South, those complaints were recorded in his medical records. *Id*. ¶ 23.

**Plaintiff Response**, Disputed as speculative.  This paragraph violates Rule 56(c)(1)(A) because the cited declarations do not support the fact asserted.  The physician assistants who conducted

the daily rounds in 10 South filled out Form 291s, noting inmates' complaints. Martin Decl., Ex. O, Beaudoin Dep. 34:5-18.  These 291 forms are not available in the medical record cited.

156. Schulte's medical records reflect that he had a congenital bicuspid aortic valve and hypertension. *Id*. ¶ 24. He was provided medication for his heart condition (lisinopril) and was followed by cardiologists at outside hospitals, including Beth Israel Hospital in New York. *Id*.

**Plaintiff Response**, Undisputed that Mr. Schulte has a congenital heart defect and hypertension. Disputed as this paragraph overstates the extent of the medical care given at the MCC.  Disputed in that Mr. Schulte had not received treatment for his heart condition outside of medication. *See* Martin Decl., Ex. B, Schulte Interrog. No. 187(c)–(d).  Disputed that Mr. Schulte "was followed by cardiologists" as he saw a cardiologist at Beth Israel in New York *prior* to his dentition at MCC, not during. *See id*. No. 187(a).

157. In or around 2019, Schulte complained that he had trouble sleeping. *Id*. ¶ 25. He was prescribed anti-anxiety medication (mirtazapine, also known as Remeron) to help improve his anxiety and sleep. *Id*.

**Plaintiff Response**, Undisputed.

158. Schulte's medical records indicate that the medication he took for anxiety worked as prescribed; after he began taking anti-anxiety medication, he routinely denied experiencing sleep issues. *Id*. ¶ 27. For example, at a visit with a psychologist on December 20, 2019, Schulte reported as follows:

> He reported his appetite is normal. He stated he is eating his meals and drinking liquids. According to him, he is sleeping adequately with the Mirtazapine. He denied having any more nightmares. He denied having any memory issues now. He said his family is emotionally supportive. He said he spends his time looking at his discovery, working out,

43

working on a civil case, and going to indoor recreation. He stated he had received the self help books on anxiety and sleep and the SHU Turning Point handouts. He said they were helpful. He stated he had listened to self help CDs. He was not currently interested in any self help materials. *Id.* (quoting Ex. 3 at BOP000493).

**Plaintiff Response**, Disputed that after Mr. Schulte began taking anxiety medication, that he "routinely" denied sleep issues. In fact, medical records show that Mr. Schulte only "having normal sleeping [] habits" only once out of 66 recorded medical visits, on December 14, 2022, after leaving the MCC. *See* Martin Decl., Ex. Z, Schulte Medical Records (2020) BOP000100, BOP000040–043; Martin Decl., Ex. AA, Schulte Medical Records (2021) BOP000109–112 (medical records making no mention of sleep); Martin Decl., Ex. BB, Schulte Medical Records (2022) BOP000199 (lone medical record indicating he was sleeping normally).

159. Schulte's medical records reflect that, at certain times, he obtained his medication daily from medical staff through the "pill line." *Id.* ¶ 28. At other times, his medication was "self carry," meaning that he had the medication with him in his cell and could take it on his own. *Id.*

**Plaintiff Response**, Undisputed.

160. Dr. Beaudouin had a routine clinical encounter with Schulte on November 18, 2020. *Id.* ¶ 29 (citing Ex. 4 at BOP00040-43). During this encounter, Dr. Beaudouin took Schulte's vital signs, received his patient history, and examined him. The physical examination included an eye exam, pulmonary exam, cardiovascular exam, abdominal exam, musculoskeletal exam, and neurological exam. *Id.* In connection with the physical examination, he also observed Schulte's posture, grooming, facial expression, affect, mood, and speech. *Id.*

**Plaintiff Response**, Undisputed.

44

161. Dr. Beaudouin took notes while taking Schulte's vitals and then input other notes into the electronic medical record system immediately after the encounter. *Id.* ¶ 30.

**Plaintiff Response**, Disputed only to the extent of the completeness of the notes described in this paragraph.

162. It was Dr. Beaudouin's practice to write everything the inmate told him about their health in the clinical encounter report. *Id.* ¶ 31.

**Plaintiff Response**, Undisputed that Beaudouin claimed this to be his practice.  Disputed as to the accuracy of the claim to "write everything" and Beaudouin's implicit claim regarding the completeness of his notes.

163. During the November 18, 2020 clinical encounter, Schulte reported that he was "doing well"; he denied experiencing headaches, dizziness, chest pain, dyspnea (shortness of breath), abdominal pain, and other gastrointestinal and genitourinary symptoms. *Id.* ¶ 32.

**Plaintiff Response**, Undisputed that Mr. Schulte stated he is doing fine and denied experiencing headache, dizziness, chest pain, dyspnea, abdominal pain, other GI or GU symptoms in relation to his prior diagnosis of secondary to congenital bicuspid aortic valve during his November 18, 2020, follow-up appointment with Dr. Beaudouin. *See* Martin Decl., Ex. Z, Schulte Medical Records (2020), at BOP000040.  Disputed to the extent that this paragraph asserts that Mr. Schulte denied having symptoms unrelated to his secondary to congenital bicuspid aortic valve and COVID-19. *See id.*

164. During this clinical encounter, Dr. Beaudouin renewed Schulte's prescriptions for mirtazapine, which his psychiatrist had prescribed for anxiety, and lisinopril, his blood pressure medication. *Id.* ¶ 33.

**Plaintiff Response**, Undisputed.

165. Dr. Beaudouin counseled Schulte concerning his diagnoses, diet, hygiene, exercise, and infection prevention. *Id*. ¶ 34.

**Plaintiff Response**, Undisputed.

166. If Schulte had reported to Dr. Beaudouin during their November 18, 2020 clinical encounter that he had experienced vomiting or intestinal illness as a result of exposure to sewage on or around October 30, 2020, Dr. Beaudouin would have noted that in the clinical encounter report. *Id*. ¶¶ 35-36. However, Schulte's medical records do not contain any mention of exposure to sewage or vomiting or illness resulting therefrom. *See id*. at Ex. 4.

**Plaintiff Response**, Disputed to the extent that this paragraph states a hypothetical, not a statement of fact as required by Rule 56(c)(1)(A).  Despite Beaudouin's statement that he "would have noted" such a report, there is no confirmation that he actually did so.  Undisputed that Mr. Schulte's medical records do not make mention of his exposure to sewage or resultant illness. Disputed to the extent that defendant asserts that Mr. Schulte's medical records are a complete account of all the medical issues he experienced while at the MCC. *See* Martin Decl., Ex. D, Kandic Interrog. No. 10 ("I've noticed that [medical staff]…are ordered by prison lawyers…to keep our medical records clear of any significant health issues that may bring about lawsuits against…federal prisons like MCC.").

167. Further, if Schulte had notified medical staff during their rounds in 10 South that he had experienced vomiting and intestinal illness, they would have input that information into his medical records. Beaudouin Decl. ¶ 37. However, Schulte's medical records do not contain any mention of exposure to sewage or vomiting or illness resulting therefrom. *See id*. at Ex. 4.

**Plaintiff Response**, Disputed to the extent that this paragraph states a hypothetical, not a statement of fact as required by Rule 56(c)(1)(A).  Despite defendant's assertion that medical

staff "would have noted" Mr. Schulte's report, there is no evidence that staff actually followed official policy.  Undisputed that Mr. Schulte's medical records do not make mention of his exposure to sewage or resultant illness.  Disputed to the extent that defendant asserts that Mr. Schulte's medical records are a complete account of all the medical issues he experienced while at the MCC. *See* Martin Decl., Ex. D, Kandic Interrog. No. 10.

168. If Schulte had complained of experiencing several days of intestinal illness, MCC medical staff would have performed a physical examination of Schulte, which would generate a clinical encounter report. Beaudouin Decl. ¶ 37. However, Schulte's medical records do not contain any clinical encounter reports in the days following October 30, 2020. *See id*. at Ex. 4.

**Plaintiff Response**, Disputed to the extent that this paragraph states a hypothetical, not a statement of fact as required by Rule 56(c)(1)(A).  Despite defendant's assertion that medical staff "would have noted" Mr. Schulte's report, there is no evidence that staff actually followed official policy.  Undisputed that Mr. Schulte's medical records do not contain clinical encounter reports in the days following October 30, 2020.  Disputed to the extent that defendant asserts that Mr. Schulte's medical records are a complete account of all the medical issues he experienced while at the MCC. *See* Martin Decl., Ex. D, Kandic Interrog. No. 10.

169. Schulte's unit manager in 10 South, Norman Reid, who typically spent a few hours a day in 10 South, never observed Schulte to be in any physical pain. Reid Decl. ¶ 19.

**Plaintiff Response**, Disputed to the extent that this paragraph asserts that all physical pain is necessarily visible or that Reid was watching Schulte at all times while on duty.

170. Warden Licon-Vitale never saw Schulte in any physical pain and did not have concerns about his physical or mental condition. *See* Martin Decl., Ex. L, Licon-Vitale Dep. 76:9-16.

47

**Plaintiff Response**, Disputed to the extent that this paragraph asserts that all physical pain is necessarily visible or that Licon-Vitale's limited interactions are material in determining whether Schulte was in physical pain.

171. Schulte claims that "[a]ny use of pepper spray in the 9th floor SHU unit resulted in pepper spray particles circulating into the 10 South cells." Am. Compl. ¶ 39. He claims that he struggled to breathe on these occasions. *Id.*

**Plaintiff Response**, Undisputed.

172. When OC-spray was used in the MCC, the facilities staff would shut off the fans to prevent the spray from circulating from the location where it was sprayed into other areas and floors of the facility. Nobile Decl. ¶ 25.

**Plaintiff Response**, Undisputed that Nobile submitted a post-deposition declaration that claims this paragraph's substance. Disputed to the extent that this paragraph implies that facilities staff would shut off the fans without exception and in a timely manner. Disputed further that shutting off the fans successfully prevented the spray from circulating into other areas and floors of the facility. *See* Martin Decl., Ex. G, Dep. of Curtis Quamina ("Quamina Dep.") 106:18-25.

173. Further, the effects of OC-spray utilized in 9 South had very little, if any, impact on the air in 10 South. Quamina Dep. 106:12-107:24; Bailey Dep. 90:19-91:22; Matos Dep. 160:20-163:3, 187:17-192:11.

**Plaintiff Response**, Disputed that the effects of OC-spray had very little impact on the air in 10 South. Inmates and staff reported experiencing adverse physical reactions in 10 South from pepper spray used elsewhere within the building. *See, e.g.,* Martin Decl., Ex. G, Quamina Dep. 106:18-25 (describing how he could tell when pepper spray had been used in 9 South from 10 South because it stung his eyes and throat); Martin Decl., Ex. I, Matos Dep. 161:14-18 (stating

48

how pepper spray particles from 9 South would remain on officer's uniforms and therefore be carried to 10 South, causing him to cough and blink his eyes); Martin Decl., Ex. D, Kandic Interrog. No. 9 (describing a "blast of pepper spray" in the air on 10 South); Martin Decl., Ex. B, Schulte Interrog. No. 149(a)–(e) (inhaled pepper spray at least monthly when it was used in 9 South and felt its effects for "hours").

174. If Schulte ever felt the impacts of the OC-spray, he had constant access to a sink and shower to relieve any of his symptoms. See Reid Decl. ¶ 10(a).

**Plaintiff Response**, Disputed that Mr. Schulte's access to a sink and shower would relieve any of his symptoms from the OC-spray, which included struggling to breathe, respiratory issues, and persistent uncontrollable coughing. *See* Martin Decl., Ex. B, Schulte Interrog. No. 149(d). Undisputed that Mr. Schulte had access to a sink and shower.

175. Schulte claims that in or around March 2020, he contracted COVID-19. Am. Compl. ¶ 41. He claims that BOP officials moved the MCC general population detainees who were infected with COVID-19 to the SHU in 9 South. Am. Compl. ¶ 41; Response to Interrogatory No. 53. He claims that within days of this move, all detainees in 10 South, including him, contracted COVID-19. Am. Compl. ¶ 41.

**Plaintiff Response**, Undisputed.

176. At the beginning of the pandemic, before rapid COVID-19 testing was widely available, MCC medical staff would perform a physical evaluation of an inmate who complained of COVID-19 symptoms. Beaudouin Decl. ¶ 38. Specifically, MCC medical staff would check the inmate's temperature, vital signs, lungs, and oxygenation. *Id.* At times, MCC medical staff also performed a chest x-ray. *Id.* If the inmate was not stable, they would be sent to the hospital, and the hospital would decide whether the patient needed to be admitted. *Id.*

49

**Plaintiff Response**, Disputed, as this paragraph overstates the extent of the medical care given at the MCC during the pandemic, which was commonly known to be poor.

177. If a patient in 10 South complained of COVID-19 symptoms, medical staff would follow this protocol. *Id.* ¶ 39.

**Plaintiff Response**, Disputed. This paragraph states a hypothetical, not a statement of fact as required by Rule 56(c)(1)(A). The record contains no evidence that staff actually followed official policy. Disputed as this paragraph overstates the extent of the medical care given at the MCC, which was commonly known to be poor.

178. Once rapid COVID-19 testing became available at the MCC, medical staff used such testing to diagnose any inmate who complained of COVID-19-like symptoms. *Id.* ¶ 40.

**Plaintiff Response**, Disputed as this paragraph overstates the extent of the medical care given at the MCC, which was commonly known to be poor.

179. If an MCC inmate complained of COVID-19-like symptoms and/or was tested for COVID-19, there would be a record in their medical chart. *Id.* ¶ 41.

**Plaintiff Response**, Disputed. This paragraph states a hypothetical, not a statement of fact as required by Rule 56(c)(1)(A). Nothing in the records supports that there affirmatively *would be* records in the medical chart as to either inmate complaints or being tested; despite having protocols to do so, there is no confirmation that individuals on duty complied. Disputed further as this paragraph overstates the extent of the medical care given at the MCC, which was commonly known to be poor.

180. Schulte's medical records indicate that he never complained of COVID-19-like symptoms and was never tested for COVID-19 while at the MCC. *Id.* ¶ 42.

**Plaintiff Response**, Undisputed that there are no medical records of Mr. Schulte's COVID-19 symptom complaints or being tested. Disputed to the extent that defendant asserts that Mr. Schulte's medical records are a complete account of all the medical issues he experienced while at the MCC. *See* Martin Decl., Ex. D, Kandic Interrog. No. 10.

181. Schulte was offered the COVID-19 vaccine on May 21, 2021 by MCC medical staff. *Id.* ¶ 43. He refused the vaccine. *See id.*

**Plaintiff Response**, Undisputed.

182. Schulte alleges that while he was housed in 10 South, he was not permitted outdoor recreation and had only limited access to indoor recreation. Am. Compl. ¶ 43. He further claims that he was denied indoor recreation for three to six weeks at a time. *Id.*

**Plaintiff Response**, Undisputed.

183. He asserts that the indoor recreation room in 10 South was too small to run or walk around in and inmates used it to watch television, further limiting space for physical exercise. *Id.* at ¶ 44. He complains that the two pieces of exercise equipment in the room were made entirely of metal and were painful to use. *Id.*

**Plaintiff Response**, Undisputed.

184. Schulte claims that as a result of his inactivity while housed in 10 South, he developed hemorrhoids, which lasted for 18 months, made it painful for him to sit or sleep, and caused him to develop acute ankle pain and experience muscle atrophy and persistent throbbing in his arms and legs. *Id.* at ¶¶ 45-46. He also claims he experienced increasingly frequent and acute heart palpitations and migraines due to lack of exercise. *Id.* ¶ 46.

**Plaintiff Response**, Undisputed.

185. 10 South had a recreation room which had an exercise bike, exercise mat, elliptical machine, and a television. Reid Decl. ¶ 26.

**Plaintiff Response,** Disputed because the cited declarations do not support the fact asserted. Reid declares that there is an exercise bike, exercise mat, elliptical machine, and a television in the recreation room, but the photos used to support this declaration only show an exercise bike and an elliptical machine — there is no exercise mat or television visible. *See* Martin Decl., Ex. X, Photos of MCC, BOP000550–51.

186. The recreation room had louvers that allowed fresh air to come in. *Id.* ¶ 28.

**Plaintiff Response**, Undisputed.  The louvers were fixed so, in the dead of winter, unmitigated frigid air came in as well.  In the dead of summer, unmitigated hot air came in as well.

187.  10 South inmates were generally permitted to utilize the recreation room for one hour per day. *Id.* ¶ 29; Bailey Dep. 80:20-22; Quamina Dep. 98:4-11.  Absent exigent circumstances at the MCC, the SAMs inmates, including Schulte, were provided with one hour of recreation time each day. Reid Decl. ¶ 29; Quamina Dep. 99:4-102:20, 103:5-7; Bailey Dep. 80:23-81:9, 81:22-83:15.

**Plaintiff Response**, Disputed. Mr. Schulte and other inmates were not consistently provided with one hour per day in the recreation room. *See* Martin Decl., Ex. B, Schulte Interrog. Nos. 166 (testifying being denied access to for three to six weeks at a time), 167, 168b; Martin Decl., Ex. D, Kandic Interrog. No. 11; Martin Decl., Ex. C, Alimehmeti Interrog. No. 11.  MCC staff supports this: when there were staffing shortages, officers would not take inmates to the recreation room for three plus days at a time. *See* Martin Decl., Ex. L, Lincon-Vitale Dep. 173:18–20.  Undisputed that the BOP policy was for 10 South inmates to be permitted to utilize

the recreation room for one hour per day, but Mr. Schulte disputes that this was actually permitted.

188. As a matter of BOP policy, SAMs inmates were not provided outdoor recreation time at the MCC. Reid Decl. ¶ 30. The only outdoor recreation area at the MCC was on the roof of the building. *Id*. Given the configuration of the MCC and the typical limitations on SAMs inmates communicating with other inmates or individuals, it would not have been possible to move the SAMs inmates to the roof to provide them with outdoor recreation time. *Id*.; Licon-Vitale at 172:2-13.

**Plaintiff Response**, Undisputed**.**

189. Schulte claims that the recreation room was too small to run or walk around in. Am. Compl. ¶ 44.

**Plaintiff Response**, Undisputed.

190. The area of the recreation room was around 175 square feet. See Reid Decl. Ex. 4.

**Plaintiff Response**, Undisputed that Reid submitted a post-deposition declaration that claims this paragraph's substance.

191. Schulte claims that inmates in 10 South used the recreation room to watch television, which limited the space for physical exercise. Am. Compl. ¶ 44.

**Plaintiff Response**, Undisputed.

192. However, the inmates in 10 South were taken to the recreation room one at a time. See Matos Dep. 143:17-144:4.

**Plaintiff Response**, Undisputed.

53

Date:   New York, New York
        March 20, 2026

                                        Respectfully submitted,
                                        MICHAEL W. MARTIN
                                        IAN WEINSTEIN
                                        *Attorneys for Plaintiff*



                                By:     */s/Michael W. Martin*
On the Statement:                       MICHAEL W. MARTIN
Macie Lavender                          Lincoln Sq. Legal Srvs., Inc.
Basha Goldwater                         150 W. 62nd St., 9th Floor
Pierina Hernandez Luperdi               New York, New York 10023
Sheena Qiao                             Tel.: (212) 636-6934
*Legal Interns*                         Email: mwmartin@lsls.fordham.edu

54