UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSHUA ADAM SCHULTE

           Plaintiff,

    v.

UNITED STATES OF AMERICA,

           Defendant.

No. 21-CV-4042 (JMF)

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

MICHAEL W. MARTIN
IAN WEINSTEIN
Lincoln Sq. Legal Srvs., Inc.
150 W. 62nd St., 9th Floor
New York, NY 10023
Tel.: (212) 636-6934
Email: mwmartin@lsls.fordham.edu
*Attorneys for Plaintiff*

On the statement:
Macie Lavender
Basha Goldwater
Pierina Hernandez Luperdi
Sheena Qiao
*Legal Interns*

Plaintiff, Joshua A. Schulte, by counsel and pursuant to Local Rule 56.1(a) of the United States District Courts for the Southern and Eastern Districts of New York, respectfully submits this Statement of Undisputed Material Facts in support of his motion for summary judgment. The Plaintiff reserves the right to submit additional material undisputed facts in support of his reply brief.

## I. BACKGROUND

1. Joshua Adam Schulte ("Mr. Schulte") was incarcerated at Metropolitan Correctional Center ("MCC") on 10 South between October 2018 and October 2021. *See* Martin Decl., Ex. A, Pl.'s Am. Compl. ("AC") ¶ 13.

2. MCC closed in 2021 as a result of the deteriorating condition of the facilities, particularly the severe and frequent plumbing, electrical, heating, cooling, and ventilation issues and has remained closed since. *See id.* at ¶ 14; Martin Decl., Ex. EE, Decision Paper Closing MCC, at BOP003028–30.

## II. EXPOSURE TO SEWAGE

3. 10 South had a variety of recurring plumbing issues. *See* Martin Decl., Ex. C, Interrog. Resps. of Sajmir Alimehmeti ("Alimehmeti Interrog.") Nos. 7–8; Martin Decl., Ex. G, Dep. of Curtis Quamina ("Quamina Dep.") 121:5-20 ("[W]e constantly had breakage, pipe breakage, drainage issues…that was their biggest headache. It was the plumbing issue that the building had."); Martin Decl., Ex. T, Judith Woods Emails, at BOP0002275 (email from October 25, 2020 stating "[t]he bathroom up here on 10 South doesn't work. When you try and flush it water come out from the back of toilet"); Martin Decl., Ex. P,

1

10 South Work Order Forms, at BOP000708 ("toilet seems to be leaking substantially"), BOP000722 ("toilet seems to be leaking substantially").

4. MCC's cast iron pipes and valves were corroded, requiring frequent maintenance. *See* Martin Decl., Ex. J, Dep. of Kenneth Alvarado ("Alvarado Dep.") 33:15-22, 54:2-19.

5. 10 South's cells' sprinklers, toilets, and floor drains leaked. *See* Martin Decl., Ex. K, Dep. of Lamine N'Diaye ("N'Diaye Dep.") 60:6.

6. 10 South experienced repeated toilet clogs and overflows. *See* Martin Decl., Ex. F, Dep. of Christopher A. Nobile ("Nobile Dep.") 148:21-24; Martin Decl., Ex. M, Dep. of Maurice Bailey ("Bailey Dep.") 46:3; Martin Decl., Ex. D, Interrog. Resps. of Mirsad Kandic ("Kandic Interrog.") No. 8; Martin Decl., Ex. I, Matos Dep. 40:4-15; Martin Decl., Ex. C, Alimehmeti Interrog. Nos. 7, 8 (describing a leak in Cell 4's plumbing chaste that "filled the cell with the stench" of sewage).

7. Designated MCC staff with system access could request repairs by entering work orders into the BOP system. *See* Martin Decl., Ex. F, Nobile Dep. 108:25–109:6.

8. Work orders remained pending in the system until they were "activated" by the facility manager or general foreman. *See* Martin Decl., Ex. F, Nobile Dep. 113:17–114:11.

9. Facilities and maintenance staff did not work nights or weekends. Martin Decl., Ex. J, Alvarado Dep. 16:11-25; Martin Decl., Ex. I, Matos Dep. 83:9-16.

10. Work orders entered over the weekend would typically not be activated until the following week. *See* Martin Decl., Ex. L, Dep. of Marti Licon-Vitale ("Licon-Vitale Dep.") 87:20–88:4; Martin Decl., Ex. F, Nobile Dep. 137:17–138:5, 150:2-21; Martin Decl., Ex. J, Alvarado Dep. 69:15-24.

11. It was MCC protocol to move an inmate to another cell when notified of "inoperable issue," such as a toilet leak. *See* Martin Decl., Ex. I, Matos Dep. 101:16-25, 102:2-3; Martin Decl., Ex. F, Nobile Dep. 134:23–135:11; Martin Decl., Ex. J, Alvarado Dep. 74:18–75:2; Martin Decl., Ex. L, Licon-Vitale Dep. 93:4-17; Martin Decl., Ex. P, at BOP000725 ("once you flush the toilet, water continues to rise; the inmate was moved to another cell").

12. There was "always" a vacant cell in 10 South. ECF 115, Decl. of Norman Reid ("Reid Decl.") ¶ 15.

13. Prior to October 30, 2020, Mr. Schulte experienced two prior incidents of sewage leaking into his cell. *See* Martin Decl., Ex. B, Interrog. Resps. of Joshua Schulte ("Schulte Interrog.") Nos. 17–22, 23–28.  In both, Mr. Schulte was moved to a different cell within 30 minutes of reporting the issue. *See id.* at 21(c), 27(c).

14. Corrections officers did not have keys to the cells in 10 South or the floor's water closets to shut off water for a running toilet. *See* Martin Decl., Ex. M, Bailey Dep. 47:15–48:9, 49:3-11.

15. Only Lieutenants had keys to 10 South's cells. *See* Martin Decl., Ex. N, Dep. of Norman Reid ("Reid Dep.") 29:2-6, 38:9-13.

16. A lieutenant and two additional officers had to be present to access an inmate's cell for repairs or to move a 10 South inmate. *See* Martin Decl., Ex. N, Reid Dep. 38:9-13; Martin Decl., Ex. F, Nobile Dep. 36:2-24; Martin Decl., Ex. GG, Temperature Readings at BOP001304–05 (noting that Mr. Schulte's cell specified a "3 man hold").

17. Except for inmate details, who did not conduct repairs during the COVID-19 pandemic, Martin Decl., Ex. J, Alvarado Dep. 88:25–89:5, all repairs were handled by facilities staff. Martin Decl., Ex. I, Matos Dep. 33:2-23.

18. On Friday, October 30, 2020, Mr. Schulte was housed in Cell 304 (hereinafter "Cell 4") of 10 South. *See* Martin Decl., Ex. S, Inmate Quarters History, at BOP000035; Martin Decl., Ex. B, Schulte Interrog. Nos. 29–32.

19. At approximately 5:00 PM on October 30, 2020, Mr. Schulte noticed sewage leaking from the base of the toilet in his cell. Martin Decl., Ex. B, Schulte Interrog. Nos. 29, 30.

20. Mr. Schulte informed a corrections officer about the leaking sewage, who responded that Mr. Schulte would be moved to a different cell. *See* Martin Decl., Ex. B, Schulte Interrog. No. 29.

21. Mr. Schulte was not moved at that time. *See id.*

22. After his report, the toilet in Mr. Schulte's cell continued to leak. *See id.* Sewage accumulated on the cell floor. *See id.*

23. The liquid from Cell 4 seeped out of Mr. Schulte's cell, and a corrections officer had to mop the hallway. *See id.*

24. At approximately 8:30 PM, a lieutenant walking by Mr. Schulte's cell asked a corrections officer "what is that smell?" and held his nose. *See id.* Mr. Schulte again reported the sewage leak and asked to be moved to a different cell. *See id.*

25. Between 8:30 PM and 12:00 AM, Mr. Schulte repeatedly told the corrections officer that his cell was filling with sewage and that he had begun to feel physically sick. *See id.*

26. At approximately 12:00 AM, a lieutenant told Mr. Schulte that he could not be moved to a different cell because it was too late on a Friday night. *See id.*

4

27. At approximately 2:00 AM, Mr. Schulte began to vomit and experience diarrhea. *See id*.

28. At approximately 3:00 AM, Mr. Schulte informed a corrections officer that he had been vomiting and requested medical attention. *See id.*

29. Mr. Schulte experienced psychological distress and felt as if he was "trapped in a burning building with no escape" as MCC staff ignored his requests to be moved and for medical attention. *See id*. at No. 63(a).

30. MCC policy was to move 10 South detainees to different cells every 21 days. *See* Martin Decl., Ex. L, Licon-Vitale Dep. 56:19-25.

31. At 7:21 AM on Saturday, October 31, 2020, Mr. Schulte was moved to Cell 302. *See* Martin Decl., Ex. S, at BOP000035; Martin Decl., Ex. B, Schulte Interrog. No. 29.

32. Mr. Schulte continued to experience acute gastrointestinal illness for several days after the October 30 sewage leak. *See* Martin Decl., Ex. B, Schulte Interrog. Nos. 54–59.

33. Mr. Schulte continues to experience emotional and psychological distress from the October 30 incident. *See id.* at No. 63a.

34. It was MCC policy for physicians' assistants ("PA"s) to record inmate complaints daily. *See* Martin Decl., Ex. O, Dep. of Robert Beaudouin ("Beaudouin Dep.") 34:5-18 (testifying that PAs completed "Form 291" after daily rounds). These records were not produced by the Government during discovery. *See generally* ECF No. 118, Gov't Mem. Supp. Mot. Summ. J. ("Gov't MSJ"),

35. On Monday, November 2, 2020, a complaint was entered regarding a leak in Cell 4's toilet. *See* Martin Decl., Ex. P, at BOP000700.

36. On Tuesday, November 3, 2020, a work order was activated for a toilet leak in Cell 4. *See id.* at BOP000706.

5

37. The November 3 work order noted that the toilet in Cell 4 of 10 South was leaking "from the under side." *See id.*

38. The November 3 work order was resolved on November 23 by "reset[ing] [the] toilet with a new wax seal." *See id.*

39. A functioning wax seal prevents sewage water from leaking out of the base of the toilet. *See* Martin Decl., Ex. F, Nobile Dep. 151:21–152:14 (confirming that "waste water" leaks from a breached wax seal); Martin Decl., Ex. J, Alvarado Dep. 68:11–69:7.

## III. EXPOSURE TO EXTREME TEMPERATURES

40. BOP policy, as amended in 2023, required that "Temperature set points [be] targeted to 76 degrees Fahrenheit in the cooling seasons and 68 degrees Fahrenheit in the heating season. All Spaces [need to] be maintained as close to the targeted set point as possible." *See* Martin Decl., Ex. Q, BOP Facilities Operations Manual, at BOP000690–91.

41. If there are issues with the age of the heating and cooling systems or with controlling temperatures in individual spaces, people in the facility "may experience a range of temperatures in their space that is a few degrees on either side of the targeted set point." *See id.*

42. MCC, prior to its closure, had several outstanding projects pertaining to its failing heating and cooling systems, including emergency replacement of the reheat coils, installation of a temperature monitoring system, HVAC renovation and replacement, and replacement of the hydronic heating system. *See* Martin Decl., Ex. EE, Decision Paper Closing MCC.

43. The MCC's 2020 Buildings and Grounds Assessment ("Building Assessment") documented that reheat coils were removed from the duct work, causing staff and inmate

6

complaints during the colder months. *See* Martin Dec., Ex. W, MCC Building Assessment Report, at BOP001913; Martin Dec., Ex. F, Nobile Dep. 65:23–25, 7–11.

44. The Building Assessment states that, "There [were] no sensors to provide feedback or control actuators. It [was] not possible to regulate airflow, or temperatures in the current HVAC configuration." *See* Martin Decl., Ex. W, at BOP001913.

45. Reheat coils functioned by sensing when air travelling through the ducts were too cold and turning on to maintain a comfortable temperature. When reheat coils were removed, some areas would not get the heat that it needed until the repairs were complete. *See* Martin Decl., Ex. F, Nobile Dep. 66–67.

46. The electronic valves in the HVAC units required replacement "as they no longer function[ed]." *See* Martin Decl., Ex. W, at BOP001913.

47. The plenums of the air handling units were "unsafe and inefficient." *See id.* at BOP001912. The doors of the air handling units were reported to "not work properly and [were] nearly inaccessible for most staff." *See id.* Many of the plenums were documented as having multiple holes in them, interfering with the air flow. *See id.*

48. The insulation within the air ducts was documented as having become brittle, with pieces of the insulation breaking off into the air supply and blocking the ducts. *Id.* at BOP001913.

49. Outside air dampers were documented as being seized. As there were no sensors to provide feedback or control actuators, it was not possible to regulate airflow or temperatures in MCC's HVAC system. *See id.* at BOP001913.

50. The outside air dampers remained seized for at least approximately one year, from February 2019 to January 2020. *See* Martin Decl., Ex. F, Nobile Dep. 91–92.

7

51. MCC staff were aware that the MCC "needed to do a lot of work in the infrastructure of the building." *See* Martin Decl., Ex. F, Nobile Dep. 17:3-4.

52. During the winters of 2018–2019 and 2020–2021, there were periods of time when the conditions in 10 South cells were "freezing" cold.  *See* Ex. A, AC ¶¶ 29–30; Martin Decl., Ex. B, Schulte Interrog. No. 65, 67.

53. This exposure to cold temperatures required Mr. Schulte wear all his clothes to keep warm, as his appendages would "go numb." *See* Martin Decl., Ex. A, AC ¶¶ 29–30; Martin Decl., Ex. B, Schulte Interrog. Nos. 74, 85.

54. The recreation room was open to the outside air year-round, which allowed air from the outside into 10 South. *See* ECF No. 119, Gv't 56.1 Statement, at ¶ 95, 186; Martin Decl., Ex. B, Schulte Interrog. No. 70(a); Martin Decl., Ex. F Nobile Dep. 154: 3–19; Martin Decl., Ex. X, Photos of MCC, at BOP001655–56.

55. Cells Four, Five, and Six of 10 South were all close to the recreation room.  *See* Martin Decl., Ex. X, Photos of MCC, at BOP000522; Martin Decl., Ex. N, Reid Dep. 109–12; Martin Decl., Ex. B, Schulte Interrog. No. 28.

56. During cold weather, the Cells closest to the recreation room were colder than the cells further from the recreation room. *See* Ex. B, Schulte Interrog. No. 28.

57. Mr. Schulte frequently complained, in verbal and writing, about the cold temperatures within his cell. *See id.* at No. 31; Ex. Y, Schulte Administrative Complaints, at BOP001586; Ex. CC, Mr. Schulte Administrative Remedy Requests, at BOP000258.

58. Other inmates on 10 South testified to the unreasonably cold temperatures in their cells. Martin Decl., Ex. C, Alimehmeti Interrog. No. 3; Martin Decl., Ex. D, Kandic Interrog. No. 3; Martin Decl., Ex. E, Saipov Interrog. No. 3.

8

59. After complaints, MCC staff provided long johns and additional blankets. Martin Decl., Ex. B, Schulte Interrog. No. 32.

60. The record includes over 100 temperature readings taken by MCC between 2019 and 2021. *See* Martin Decl., Ex. GG, Temperature Readings. Some temperature readings were taken by an infrared thermometer, and others were recorded with a handheld, battery operated gun. *See* Martin Decl., Ex. F, Nobile Dep. 165:21-25, 166:24–167:17. Temperature readings taken by the infrared thermometer were written by hand, listing the location, date, time, and temperature. *See id.* at 165:14-20. Unlike the battery-operated gun, the infrared thermometer would not record the ambient temperature. *See id.* at 165:21-25, 166:24–167:17.

61. Most of these temperature readings taken on 10 South were taken in 2021, between January and July. *See* Martin Decl., Ex. GG, at BOP001291–1332, BOP001462–1585.

62. In December 2019, there were only six days when temperature readings were taken on 10 South: December 5, December 17, December 19, December 20, December 21, and December 22. *See id.* at BOP001426–43.

63. During the winter months of 2020, there were ten days when temperature readings were taken on 10 South: January 13, January 14, January 15, January 21, January 24, February 22, February 23, February 25, December 9, and December 11. *See id* at BOP001334–37, BOP001358–93.

64. During the winter months (December, January, February) of 2021, there were only five days when temperature readings were taken: January 25, February 8, February 16, February 17, and February 24. *See id.* at BOP1318–32.

9

65. The temperature readings do not have a standardized practice of measurement. *See* Martin Decl., Ex. F, Nobile Dep. 162:19-22.

66. The cold temperatures in the cells on 10 South caused Mr. Schulte to experience migraines, numbness in his extremities, and restricted his ability to move. *See* Martin Decl., Ex. A, AC, at ¶ 32; Martin Decl., Ex. B, Schulte Interrog. No. 85. During the summer months, Mr. Schulte experienced migraines about once a week. *See* Martin Decl., Ex. B, Schulte Interrog. No. 106.

67. At one point, in Mr. Schulte's cell, it was cold enough to freeze water in a cup overnight. *See id.* at No. 34.

68. Mr. Schulte was moved to another cell as a result of the water freezing overnight. *See id.* at No. 31.

69. MCC staff received multiple complaints from Mr. Schulte about the conditions in 10 South cells. *See, e.g.*, Martin Decl., Ex. GG, at BOP001339 ("We haven't had heat all winter" on Dec. 7, 2020); Martin Decl., Ex. CC, at BOP000258 ("It is freezing cold! No heat!" on Dec. 14, 2021), BOP000260 ("Only cold air blows from the vents – no heat" on Dec. 15, 2021); Martin Decl., Ex. B, Schulte Interrog. No. 102 (testifying that he reported excessive temperatures to unit mangers, officers, and the Warden).

Date:   New York, New York
        March 20, 2026

                                                    Respectfully submitted,
                                                    MICHAEL W. MARTIN
                                                    IAN WEINSTEIN
                                                    *Attorneys for Plaintiff*


                                            By:     */s/Michael W. Martin*
On the Statement:                                   MICHAEL W. MARTIN
Macie Lavender                                      Lincoln Sq. Legal Srvs., Inc.
Basha Goldwater                                     150 W. 62nd St., 9th Floor
Pierina Hernandez Luperdi                           New York, New York 10023
Sheena Qiao                                         Tel.: (212) 636-6934
*Legal Interns*                                     Email: mwmartin@lsls.fordham.edu

11